# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOUGLAS N. GAER, Individually And On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>vs.<br><br>EDUCATION MANAGEMENT CORP.,  TODD S. NELSON, EDWARD H. WEST, RANDALL J. KILLEEN, JOHN R. MCKERNAN, JR., ADRIAN M. JONES, JEFFREY T. LEEDS, LEO F. MULLIN, PAUL J. SALEM, PETER O. WILDE, GOLDMAN, SACHS & CO., J.P. MORGAN SECURITIES INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, MORGAN STANLEY & CO. INC., ROBERT W. BAIRD & CO. INC., WILLIAM BLAIR & CO., L.L.C., BMO CAPITAL MARKETS CORP., PIPER JAFFRAY & CO., BARRINGTON RESEARCH ASSOCIATES, SIGNAL HILL CAPITAL GROUP, LLC, and STIFEL, NICOLAUS & CO., INC.<br><br>               Defendants. | **CIV. NO. 2:10-cv-01061-RCM**<br><br><br><br><br><br>**FILED ELECTRONICALLY**<br><br><br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ...................................................................2

II.     OVERVIEW OF THE SEPARATE CLAIMS ...........................................7

III.    JURISIDICTION AND VENUE ...............................................................8

IV.     PARTIES ..................................................................................................8

        A.   Plaintiffs ........................................................................................8

        B.   Defendants......................................................................................9

             1.   Education Management Corporation..........................................9

             2.   Individual Defendants ................................................................9

             3.   Underwriter Defendants ...........................................................11

V.      REGULATORY BACKGROUND ..........................................................13

        A.   Eligibility and Participation in Title IV Programs ............................14

        B.   Negotiated Rulemaking.....................................................................17

VI.     LEAD PLAINTIFF'S INVESTIGATION AND CONFIDENTIAL
        SOURCES...............................................................................................19

        A.   Description of Confidential Sources ..................................................19

        B.   Post-Class Period Statements of Current EDMC
             Employee to Congress.......................................................................30

VII.    VIOLATIONS OF THE SECURITIES ACT...........................................37

        A.   EDMC's October 1, 2009 IPO ..........................................................38

        B.   The Registration Statement Contained Untrue and Misleading
             Statements and Failed to Disclose Material Information ..................40

             1.   Improper Recruiting and Enrollment Practices
                  That Materially Affected Enrollments ......................................41

2.      Pressure on Admissions Staff to Enroll Students and Improper
        Incentive-Based Compensation Practices That Resulted
        In Improper Recruiting and Enrollment Practices.....................44

3.      Academic Program Quality and Graduate Career Placement
        Were Not As Described.............................................................47

4.      Enrollment and Financial Data Disclosed in the Registration
        Statement Did Not Comply With Relevant GAAP and SEC
        Reporting Requirements...........................................................49

5.      Omissions Regarding Material Related Party Transaction
        With Goldman Sachs Capital Partners Affiliate.......................53

6.      Omissions Regarding Material Federal Regulatory Changes
        With Respect to "Gainful Employment" and Incentive
        Compensation...........................................................................58

C.  The Untrue and Misleading Registration Statement .........................60

1.      Statements Regarding EDMC's Historical Enrollment
        Growth and Marketing Practices Omitted Material
        Information About EDMC's Improper Recruiting
        and Enrollment Practices...........................................................61

2.      Additional Untrue Statements and Material Omissions
        Regarding EDMC's Academic Program Quality and
        Graduate Career Placement ......................................................69

3.      Additional Untrue Statements and Material Omissions
        Regarding EDMC's Incentive Compensation Practices ...........72

VIII.   CAUSES OF ACTION UNDER THE SECURITIES ACT......................74

IX.     VIOLATIONS OF THE EXCHANGE ACT ...........................................79

A.  The Fraudulent Scheme....................................................................80

1.      EDMC Systematically Employed Abusive and Deceptive
        Recruiting and Enrollment Practices Encouraged by
        Management and Managements' Unrealistic Enrollment
        Quotas and Improper Incentive-Based Compensation.............80

        a.      EDMC Management Set Unrealistic Enrollment
                Quotas And Constantly Monitored Enrollment
                Numbers And Admissions' Staff Quotas..........................80

    b. EDMC's Improper Incentive-Based Compensation System ................................................................................84

    c. EDMC's Systemic Abusive and Deceptive Recruiting and Enrollment Practices ....................................................87

    d. EDMC Manipulated Its Graduate Employment and Enrollment Figures ...............................................................93

  2. Misrepresentations Regarding Changes to Title IV Regulations .................................................................................94

  3. The Exchange Act Defendants Concealed a Material Related Party Transaction With an Affiliate of Goldman Sachs Capital Partners ........................................................................97

B. The Exchange Act Defendants' Material False and Misleading Statements and Omissions ................................................................100

  1. The Registration Statement ......................................................100

  2. First Quarter Fiscal Year 2010 ................................................101

  3. Second Quarter Fiscal Year 2010............................................110

  4. Third Quarter Fiscal Year 2010...............................................117

C. The Truth Begins to Emerge ............................................................125

D. The Exchange Act Defendants' Additional Violations of GAAP ...........................................................................................141

E. Post-Class Period Events .................................................................145

  1. Defendant Nelson's Admission Regarding the Significant Impact of the Proposed "Gainful Employment" Regulations .............................................................................145

  2. Statements of Current EDMC Employee Bittel to Congress ...............................................................................146

  3. Attorneys General Investigations Regarding EDMC ..............146

  4. Material Related Party Transaction .........................................147

5.      Report Regarding EDMC's Revenues From Military
        Students Resulting From Abusive and Deceptive
        Practices...................................................................................147

F.      Additional Scienter Allegations .....................................................148

        1.      The Undisclosed Material Related Party Transaction With
                an Affiliate of Goldman Sachs Capital Partners Supports
                a Strong Inference of Scienter ..................................................148

        2.      Defendants Nelson and West Were Motivated to Commit
                Fraud Because Their Compensation Was Tied to
                EDMC's Performance .............................................................150

        3.      The Magnitude and Pervasiveness of the Abusive and
                Deceptive Recruiting and Enrollment Practices and the
                Nature of the Practices Supports a Strong Inference of
                Scienter ....................................................................................151

        4.      The Exchange Act Defendants' Statements Regarding
                "Gainful Employment" Support A Strong Inference
                of Scienter................................................................................152

        5.      The Misconduct Relates to EDMC's Core Operations ...........153

G.      Loss Causation/Economic Loss........................................................153

X.      CAUSES OF ACTION UNDER THE EXCHANGE ACT ....................156

XI.     CLASS ACTION ALLEGATIONS APPLICABLE TO
        ALL CLAIMS.........................................................................................158

XII.    NO SAFE HARBOR .............................................................................161

XIII.   PRAYER FOR RELIEF ........................................................................162

Court-appointed Lead Plaintiff Oklahoma Police Pension and Retirement System

("Oklahoma Police") and Plaintiff Southeastern Pennsylvania Transportation Authority

("SEPTA") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring claims

arising under the Securities Act of 1933 (the "Securities Act"), individually and on behalf of a

class of similarly situated persons and entities, except Defendants and their affiliates, who

purchased Education Management Corp. ("EDMC" or the "Company") common stock in an

initial public offering completed on October 1, 2009 (the "IPO").  The Securities Act claims

allege strict liability and negligence causes of action.  As alleged herein, the Securities Act

claims do not sound in fraud and are not based on any knowing or reckless misconduct by

Defendants (defined below) in connection with the IPO.

Separately, Plaintiffs, by and through their undersigned counsel, bring claims arising

under the Securities Exchange Act of 1934 (the "Exchange Act"), individually and on behalf of a

class of similarly situated persons and entities, except Defendants and their affiliates, who

purchased EDMC common stock in the IPO or on the open market from October 1, 2009 through

and including August 13, 2010 (the "Class Period").  To assist the Court in distinguishing the

allegations of fraud which underlie the Exchange Act claims, those allegations are set forth

separately below, following the Securities Act claims.

Plaintiffs allege the following upon personal knowledge as to themselves and their own

acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief as

to allegations concerning matters other than themselves and their own acts is based upon an

investigation by their counsel which included, among other things: (i) review and analysis of

documents filed publicly by EDMC with the United States Securities and Exchange Commission

(the "SEC"); (ii) review and analysis of press releases, news articles, and other publicly-available

records, including those issued by government bodies including the United States Government

Accountability Office ("GAO"), United States Department of Education (the "Department of

Education" or the "Department"), and the United States Senate Committee on Health, Education,

Labor, and Pensions (the "HELP Committee") issued by or concerning EDMC and other

Defendants named herein; (iii) review and analysis of research reports issued by financial

analysts concerning EDMC's securities and business; (iv) discussions with consulting experts;

(v) discussions with confidential witnesses; and (vi) review and analysis of certain pleadings

filed in connection with other litigation naming EDMC as a defendant or nominal defendant.

Plaintiffs believe that substantial additional evidentiary support for the allegations herein exists

and will continue to be revealed after Plaintiffs have a reasonable opportunity for discovery.

## I.   <u>SUMMARY OF THE ACTION</u>

1.     This is a securities class action brought on behalf of: (1) purchasers of EDMC

common stock in the IPO for violations of the Securities Act; and (2) purchasers of EDMC

common stock during the Class Period for violations the Exchange Act.

2.     EDMC is one of the largest for-profit post-secondary education providers in

North America.  The Company offers campus-based instruction at 101 locations in 31 U.S. states

and Canada through its Art Institute, Argosy University, Brown Mackie Colleges, and South

University schools, and online instruction through the Art Institute, Argosy University, and

South University.  As of October 2010, EDMC had 158,300 enrolled students.  By comparison,

EDMC enrolls more students than the entire Pennsylvania State System of Higher Education,

and has an enrollment that is approximately twice as large as the Pennsylvania State University,

including the University Park campus and *all* of Penn State's Commonwealth campuses.  If

EDMC were a state university system, it would be among the 12 largest in the country.

3.      Prior to and throughout the Class Period, EDMC reported dramatic increases in student enrollments.  As of October 2008, EDMC had 110,800 enrolled students.  A year later, as of October 2009, EDMC reported having over 136,000 students, an increase of nearly 23%.  Between October 2009 and October 2010, EDMC saw a further increase in enrollments of 22,300, or nearly 16.4%.

4.      EDMC's primary source of revenues is tuition collected from students in connection with their enrollment in the Company's academic programs.  The overwhelming majority of these tuition payments come from students' receipt of financial assistance from federal student financial aid programs authorized by Title IV ("Title IV") of the Higher Education Act of 1965, as amended (the "HEA").  During the Class Period, EDMC derived approximately 81% to 89% of its revenues from Title IV funds.

5.      The Company's business is highly regulated at the federal, state, and institutional accrediting agency levels.  To be eligible to receive Title IV funds, each EDMC institution must comply with the standards set forth in the HEA, regulations promulgated thereunder by the Department of Education, other regulations, and the requirements of the various accrediting agencies that govern EDMC's schools.  Thus, during the Class Period, it was crucial to EDMC's ongoing and future business operations that the Company and its institutions maintain compliance with the HEA and applicable federal regulations, and maintain institutions' accreditation.  Moreover, EDMC's financial condition and stock price were critically dependent upon EDMC institutions' continued eligibility to secure revenues through Title IV federal financial aid programs.

6.      As alleged in greater detail herein, the HEA and Department of Education regulations impose requirements on institutions seeking to participate in Title IV student

financial aid programs.  These requirements include, among other things: prohibitions on various misleading or improper student recruiting practices; prohibitions on paying incentive compensation to institutions' admissions and financial aid personnel based on enrollments; a requirement that for-profit institutions, except in certain circumstances, prepare students for "gainful employment in a recognized occupation"; and that the institution maintain state authorization and accreditation by a recognized accrediting commission.  Institutions that fail to comply with these and other requirements risk losing their ability to receive Title IV funds.

7.      Prior to the Class Period, on June 1, 2006, EDMC was acquired in a $3.4 billion leveraged buyout by a consortium of private equity investors including Goldman Sachs Capital Partners, Providence Equity Partners, and Leeds Equity Partners (the "2006 Transaction") (Goldman Sachs Capital Partners, Providence Equity Partners, and Leeds Equity Partners are referred to as EDMC's "private equity shareholders" herein).  EDMC, which had been publicly traded before the 2006 Transaction, remained privately-held until the October 1, 2010 IPO. After the IPO, affiliates of the Company's private equity shareholders continued to own nearly 70% of EDMC's outstanding common stock.

8.      Throughout the Class Period, EDMC publicly touted its business and financial performance, consistently increasing revenues and enrollment numbers, the quality of and demand for its academic programs, internal controls, and the Company's compliance with – and ability to comply with – current and pending federal student financial aid regulations. Defendants herein made such representations in the materials filed in connection with the IPO, EDMC's other public filings with the SEC, the Company's press releases, and investor conference calls with analysts.  Those representations, however, were materially untrue and misleading as they did not accurately represent EDMC's past and current business and financial

position, and failed to disclose material information to the investing public.  Among Defendants'

inaccurate representations and omissions of material facts were that EDMC had been regularly

and systematically engaged in improper recruiting, enrollment, admissions and financial aid

practices prior to and throughout the Class Period that subjected the Company to risk of loss of

its ability to receive Title IV funds.  As alleged in detail herein, EDMC's undisclosed practices

included: improper recruiting and enrollment practices such as misleading prospective students

about tuition costs, academic program quality, graduation rates, graduate employment prospects

and expected graduate salaries, and aggressively targeting low-income and vulnerable

populations; using aggressive telemarketing practices in student recruiting; improperly

compensating admissions staff; engaging in improper practices in connection with students' and

prospective students' federal financial aid forms; inflating EDMC's enrollment data; and

misrepresenting the success of EDMC's graduates and the student loan repayment rates of its

graduates in connection with pending "gainful employment" regulations.  These practices also

rendered EDMC in violation of then-governing federal regulations and requirements, thus

seriously jeopardizing its access to federal student aid – the vast majority of EDMC's revenue.

Furthermore, the strong historic and continued growth reported by EDMC in connection with the

IPO and throughout the Class Period was grounded upon these improper and inherently

unsustainable practices, rendering EDMC's reported financial performance materially untrue and

misleading.

      9.     The truth about EDMC's improper recruiting and enrollment practices was

revealed to the stock market between August 3 and August 13, 2010.  As alleged herein, these

revelations first began to come to light in connection with a GAO report entitled, "For-Profit

Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Questionable

Marketing Practices" (the "GAO Report").  Next, on August 4, 2010, the Senate HELP

Committee held a hearing related to its investigation into for-profit education providers at which

it was revealed that EDMC employed systemic improper practices related to student recruiting,

enrollment, admissions, and financial aid.  As detailed in the GAO Report and in HELP

Committee hearing testimony, for-profit colleges including EDMC systemically used improper

practices in an effort to consistently increase revenues through tuition and fees paid for by

federal student aid.  The practices revealed included: misleading prospective students about

tuition costs, academic program quality, accreditation, graduation rates, and graduate

employment prospects and expected salaries, and aggressively targeting low-income and

vulnerable populations; using aggressive telephone marketing practices; engaging in improper

practices in connection with students' and prospective students' financial aid forms; and

improperly compensating admissions staff based on student enrollments.

   10.   In addition, an August 5, 2010 *BusinessWeek* article, "Goldman Schools Students

on Debt," published after markets had closed, revealed that EDMC had incurred substantial debt

to affiliates of its private equity shareholders in connection with the 2006 Transaction.  In the

article, EDMC's former CFO stated that EDMC's massive debt to the Company's private equity

shareholders "changed the culture of EDMC."  The article further describes that the burden of

EDMC's debt to its private equity shareholders caused the Company to pursue aggressive growth

strategies that undermined its programs' academic quality and led to EDMC's use of improper

recruiting and enrollment practices.  Prior to the IPO and throughout the Class Period, EDMC

had not disclosed that affiliates of its private equity shareholders had been substantial creditors of

the Company in connection with debt that financed the 2006 Transaction and remained on

EDMC's books throughout the Class Period.

11.     Finally, on August 13, 2010, after the close of the market, the Department of Education released data on federal student loan repayment rates for for-profit education providers, including EDMC, in connection with pending "gainful employment" regulations.  As to EDMC, the Department of Education's repayment data showed an overall repayment rate of 38% – well below what Defendants had suggested in their public statements during the Class Period, and well below the 45% threshold necessary to maintain full Title IV eligibility under the pending "gainful employment" regulations.  EDMC's low repayment rates confirmed that EDMC was systemically employing improper recruiting and enrollment practices throughout the Class Period.

12.     When the truth regarding EDMC was revealed, EDMC's stock price plummeted from a Class Period high of $26.40 per share to $9.71 per share on August 16, 2010, the first trading day after the close of the Class Period.

## II.    OVERVIEW OF THE SEPARATE CLAIMS

13.     In Counts I through III, Plaintiffs assert claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against EDMC, Defendants Todd S. Nelson, Edward H. West, and Randall J. Killeen, the Director Defendants (as defined below), and the Underwriter Defendants (as defined below) (collectively, the "Securities Act Defendants") who are statutorily liable for the materially untrue and misleading statements set forth in the Registration Statement.  In connection with the Securities Act claims, Plaintiffs specifically disclaim any allegations of fraud in connection with Defendants' statements or omissions relating to the IPO, which sound in strict liability and negligence. Moreover, the Securities Act claims are not based on any allegations of knowing or reckless misconduct on the part of any Defendant in connection with the IPO.

14.     In Counts IV and V, Plaintiffs assert claims for violations of Sections 10(b) and

20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and the rules and regulations

promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b5"), against

Defendants EDMC, Nelson, and West (collectively, the "Exchange Act Defendants").

## III.    JURISDICTION AND VENUE

15.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the

Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and Sections 10(b) and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations of the SEC

promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

16.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. §

78aa, and 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15

U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

EDMC is a Pennsylvania corporation with its headquarters located in Pittsburgh, Pennsylvania,

within this District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the United States mails, interstate telephone communications, and the facilities of the

national securities markets.

## IV.    PARTIES

### A.    Plaintiffs

19.     Lead Plaintiff Oklahoma Police is a public pension fund established for the

benefit of current and retired Oklahoma police officers and employees of Oklahoma's police

departments.  Oklahoma Police provides retirement benefits to thousands of members and their

beneficiaries and has over $1.5 billion in assets under management.  As set forth in the

certification submitted in support of its motion for appointment as Lead Plaintiff, Oklahoma

Police purchased EDMC common stock on the open market during the Class Period and suffered

damages as a result of the misconduct alleged herein.

20.     Plaintiff SEPTA is a regional transportation authority that operates various forms

of public transit serving Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties in

Pennsylvania.  As set forth in the attached certification, Plaintiff SEPTA purchased EDMC

common stock in the IPO and on the open market during the Class Period and suffered damages

as a result of the misconduct alleged herein.

### B.     Defendants

#### 1.     Education Management Corporation

21.     Defendant EDMC is a Pennsylvania corporation with a business headquarters

located in Pittsburgh, Pennsylvania.  EDMC is one of the largest for-profit education providers in

the United States and offers campus-based and online instruction to students through its Art

Institute, Argosy University, Brown Mackie Colleges, and South University schools.  EDMC

operates schools in 101 locations in 31 U.S. states and Canada that award undergraduate and

graduate degrees and certain specialized non-degree diplomas in a broad range of disciplines.

EDMC's common stock is listed and publicly traded on the NASDAQ exchange under the ticker

symbol "EDMC."  EDMC is also the Registrant for the IPO.

#### 2.     Individual Defendants

22.     Defendant Todd S. Nelson ("Nelson") served as the Company's Chief Executive

Officer ("CEO") and Principal Executive Director at all relevant times hereto.  The IPO was

made pursuant to a registration statement on Form S-1 (File No. 333-148259) filed with the

Securities and Exchange Commission on December 21, 2007, and as amended on August 6, 2008, October 1, 2008, February 23, 2009, April 6, 2009, August 31, 2009 and September 21, 2009 (the "Registration Statement").  Nelson signed the Registration Statement filed in connection with the IPO.

23.     Defendant Edward H. West ("West") served as the Company's President and Chief Financial Officer ("CFO") at all relevant times hereto.  West signed the Registration Statement.

24.     Defendant Randall J. Killeen ("Killeen") served as Vice President, Controller, and Chief Accounting Officer at all relevant times hereto, and signed the Registration Statement.

25.     Defendants Nelson, West, and Killeen are collectively referred to as the "Officer Defendants" herein.

26.     Defendant John R. McKernan, Jr. ("McKernan") served as Chairman of the Board of Directors of the Company at all relevant times hereto, and signed the Registration Statement.

27.     Defendant Adrian M. Jones ("Jones") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  Jones also serves as a Managing Director of Goldman, Sachs & Co., and was appointed to the EDMC board by Goldman Sachs Capital Partners.

28.     Defendant Jeffrey T. Leeds ("Leeds") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  Leeds also serves as President and Co-Founder of Leeds Capital Partners, and was appointed to the EDMC board by Leeds Capital Partners.

29.     Defendant Leo F. Mullin ("Mullin") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  Mullin serves as consultant to

Goldman Sachs Capital Partners, and was appointed to the EDMC board by Goldman Sachs Capital Partners.

30.     Defendant Paul J. Salem ("Salem") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  Salem is a Senior Managing Director and Co-Founder of Providence Equity Partners, and was appointed to the EDMC board by Providence Equity Partners.

31.     Defendant Peter O. Wilde ("Wilde") served as a director of the Company at all relevant times hereto, and signed the Registration Statement.  Wilde is a Managing Director of Providence Equity Partners and was appointed to the EDMC board by Providence Equity Partners.

32.     Defendants McKernan, Jones, Leeds, Mullin, Salem, and Wilde are collectively referred to as the "Director Defendants" herein.

33.     The Officer Defendants and the Director Defendants are collectively referred to as the "Individual Defendants" herein.

### 3.     Underwriter Defendants

34.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") maintains offices at 85 Broad Street, New York, NY 10004.  Goldman Sachs was an underwriter and joint bookrunner for the IPO and served as a co-representative of all of the underwriters pursuant to the IPO. Goldman Sachs sold 5,771,960 shares[1] of EDMC stock in the IPO.

35.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") maintains offices at 270 Park Avenue, New York, NY 10017.  JP Morgan was an underwriter joint bookrunner for the

---

[1] As set forth herein, the number of shares that each Underwriter Defendant sold in the IPO does not include any sales from over-allotments.  As specified in the Prospectus, the Underwriters had a 30-day option to purchase up to an additional 3,000,000 shares from EDMC to cover over-allotments.  The Underwriters exercised that option.

IPO and served as co-representative of all of the underwriters pursuant to the IPO.  JP Morgan sold 3,666,680 shares of EDMC stock in the IPO.

36.     Defendant Merrill Lynch, Pierce Fenner & Smith Incorporated ("Merrill Lynch") maintains offices at 1251 Avenue of the Americas, Suite 24, New York, NY 10020.  Merrill Lynch was an underwriter and joint bookrunner for the IPO.  Merrill Lynch sold 2,087,720 shares of EDMC stock in the IPO.

37.     Defendant Barclays Capital Inc. ("Barclays") maintains offices at 200 Park Avenue, New York, NY 10166.  Barclays was an underwriter and joint bookrunner for the IPO. Barclay's sold 2,087,720 shares of EDMC stock in the IPO.

38.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") maintains offices at 11 Madison Avenue, New York, NY 10010.  Credit Suisse was an underwriter and joint bookrunner for the IPO.  Credit Suisse sold 2,087,720 shares of EDMC stock in the IPO.

39.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") maintains offices at 1585 Broadway, New York, NY 10036.  Morgan Stanley was an underwriter and joint bookrunner for the IPO.  Morgan Stanley sold 2,087,720 shares of EDMC stock in the IPO.

40.     Defendant Robert W. Baird & Co. Incorporated ("Baird") maintains offices at 777 East Wisconsin Avenue, Milwaukee, WI 53202.  Baird was an underwriter and co-manager for the IPO.  Baird sold 442,100 shares of EDMC stock in the IPO.

41.     Defendant William Blair & Company, L.L.C. ("Blair") maintains offices at 222 West Adams Street, Chicago, IL 60606.  Blair was an underwriter and co-manager for the IPO.  Blair sold 442,100 shares of EDMC stock in the IPO.

42.     Defendant BMO Capital Markets Corp. ("BMO") maintains offices at 3 Times Square, New York, NY 10036.  BMO was an underwriter and co-manager for the IPO.  BMO sold 442,100 shares of EDMC stock in the IPO.

43.     Defendant Piper Jaffray & Co. ("Piper Jaffray") maintains offices at Suite 800, 800 Nicollet Mall, Minneapolis, MN 55402.  Piper Jaffray was an underwriter and co-manager for the IPO.  Piper Jaffray sold 442,100 shares of EDMC stock in the IPO.

44.     Defendant Barrington Research Associates ("Barrington") maintains offices at 161 N. Clark Street, Suite 2950, Chicago, IL 60601.  Barrington was an underwriter and co-manager for the IPO.  Barrington sold 147,360 shares of EDMC stock in the IPO.

45.     Defendant Signal Hill Capital Group, LLC ("Signal Hill") maintains offices at 300 East Lombard Street, Baltimore, MD 21202.  Signal Hill was an underwriter and co-manager for the IPO.  Signal Hill sold 147,360 shares of EDMC stock in the IPO.

46.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") maintains offices at 501 North Broadway,  One Financial Plaza, St. Louis, MO 63102.  Stifel Nicolaus was an underwriter and co-manager for the IPO.  Stifel Nicolaus sold 147,360 shares of EDMC stock in the IPO.

47.     Defendants Goldman Sachs, J.P. Morgan, Merrill Lynch, Barclays, Credit Suisse, Morgan Stanley, Baird, Blair, BMO, Piper Jaffray, Barrington, Signal Hill, and Stifel Nicolaus are collectively referred to as the "Underwriter Defendants" herein.

## V.     REGULATORY BACKGROUND

48.     EDMC purportedly offers associate's, bachelor's, master's, and doctoral degree programs and non-degree diploma programs to more than 158,300 students at 101 locations in 31 states and Canada and through its online programs, as of October, 2010.  As of September 2010, EDMC's 101 locations included 19 Argosy University locations, 25 Brown Mackie College

locations, 8 South University locations, 48 Art Institute locations, and the Western State

University College of Law.  EDMC's online education is offered through Argosy University,

South University and the Art Institutes.  The Company claims that each of its United States

institutions is accredited by an accrediting commission recognized by the Department of

Education.  During the Class Period, EDMC derived approximately 81% to 89% of its revenues

from federal student financial aid programs under Title IV.

> **A.** **Eligibility and Participation in Title IV Programs**

49.     EDMC's financial performance is crucially dependent on the revenue it receives

through federal student aid, its eligibility to participate in Title IV Programs, and its ability to

maintain accreditation at its various institutions.

50.     To participate in Title IV Programs, EDMC institutions must each comply with

the standards set forth in the HEA and the regulations promulgated thereunder by the Department

of Education.  Among other things, the HEA and the regulations promulgated thereunder

prohibit institutions from making misrepresentations, defined as "any false, erroneous or

misleading statement," "regarding the nature of its educational program, its financial charges or

the employability of its graduates" to "a student enrolled at the institution, to any prospective

student, to the family of an enrolled or prospective student, or to the Secretary."  34 C.F.R. §

668.71.  Further, institutions are required to provide and "accurately describe (i) the cost of

attending the institution, including (ii) tuition and fees, (iii) books and supplies, (iv) estimates of

typical student room and board costs or typical commuting costs, and (v) any additional cost of

the program in which the student is enrolled or expresses a specific interest" to prospective and

enrolled students.  Title IV § 485(a).

51.     In order to further discourage such misrepresentations in connection with

recruiting, admissions and financial aid, the HEA prohibits institutions from providing "any

commission, bonus, or other incentive payment based directly or indirectly on success in

securing enrollments or financial aid to any persons or entities engaged in any student recruiting

or admission activities or in making decisions regarding the award of student financial

assistance."  Title IV § 487(a).  Twelve "safe harbors" were enacted in 2002, effective July,

2003, to provide guidance as to what forms of compensation would be considered a violation of

this ban.  One such "safe harbor" provides that an institution may make up to two adjustments

(upward or downward) to a covered employee's annual salary or fixed hourly wage rate within

any 12-month period without the adjustment being considered an incentive payment, provided

that no adjustment is based solely on the number of students recruited, admitted, enrolled, or

awarded financial aid.  34 C.F.R. 668.14(b)(22).  The regulatory "safe harbors" do not eliminate

the statutory prohibition against compensating admissions, recruiting or financial aid staff solely

based on the number of students enrolled or receiving financial aid.

52.     The HEA further requires that programs at for-profit institutions, other than those

clearly designated as "liberal arts," and other vocational programs not designed to lead to a

degree, must prepare students for "gainful employment in a recognized occupation" to be eligible

for Title IV federal student aid.

53.     In addition, state authorization and accreditation by an accrediting commission

recognized by the Department of Education are also required for an institution to become and

remain eligible to participate in Title IV programs.  As such, EDMC is also subject to extensive

state regulations and requirements of accrediting agencies, including the Accrediting Council for

Independent Colleges and Schools ("ACICS"), Accrediting Commission of Career Schools and

Colleges ("ACCSC"), Commission on Colleges of the Southern Association of Colleges and

Schools, Higher Learning Commission of the North Central Association, Middle States

15

Association of Colleges & Schools of the Commission on Higher Education, Northwest

Commission on Colleges and Universities, and the Commission on Colleges of the Western

Association of Schools and Colleges.  The requirements of each of the accrediting agencies are

set forth in numerous documents and include, among other requirements, that:

- "Advertising, recruiting, and admissions information adequately and accurately represent the programs, requirements, and services available to students."

- "An institution may not delegate without supervision these [recruiting] activities to anyone whose economic incentives are to recruit prospects through means that are unethical or subject to public criticism or to admit ill-prepared applicants."

- "[r]ecruiting shall be ethical and compatible with the educational objectives of the institution.  …  The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and programs, services, tuition, terms, and operating policies."

- Schools are required "to describe themselves to prospective students fully and accurately and to follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure.  The school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments …  Each school observes ethical practices and procedures in the recruitment of its students."

- "No misrepresentations should be made in student recruitment, including … b. misrepresenting job placement and employment opportunities for graduates; c. misrepresenting program costs; d. misrepresenting abilities required to complete intended program."

54.     If the Department of Education or another regulatory agency determines that an

institution improperly disbursed Title IV program funds or violated a provision of the HEA or

the implementing regulations, that institution could be required to repay such funds to the

Department or the appropriate state agency or lender and could be assessed a substantial fine.

Violations of Title IV program requirements could also subject EDMC to other civil and criminal

penalties, including the limitation, suspension or termination of the participation of affected

institutions in Title IV programs, and, thus, threatening its receipt of federal student aid funds.

## B.    Negotiated Rulemaking

55.    On May 26, 2009, the Department of Education published a Federal Register Notice announcing its intent to establish a negotiated rulemaking committee to develop proposed regulations to maintain or improve program integrity in federal student aid programs.  The rulemaking committee was to consider issues including, "incentive compensation paid by institutions to persons or entities engaged in student recruiting or admission activities" and "gainful employment in a recognized occupation."  The notice also announced a series of three regional public hearings at which interested parties could comment on the topics suggested by the Department and suggest additional topics for consideration for action by the negotiating committees.  The notice invited parties to comment and submit topics for consideration in writing.

56.    On May 29, 2009, Robert Shireman, the Deputy Undersecretary for the Department of Education, held a conference call regarding the negotiated rulemaking and reported that the Department was considering reversing the 2002 "safe harbors" related to the incentive compensation ban and adding standards to the rules requiring that certain programs, including those at proprietary colleges, demonstrate that graduates are finding "gainful employment" in their field.

57.    On September 9, 2009, the Department of Education published a Federal Register Notice announcing the establishment of two negotiating rulemaking committees, Team I: Program Integrity Issues, and Team II: Foreign School Issues.  As to Team I: Program Integrity Issues, "gainful employment in a recognized occupation" and "incentive compensation" were listed as topics to be addressed.  The September 9, 2009 notice further stated that the Department anticipated that the negotiated rulemaking sessions would begin in late 2009, with each committee meeting for three sessions of approximately five days at roughly monthly intervals.

The final dates of the negotiated rulemaking sessions on Program Integrity were November 2-6, 2009, December 7-11, 2009, and January 25-29, 2010.

58.     During the negotiated rulemaking sessions' consideration of "gainful employment," the Department of Education focused on developing certain thresholds based on loan repayment rates and debt to income ratios of former students in a given program to demonstrate "gainful employment."  For a program to be eligible for federal student aid, it would have to meet one of those two thresholds.  By February, 2010 and throughout most of the first half of 2010, the Department was considering requiring programs to demonstrate a 90% repayment rate on Title IV loans among a program's graduates to satisfy the "gainful employment" requirement via the loan repayment rate threshold.  A loan would not be considered in repayment if it was delinquent, in default, in deferment, or in forbearance.

59.     As to incentive compensation, prior to the start of the negotiated rulemaking sessions, the Department of Education recommended and continued to recommend the elimination of the "safe harbors" related to the ban on incentive based compensation for admissions and financial aid personnel.

60.     On June 16, 2010, the Department of Education issued a Notice of Proposed Rulemaking regarding, among other things, incentive based compensation.  The proposed regulations, which were the result of the negotiated rulemaking, remove all of the "safe harbor" provisions relating to the ban on incentive based compensation for admissions and financial aid personnel.

61.     On July 23, 2010, the Department of Education issued a Notice of Proposed Rulemaking and released its proposed rules regarding the "gainful employment" requirement.  Under the proposed regulations, which also resulted from the negotiated rulemaking, programs

will be fully eligible to receive Title IV funds if at least 45% of the principal of the loans of

former students is being paid down, or if its graduates have debt to income ratios of less than

20% of discretionary income or 8% of total income.  A program will become ineligible for Title

IV funds if less than 35% of the principal of the loans of former students is being paid down, or

if its graduates have debt to income ratios above 30% of discretionary income or 12% of total

income.  Further, programs that fall between these eligibility measures will be restricted.

Restricted programs will have enrollment growth limits, be required to demonstrate employer

support for the program, and must warn prospective and current students of high debt levels.

## VI.   PLAINTIFFS' INVESTIGATION AND CONFIDENTIAL SOURCES

62.   As noted herein, Plaintiffs' allegations are based upon the investigation of Lead

Counsel, which included, among other things: review of EDMC's public filings with the SEC;

EDMC press releases; transcripts of EDMC's investor conference calls; publicly available

trading information; publicly available materials from Congressional and other federal

government sources, including those related to investigations of for-profit colleges including

EDMC; articles in the general and financial press; and investment analyst reports.

### A.   Description of Confidential Sources

63.   Plaintiffs' allegations are also based upon information provided by former

employees of EDMC with knowledge of the Company's business practices including: student

recruiting and enrollment practices; federal financial aid practices; recruiting and compensation

of Assistant Directors of Admissions ("ADAs") responsible for student recruitment and

enrollment; financial forecasting; and internal controls.  These former employees include, but are

not limited to, the following:

Confidential Witness 1 was a Senior Admissions Representative ("SAR") for
South University's online division from August 2008 through July 2010.  CW1

recalled that compensation for EDMC's admissions representatives was determined "solely based on how many students you ran across the finish line" to enrollment. CW1 stated that EDMC claimed to use a "compensation matrix" to set salary levels for admissions staff that purported to take into account qualitative factors other than the number of enrollments. In reality, however, CW1 recalled that enrollment volume (measured by a "new student point range") was the sole consideration used to determine compensation levels for admissions representatives, or ADAs. ADAs had increasing enrollment quotas based on the length of their tenure at EDMC and their prior enrollment volume. According to CW1, EDMC evaluated each ADA every six months. Following those reviews, EDMC would adjust ADAs' salaries based on whether they had met their enrollment quotas. Top performers would be required to meet increasingly higher production targets, including double-digit enrollments for the next 5 1/2 week enrollment session. CW1 recalled having received a $15,000 raise after just six months on the job due to exceeding enrollment quotas. ADAs who failed to meet their quotas saw their salaries cut. CW1, who was aware that the "safe harbor" rules precluded EDMC from paying its admissions staff based on enrollments, believed that EDMC's practice of cutting ADA salaries based on reductions in enrollments violated those rules. According to CW1: "[I]f you do not make your goals, the ADA would get a pay deduction. This is also illegal in academics. If we cannot work on commission, then we cannot have pay deductions either." CW1 also recalled that sometime before Thanksgiving 2009, EDMC held a company-wide meeting at EDMC Online Higher Education's offices to announce several changes to the Company's job expectations for ADAs. These changes affected ADAs' recruitment practices and involvement in the financial aid process. CW1 recalls that at the company-wide meeting, ADAs were brought into a conference room in groups of approximately 100 to hear about those changes, and that EDMC Online Higher Education CEO Stephen J. Weiss ("Weiss") and President John R. Kline ("Kline") attended the meetings. CW1 stated that Weiss initiated the changes and Kline implemented them. The changes, which CW1 recalled having made ADAs' jobs much more difficult, included increasing the amount and duration of required telephone contacts with prospective students to 150-200 calls with at least 3-4 hours of "talk time" per day. These new requirements, which were added onto the existing enrollment quota system, forced CW1 to work overtime. CW1 recalled that EDMC's new requirements also instructed ADAs to get more intimately involved in helping students obtain financial aid, something that was rarely done before. CW1 recalled that Weiss and Kline justified the ADAs' new role in the financial aid process by stating that it made sense given that ADAs had already built strong relationships with the students. According to CW1, the new system required ADAs to obtain copies of students' tax returns, birth dates, social security numbers, and information on students' living arrangements. CW1 also recalled hearing about numerous ADAs who engaged in inappropriate recruiting practices and misrepresentations about EDMC's online programs and financial aid. These included: misrepresentations about students' homework obligations and need to buy books or course materials; encouragement of students to cheat on required college placement exams;

promises to students that they would receive financial aid and not have to pay it back, including telling students they could default on student loans and write them off; and representations to graduate-level students that they were eligible for Pell grants, which they were not. According to CW1, these and other misrepresentations were made to students over the telephone despite the fact that EDMC's online division had a compliance division that monitored ADAs' telephone calls: "[compliance] didn't care as long as they got students in. It was all about the [compensation] matrix."

Confidential Witness 2 served as an ADA and a Director of Admissions for EDMC's online division from March 2006 through December 2009. CW2 recalled that EDMC's compensation system was structured such that an admissions representative received points for each student they enrolled. At the end of each recruiting period, "these points were tallied up and this determined your salary." CW2 recalled that the compensation system remained essentially the same throughout CW2's tenure at EDMC. According to CW2, there was a lot of pressure on admissions staff to meet enrollment numbers: "the way compensation was structured at EDMC put a lot of pressure on admissions reps to recruit as many students as they could." "We were compensated based on how many students you start." CW2 left EDMC due to the fact that the Company put too much emphasis on recruiting a large number of students, rather than recruiting quality students. CW2 understood that "there were issues with recruitment" at EDMC involving inappropriate practices. CW2 described EDMC's online division as a "churn and burn" environment where there was a high turnover among admissions staff.

Confidential Witness 3 was an ADA at EDMC from October 2006 through October 2009. CW3 described a very "cutthroat" and "competitive" environment at EDMC admissions, where the average tenure of an ADA was approximately three months. During CW3's time at EDMC, the Company instituted a telemarketer-style "dialer system" that automatically dialed prospective students for ADAs to solicit over the phone. CW3 described this as being a "big brother" system that contributed to the cutthroat atmosphere. CW3 was aware of – and not surprised by – the GAO's findings of deceptive recruiting practices at EDMC. CW3 acknowledged that EDMC "knew all the tricks" to get students enrolled. CW3 described the pressure on ADAs to enroll as many students as possible, "[i]f a student said they weren't ready to start, it was our job to talk them into it," including people who "would never be able to pay for their education." CW3 further recalled that students would use their federal student loan money for things other than tuition. "People would call in to ask, 'what's my Stafford loan money? I need to pay my rent.'" In addition, CW3 recalled that EDMC dramatically increased its tuition from 2006 through 2009, from $292 per credit in 2006 to $437 per credit in 2009. CW3 also recalls that EDMC compensated ADAs based on enrollments, with additional purported review criteria such as product knowledge and customer service being "just fluff."

21

Confidential Witness 4 was an ADA for South University's online division from August 2008 through April 2010.  When CW4 was hired, South University's Director of Online Admissions, Bret Segar ("Segar"), explained to CW4 that ADAs were not paid on commission because commissions were against the law.  According to CW4, Segar said, "I can't pay you on commission but we have something called a matrix."  Segar then explained how EDMC used the "matrix" system to get around the restriction on paying commissions.  The matrix was based on how many people ADAs started into EDMC's online programs for each recruitment period.  CW4 began at EDMC in August 2008 earning a salary of $29,000 per year, and was earning $53,500 as of April 2010.  CW4 believed that EDMC's compensation practices violated Title IV funding laws because ADA salaries were based on numbers of enrollments.  CW4 recalled having been under increasing enrollment quotas during each successive recruitment period.  CW4's quotas started at 4 students per period and were raised from 6, to 9, to 11 students per three-month period.  By the time CW4 left EDMC, CW4 had to recruit 30 new students into EDMC's online programs every three months.  If CW4 failed to meet the increasing quotas, there was a risk of a salary reduction: "I had the potential of losing 15% of my salary if I didn't meet the performance goals."  If an ADA missed his or her quota in three consecutive recruiting periods, he or she would be terminated.  According to CW4, EDMC used "heavy sales recruiting tactics" to get students to enroll in online courses.  CW4 recalled: "I was encouraged to not tell people what the cost of the school was in actuality.  I was told to say the price per credit hour and let them do the math."  CW4 further recalled: "[i]t was encouraged that by any means you can, get a student into the school. . . .  The big thing at EDMC was to get to know your clients and befriend them."  CW4 was aware of EDMC keeping statistics on student withdrawals because certain involuntary withdrawals (due to a lack of financial aid or poor grades) would negatively affect CW4's enrollment quota.  CW4 recalled that withdrawal rates of EDMC's online students was around 40%, as "[a] lot of students found out that the online environment didn't work out for them."

Confidential Witness 5 was Manager of Human Resources for EDMC's online division from May 2007 through January 2010.  CW5 recalled that in the two and a half years that CW5 was at EDMC, turnover in the online division was over 100%, and CW5 had to terminate over 1,000 employees in CW5's first year.  CW5 "had issues" with EDMC's recruiting practices due to "constantly" fielding complaints from ADAs who felt uncomfortable with enrolling certain students, and who were under pressure from Directors of Admissions who told the ADAs to get prospective students enrolled in EDMC's programs regardless.  According to CW5, "[e]mployees came to me all the time with these complaints – especially if they were going to be disciplined for not making their numbers."  CW5 believed that EDMC's enrollment quotas were "very aggressive" and recalled that the quotas were tied to ADAs' prior performance and salaries, rather than their tenure with the Company.  CW5 recalled that EDMC management at the Director of Admissions and Vice President of Admissions levels for each online school kept close tabs on each ADA's performance, and that poor performers were placed on a "performance improvement plan" intended to increase their

enrollment numbers. Every week, EDMC monitored the enrollment numbers for each ADA, and CW5 recalled attending weekly meetings with Kate Kelliher, the Admissions Director for the Art Institute and interim VP for online admissions, and other VPs for admissions at EDMC, at which ADA enrollment numbers were discussed. During those meetings, it was decided which ADAs would be disciplined or fired based on enrollments. As CW5 described these decisions, "[i]t was all about the numbers. CW5 recalled that Weiss knew about the weekly meetings and the Company's focus on enrollment numbers. CW5 described how ADAs were subject to a review every six months during which they would receive either a raise (a "performance increase") or a salary cut based on EDMC's compensation matrix. Performance increases were uncapped, although salary cuts were limited to no more than 15%. CW5 recalled that one ADA who started making between $30,000-$40,000 per year received a performance increase after six months with EDMC that raised his salary to $90,000 per year. In addition, CW5 recalled that EDMC's focus on "enrolling anybody it could" created problems for several reasons. First, CW5 recalled serving on a committee to review requests from students with special needs to see if those students could receive assistance such as special computers. During this review, CW5 reviewed students' prior transcripts and recalled finding: "[a] lot of these students barely passed high school. These people would never pass in this college environment." Regardless, those students were enrolled in EDMC programs because "a lot of the admissions reps were enrolling people just to enroll them." Second, CW5 recalled that EDMC's financial aid group was "running into problems" because ADAs "would enroll everyone and everybody." CW5 understood that when a prospective student did not get financial aid, admissions staff would complain and Directors of Admissions would "intervene" when this happened.

Confidential Witness 6 served as Associate Director of the Finance Department at South University's Tampa, Florida campus from September 2007 through April 2010. CW6 believes that South University's Tampa campus is not in compliance with federal student loan program requirements. During CW6's tenure at South University, enrollment in Tampa had swelled from 122 students in 2007 to over 1,000 in 2010. CW6 described how the Tampa office was not sufficiently staffed to handle this increased volume, stating: "I was working way too many hours. Nobody was listening. I was more qualified than my director, who didn't have any financial aid or funding experience." CW6 believed that EDMC's compliance program was insufficient, stating that EDMC "didn't really know what they were doing" in terms of compliance. CW6 also described having discovered that, in October 2009, several graduate students receiving direct loans from the Department of Education were receiving $6,000 above the typical amount of aid awarded to students in the program. CW6 brought these over-awards to McLaughlin's attention and told him, "I don't think this meets the criteria – we're over-awarding the students." McLaughlin ignored CW6's finding, and the over-awards continued through CW6's departure from the Company in April 2010. CW6 is aware from contacts with current employees at South University that the government eventually discovered these over-awards and required EDMC to return $250,000 in over-awarded grants.

Confidential Witness 7 worked as a Director of Staffing at EDMC's online division from December 2007 through May 2008.  In CW7's capacity at EDMC, CW7 was responsible for recruiting ADAs and conducted exit interviews with ADAs leaving EDMC's online division.  According to CW7, EDMC aggressively sought to expand the number of ADAs at the Company, requiring CW7 to hire from 50-60 new ADAs per week.  CW7 recalled that these hiring targets were set out in an Excel spreadsheet with "formulas that directly tied the number of ADAs with productivity and for EDMC to make its earnings numbers."  CW7 recalls having to prepare, every Monday by noon, several Excel spreadsheets called "Hire and Fire Reports," "Recruitment Matrix," and the "Weekly Staffing Report" that tracked how many ADAs were hired, fired, or quit each week, as well as the weekly recruiting goals for ADAs.  This data was used to project how many ADAs were needed to keep up the volume of student enrollments and earnings.  All of this information was uploaded to EDMC's computer system through a "Recruitment Dashboard" to which EDMC's senior-level managers had access.  CW7's reports were also sent to Weiss, EDMC Online's President, EDMC's Director of Human Resources, and the Vice Presidents of each of EDMC's online brands for discussion on conference calls that were held every Monday at noon.  CW7 recalled that there was "unusually high" turnover among ADAs, and that there was tremendous and unusual attention paid by Weiss and other managers to detail about individual ADA hiring and salary decisions.  CW7 never recalls hearing complaints from management about high ADA turnover, stating: "[t]here was zero accountability to keep these people [the ADAs].  It was all about volume."  CW7 also conducted exit interviews of ADAs and recalled hearing complaints from departing employees who felt that there was a disconnect between the job they were hired to do and what they were actually being asked to do.  CW7 recalled hearing from ADAs that, "[t]here were a lot of people who were asked to do things [that were] unethical."  CW7 described how ADAs complained of being asked to provide misinformation to students about financial aid so that the ADAs could meet their quotas.  CW7 also described ADAs having complained: "I can't do this to people.  [Students] don't know what they're getting into.  It's too expensive."  CW7 concurred, calling EDMC a "diploma mill" and stating, "[i]t was a disgrace what they charged people to get what was essentially a valueless degree."  According to CW7, despite the pressure to hire new ADAs, EDMC would not allow its recruiters to work with EDMC's career services staff to hire prospective ADAs from among the graduates of EDMC institutions.  CW7 recalled, "They were adamant that I not work with career services [at EDMC schools]."

Confidential Witness 8 was a senior financial analyst at EDMC from 2007 until approximately March 2009 whose responsibilities included preparing financial reports for EDMC's online division.  CW8 dealt with EDMC online's numbers "on a daily basis," and understood EDMC's student recruiting goals and the company's related financial targets.  CW8 believed: "[t]heir goals for recruitment were extremely over aggressive.  Their whole budget and objectives were well out of reach."  According to CW8, EDMC's plan was to double the size of the online division "practically every year" with the use of "aggressive marketing and

aggressive sales people . . . to go after as many students as you can." EDMC management kept a close eye on enrollment, and CW8 understood that management knew "hour by hour" exactly where the online division was in terms of enrollment, with enrollment figures updated manually and captured in a computer system that was "kept very current." As an example, CW8 recalled being in a meeting with senior management where at 3:00 p.m. there was an announcement that EDMC had enrolled 87 new students in a certain online program. CW8 recalled believing that EDMC's system for reporting enrollment data was not subject to internal controls that were "true and accurate." According to CW8, EDMC counted students as "enrolled" when they had been enrolled during the previous semester but had not decided to enroll in any classes in the current semester. CW8 recalled that such students may have indicated that they would "probably" enroll in the next term, but had not actually committed to do so. CW8 believed that such students should not have been counted as enrolled as they were not "technically" enrolled in the current semester.

Confidential Witness 9 was a Vice President for Marketing & Admissions Operations at EDMC's corporate headquarters from 1988 until April 2010. CW9 was responsible for managing EDMC's marketing and admissions budget, planning, and analysis. CW9 recalled that after EDMC was acquired by private equity investors including Providence Equity Partners and Goldman Sachs, however, EDMC's focus changed as the "new group managed it short term" to consider its "financial interests." Under EDMC's new management, including Defendants Nelson and West, and Senior VP of Marketing and Admissions Anthony DiGiovanni, Chief Information Officer Robert Carroll, and Senior Vice President of Student Recruitment/Enrollment Vijay Shah, achieving growth by aggressively increasing enrollments became a major goal for the Company. CW9 recalled that EDMC's new senior management, including Defendants Nelson and West, criticized EDMC's historical business practices, including that EDMC had "not grown fast enough," and was "too cautious" and "not aggressive enough." CW9 had been historically involved with the coordination of Marketing & Admissions' budgeting, forecasting, and strategy, including "coming up with [the] numbers" for plans and forecasts based on the Company's prior performance. When new management came in after the 2006 Transaction, they took this process over. According to CW9, the reports and plans prepared by new management "did not make sense" and used numbers that "appeared to be overly aggressive" based on CW9's experience of EDMC's historical budgets and performance. Much of these aggressive forecasts concerned EDMC's increasing enrollment of students in online programs through a new, "large organization" for online recruiting based in Phoenix and Pittsburgh.

Confidential Witness 10 served as Vice President of Human Resources at EDMC's online division from August 2006 through February 2009. CW10 was familiar with EDMC's policies with respect to the compensation of ADAs. According to CW10, "all pay raises for admissions reps were approved by corporate headquarters." CW10 also recalled that all of the training materials

used in new employee training programs were developed by EDMC Corporate headquarters.

Confidential Witness 11 was Vice President for Admissions at EDMC's online division from 2002 through 2007. CW11 had previously worked in admissions at the Apollo Group's University of Phoenix during the same time that Defendant Nelson served as Apollo Group's CEO, and CW11 knew Defendant Nelson from their time at Apollo Group. According to CW11, Apollo Group "really pushed the envelope" in terms of admissions compliance and ethics. With respect to admissions staff compensation for EDMC's online programs, CW11 recalled that salaries for admissions representatives were "determined based on a look at how many new students they enrolled." CW11 recalled that EDMC's compensation plan was developed by the Vice President of Enrollment, Vijay Shah, and "a council of about seven to ten high-level executives" at the EDMC Corporate level. After the compensation plan was developed, CW11 recalled that it was reviewed by EDMC's CEO and President. CW11 does not recall Defendant Nelson having made any changes to the compensation system after reviewing it. CW11 further recalls EDMC having had a "dashboard" system that showed the total number of student enrollments, retentions, and EDMC's enrollment targets.

Confidential Witness 12 worked from May 2007 until June 2008 as a Student Finance Assistant in Argosy University's Santa Ana, California, Financial Aid office. CW12 recalled that students were recruited in the following manner: "The way it works is the admission department gets people to come in. They tell them that there's tons of financial aid available. The admissions reps are driven to get as many students as possible. If they don't get them in, they get fired. The admissions reps tell [prospective students] exactly what they want to hear." CW12 recalled that EDMC's admissions staff were incentivized based on the number of students they enrolled, noting, "[s]ome enrollment people were making more than their bosses because they made their quotas. Some made six-figure salaries." In addition, according to CW12, EDMC had "no guidelines" for telling students about whether they could afford EDMC's programs or whether they would ever be able to pay back their loans.

Confidential Witness 13 was a college recruiter for EDMC's Art Institutes, serving in both the southeastern region and as a national representative from 1999 through 2004. CW13, who left EDMC for personal reasons, maintained close, personal contact with several former co-workers at EDMC. According to CW13, starting in 2006 after EDMC went through a change of management, CW13 began to hear complaints from people still employed by EDMC. These EDMC employees told CW13 that the Company was changing and that new management consisted of personnel from ITT Tech and DeVry, institutions that CW13 knew had engaged in unethical recruiting from having competed against those companies to attract students. CW13 recalled that DeVry was "desperate to get students and would say anything" to get enrollments, including telling students they could expect salaries and job positions that were not true. CW13 recalls hearing that EDMC hired several new employees from those institutions and that

26

those new employees recruited the "same way they always did." According to CW13, EDMC hired a senior recruitment executive from DeVry who led a "radical shift in recruitment policy" at EDMC that resulted in the Art Institutes having increasing enrollment that made it "no longer exclusive" as an institution. CW13 further recalled agreeing with the assessments of CW13's contacts within the Company, that "EDMC was going from caviar to McDonald's" as a result of the new emphasis on increasing enrollments.

Confidential Witness 14 served as a recruiting agent for EDMC in Colorado from 2007 through 2008. CW14 recalled that recruiters were given a script by EDMC to use when speaking with prospective students over the telephone and were also advised to tell prospective students that they would get "good paying jobs" upon graduation. According to CW14, EDMC recruiters were instructed to "make the program sound like it is more effective than it is" and "make it sound exciting." If students were interested in an EDMC program, they were advised to contact the admissions department at the particular school. CW14 recalled being harassed at least once or twice a week by supervisors for not having made enough sales, and further recalled that other recruiters were similarly pressured to sell.

Confidential Witness 15 worked as an ADA at Brown Mackie College in Arizona from December 7, 2009 through July 2010. CW15 described the aggressive, high-pressure sales tactics that were expected of ADAs. According to CW15, "we would badger [prospective students] on the phone, to get them to come in for an appointment." CW15 recalled that ADAs "were told [by their supervisors]'make [prospective students] feel the pain, make them feel the pain.'" CW15 further recalled receiving e-mails and attending a week-long training in Cincinnati on "making people feel the pain." As part of this pressure tactic, CW15 recalled using details about vulnerable prospective students' personal lives to pressure them into enrolling. For example, CW15 described a prospective student with a child and AIDS that was told, "now more than ever you need an education, for what time you have left here, get a job where they might have life insurance, get a job where you can get health insurance." In addition, ADAs were required to find five personally developed referrals ("PDRs") each week, with CW15 recalling that "each week, to keep our job, we were encouraged on our lunch hours to go to fast food places, dead end jobs [and tell people], I can get you into a career." If a student changed his or her mind about enrolling, ADAs told the student that they had to come to the office to sign paperwork. According to CW15, there was no paperwork to sign. Rather, this was a tactic to get the student in the door for additional pressure from a senior director of admissions. CW15 also recalled that EDMC provided training to ADAs to encourage them to answer prospective students' questions evasively when the "real answer" would discourage enrollment. For example, CW15 stated that if ADAs were asked if Brown Mackie's credits would transfer to another institution, "the real answer is 'no college will take our credits,'" but instead, "what we would say is, 'this course is designed for you to enter the job market,' . . . 'if you do plan on transferring, contact that school.'" Student concerns about program costs were similarly evaded, with CW15 recalling, "we were told to emphasize, 'it's all

covered' – even though it's being covered by student loans." CW15 recalled that ADAs would be reprimanded for telling students that most of the cost of tuition would be financed with loans that would have to be paid back, that student loans were not dischargeable in bankruptcy, and that defaulting on student loans could prevent someone from getting a mortgage. Similarly, with respect to questions about career prospects for graduates, CW15 described that, "[w]e would just tell them, you can go onto the web and punch it in, and see what numbers you come up with, [but they] spend $40k with us and can get an $8/hour medical assistant job, but we can't tell them that." CW15 further recalled that career placement statistics for the particular Brown Mackie College location were misleading, including that the school reported a graduate as placed when, "they could have been in that job for just one day" and also that definitions of relevant employment were stretched. "[I]f you had a business administration or management degree and you ended up as a manager of a Circle K [convenience store], they included that in the statistics saying that's management." CW15 further recalled that EDMC set aggressive sales goals for ADAs: "[y]ou signed a contract that you would hit this sales goal," adding further that, "there was a ton of pressure to hit your numbers every month." CW15 described EDMC's compensation system as, "they had a chart, and depending on how much money you wanted to make was your quota that you had to get." According to CW15, EDMC's policies regarding student recruiting practices and ADA compensation came from, "[t]he gentleman that runs EDMC, Todd Nelson [who] ran University of Phoenix." CW15 recalled that, "when [Nelson] abruptly resigned when [University of Phoenix] got sued, EDMC hired him, he brought the whole system to EDMC and all of the key personnel, and they just instituted the exact same system. . ." CW15 recalled that ADAs used "leads" that the Company purchased from "lead generating companies" that collected "leads" by posting ads saying things like, "Obama wants you to go back to school," encouraging people to click on links that forwarded them to the "lead generating companies." CW15 recalled that, "[s]ometimes [when I called a lead] they'd say 'I [thought] I was entering to win a free laptop.'" "99% [of online leads] were entering their information on, 'Obama wants you to go back to school' or something like that, [but] some of them think they're clicking on [] a job." In contacting those online "leads," ADAs would use an "interview process" script that enabled the ADA to "summarize back to them in [a] bleak picture, to make them feel the pain, to make them cry, no one has ever been turned away, as long as you want to sign on the dotted line and you can get financial aid, you are in." CW15 further stated that, as to these recruiting practices, the campus president "absolutely knew what was going on."

<u>Confidential Witness 16</u> was a Pittsburgh, Pennsylvania-based ADA for Argosy University from approximately 2007 through August 2009. CW16's recruiting was conducted exclusively over the telephone. CW16 described having worked in an office filled with "rows of people [making sales calls]" to prospective students, where EDMC "had it set up where once one call was done, the next call would kick in, [and the system] would monitor how many calls the assistant directors would take." CW16 recalled that ADAs faced increasing enrollment quotas and stated that, "[e]ach semester you had to hit a certain amount of

people." According to CW16, these enrollment quotas were directly tied to ADA compensation, recalling that, "[y]ou can make so much . . . money, 70, 80, 90k – you're paid based on people you brought in." CW16 recalled being promoted due to having met enrollment targets and that, "the promotion was not based on experience [or] skill sets, it [was based] upon numbers, and if the people in your team aren't producing, then you get demoted." EDMC's quotas created a high-pressure, high-stress environment for ADAs where, "if you didn't make your quota, then you're put on probation, third time, they'll get rid of you." This environment was created by Defendants Nelson and West, who CW16 recalled meeting with and putting direct pressure on ADAs' supervisors (directors of admissions) to increase enrollments. CW16 recalled that EDMC's CEO and CFO would meet with directors of admissions for discussions, "if the numbers aren't there." According to CW16, management's attitude was, "[i]f you can't get it done, we'll replace you." EDMC's enforcement of enrollment quotas was, "was very frightening, very intimidating." Each morning, CW16's supervisors "used to get people in a room and . . . get them excited . . . [by cheering] 'I am good'… every morning we'd have to clap, almost like we're getting a speech from a football coach, and in the middle of the afternoon, they'd call us in, and if [we weren't] doing good they'd ream us out." According to CW16, "if you're not producing numbers they just box your stuff up in front of everyone, humiliate you." "[I]f you're not trying to close the deal, they'll push you aside." CW16 also recalled receiving "sales presentation" training about how to speak with prospective students. This training focused on securing enrollments with the goal to, "convince people, sometimes have them on the phone for three hours, [we would] would wear them down to get them to apply." "The longer you keep them on the phone by talking to them and convincing them . . . the likelihood [increases] for them to start, that's when it counts for numbers." CW16 recalled that part of EDMC's sales training involved overstating the career opportunities available to graduates. CW16 said, "they wanted us to paint a visual for these people . . . they'd [have us] say '. . . ya know, after you finish this program, pause, aren't you looking for the perfect job? Don't you think, to be a counselor, wouldn't it be great? One of the great benefits for you as a student is our career service, they'll help you, they have umpteen amount of places they can refer you to." According to CW16, however, career services at EDMC were of little value, "[c]areer services was four people who basically go on monster.com and indeed.com, they have no connections." CW16 also recalled that supervisors encouraged ADAs to mislead prospective students into applying by, among other things, waiving the $50 application fee. According to CW16, ADAs would tell prospective students, "you seem like a really, really good prospective student, let me see what I can do to waive the $50 administration fee." The ADA would put the student on hold under the pretense of speaking with a supervisor. The ADA did not speak to a supervisor, but would come back to the student that the fee was waived by saying, "hey, I got great news . . . my director says you're gonna be such a good student." Supervisor approval was not required, and ADAs could waive application fees on their own. CW16 also recalls having been pressured to enroll vulnerable students that were unprepared for college level study. In one

instance, CW16 was working with a prospective student suffering from psychological problems.  CW16 understood that the student's psychiatrist cautioned that, "she was not ready to go to school."  Nonetheless, CW16 was criticized by a supervisor for not enrolling the student.  The supervisor told CW16, "you should have closed her. . . why didn't you get her into a program?"  CW16 also recalled that EDMC had previously required that incoming students take a proficiency test, but later decided to waive the test.  According to CW16, "even if the person didn't graduate from high school, they could take classes to kind of go in the back door to get them in a program if they get remedial stuff."  Finally, according to CW16, EDMC was not concerned whether students would, in fact, succeed in their studies, stating, ". . . once these students go in, they are pretty much thrown to the wind, [and] now that they have the money to go to school, EDMC profits, so forget 'em."

## B.  Post-Class Period Statements of Current EDMC Employee to Congress

64.     Plaintiffs' allegations are also based upon the written and oral post-Class Period Congressional testimony of Kathleen Bittel ("Bittel"), a current EDMC employee, and a September 15, 2010 letter that Bittel faxed to six U.S. Senators, including Senator Tom Harkin, the chairman of the HELP Committee (the "Bittel Letter").  Bittel has worked at EDMC for approximately the past three years in admissions and career services capacities.  For the past year and a half, Bittel has worked as a career services advisor at the Art Institute of Pittsburgh.  Previously, she worked in admissions as an ADA for Argosy University.

65.     Bittel testified before the Senate HELP Committee on September 30, 2010 and provided written testimony in connection with her appearance before the Committee.  Bittel's testimony and the Bittel Letter, strongly corroborate the allegations concerning EDMC's recruitment, enrollment, financial aid, and career placement practices as detailed by the Confidential Witnesses described in ¶63, *supra*, and as otherwise alleged herein.  Furthermore, the Bittel Letter states that:

> I can attest that all that was testified to in the [HELP Committee] hearings [on August 4, 2010] was not only very true, but a companywide policy and not just [something at Argosy University].  These alleged tactics were part of our daily sales meetings, and were being utilized by my most "successful" colleagues.

66.     According to Bittel's written testimony, the admissions department at Argosy University was a "high-pressure" environment where ADAs were "constantly pressured to deliver a minimum of two applications per week."  ADAs would, in turn, place pressure on prospective students to enroll.  Bittel testified that "[n]ew 'leads' were to be called three times a day for at least a week, then you could drop back to two, then one as the month progressed."  These "leads" were generated when prospective students provided information about themselves that was sold to numerous online schools without the students' knowledge.  Bittel recalled that prospective students would be called almost immediately after providing a telephone number, and that "these poor people were inundated with phone calls mere minutes after their oftentimes unwittingly submitted information."

67.     Bittel's written testimony also described how ADAs did nothing to help students beyond their enrollment and "were responsible only to keep the student enrolled and attending the classes for one week."  Nonetheless, Bittel described how she checked in on the enrollment status of the students she enrolled at Argosy University.  Bittel testified, "[o]ut of the 96 students I enrolled, only 46 continued to be taking classes when I checked on their status 16 months later.  Additionally, more than half of the students still enrolled were on Academic Probation."

68.     In her oral testimony before the HELP Committee, Bittel further testified that, "high-pressure sales tactics are being used to recruit individuals from the lower-income sector of our population as they are eligible for the most amount of [federal student] aid."

69.     Bittel's oral testimony also showed that EDMC's business focus is on recruiting and enrolling students in an "unethical funneling of tax dollars through low-income individuals to further fill the coffers of mega-rich corporations" rather than providing students with opportunities to advance themselves.  Bittel testified, "I see a systemic problem here when there

31

are only nine employees servicing the students [at EDMC's Art Institute Online, Argosy University Online, and South University Online] that are being recruited by an admissions workforce of almost 1,600." Bittel also testified that, at EDMC, "[c]areer services employees are being paid nearly a third of what the top performers in the admissions department receive."

70.     The relative lack of attention to career placement at EDMC was further detailed in Bittel's written testimony, where she stated that among the nine career services staff, "[t]his number was broken down into 5 advisors for the Art Institute Online graduates, 2 advisors for the Argosy University Online graduates, and 2 for the South University Online graduates." Bittel explained that she "was responsible for 50-60 graduates in each [Art Institute] class. We were responsible to work 3 classes simultaneously. We have only 6 months to work with each class and the pressure to find gainful employment for so many in such a short period of time was overwhelming."

71.     Bittel's written testimony provides details of her experience working in the Career Services Department at EDMC's Art Institute. Bittel had hoped that a move to career advising from admissions would be a rewarding opportunity to help graduates that were actively seeking a better life "find good jobs in a poor job market." In reality, however, Bittel testified that:

> I realized quickly it was all about hitting quotas instead of really helping students find meaningful work. I quickly came to see that career service department's primary role is to lend credibility to the brands of EDMC by allowing them to claim such large numbers of successful graduates working in their fields. But these are not realistic numbers being reported.

72.     According to Bittel's written testimony, "[e]arly in my employment with career services, a co-worker showed me how to manipulate information received from a student, to ensure that the student could be listed as 'gainfully employed' for the purposes of the company's statistics." Bittel recounted how that co-worker showed her two documents:

one was a signed Employment Verification form from the graduate stating they were working in their field earning $8,000 a year, the other a printout from salary.com estimating that the average salary in their field and in their zip code would be $25,000, which would meet the salary threshold of $10,500 to justify marking them as employed in their field.  "Which one do you think I'm going to turn in?" they laughed as they tossed the graduate's document in the trash and entered the salary.com data into the student's file.

73.      Bittel's written testimony states that falsifying student employment data in the manner done by her co-worker "[was] not discouraged by managers."  Bittel testified that she "immediately reported these actions to the supervisor I had at the time, who promised to discuss this with the head of the department.  No disciplinary action was taken."  In fact, Bittel's testimony reveals, "to the contrary, this same co-worker who changed the student's salary data received EDMC's 'North Star Award' shortly thereafter."  According to Bittel, "[t]he intent of the award is to exhibit to other employees that 'this was a star to follow.'"  Reacting to Bittel's written testimony about substituting students' reported salary information with estimated salary levels, Senator Tom Harkin, Chair of the HELP Committee, asked Bittel whether "[there] – basically was – an encouragement to do that [at EDMC]?"  Bittel responded affirmatively, stating, "[t]hat was the way I took it.  It – it wasn't written down in a memo.  They're far too smart for that."  Bittel further told the Committee that "I saw that person rewarded in many ways. . . . actions speak louder than words.  And that is how that was – the way I took it to be."

74.      Bittel's written and oral testimony both describe EDMC having an "89.5% employment quota" for career counselors.  According to Bittel's written testimony, "[w]hen I missed my quota by one tenth of one percent, the company docked $500 from my 'bonus' and I was told that I could lose my job if I failed to meet October's goal."  In response to a question from Senator Harkin about what it meant for Bittel to "make your numbers," Bittel described the requirement:

I was required to provide documentation that 85.9 percent of all the
graduates under my care were employed in field-related employment
earning more than $30,000.  And I would ask you, sir, from an online art
school in these times, in this economy and with this job market, do you
honestly believe that's achievable?  That was my quota.  That was my
requirement – 85.9 percent in field-related jobs earning $30,000 or more.

75.    Bittel's written testimony describes how, at EDMC, "we were able to essentially

eliminate graduates from the employment statistics if we could prove they had attenuating

circumstances that prevented them from seeking field related employment."  Bittel listed five

situations that created a "waiver" in which a graduate would not be counted in EDMC's

employment statistics "prior to calculating the number of those gainfully employed," including:

- Military – active duty military or the spouse of a solider
- Medical Condition – primary care-giver or suffering from a medical condition
  or disability preventing them from work
- Established Professional – someone who had worked in an unrelated field for
  at least 6 months earning a minimum of 10% more than the average starting
  salary in their degree program
- Stay at Home Parent – one not seeking employment, choosing to raise their
  children instead
- Education – one who was continuing their education and choosing not to seek
  employment at that time

76.    Bittel describes a graduate's signature on an "established professional" waiver

form as an "acknowledg[ement] that they could not leave their current employment due to the

'financial hardship' it would cause them, because a job in their degree field would pay them far

less than what they were already earning in the field they had hoped to leave by obtaining the

education."

77.    In addition to the issue of "waivers" skewing EDMC's reported placement

statistics, Bittel's written testimony details further efforts by EDMC to falsely report that certain

graduates were gainfully employed in their field of study.  According to Bittel, "I was repeatedly

pressured to call graduates working in unrelated fields and review with them the courses they

had taken while at the Art Institute to find obscure details of their current jobs where it could be considered that they were indeed 'using their skills.'"  Bittel testified that, "[i]f one could convince [graduates] that they were using these 'skills' at least 25% of the time in their current job, and to sign the employment form stating so, then their job could be counted as field related employment."  According to Bittel, this was "rife with abuse" as EDMC career counselors "were expected to convince graduates that skills they used . . . as waiters, payroll clerks, retail sales, and gas station attendants were actually related to their course of study in areas like graphic design and residential planning."

78.     Bittel further testified that EDMC also falsely presented statistics about graduates' employment rates by counting among the employed those who worked at a job "for merely one day."  According to Bittel's written testimony, "[t]here was no company policy stating that a graduate had to be currently employed in order for their job to be counted among the statistics. If they worked in their field for one day within the time period between graduation and the six month deadline, it was routinely included in the statistics as gainful employment."

79.     Bittel's written testimony also states that many of her cited examples of graduates who were not adequately employed in their fields of study came from graduates that were discussed at weekly "brainstorming meetings."  She describes these meetings as, "including all 9 advisors and 2 supervisors where we discussed one another's problem graduates.  . . .  Much brainstorming was done in order to come up with other angles that we could employ to make them fit into the employment category before the deadline."

80.     The Bittel Letter contains a substantially similar account of EDMC's recruitment, enrollment, financial aid, and career placement practices as provided in Bittel's Congressional testimony.  In addition, the Bittel Letter provides further details of these practices at EDMC.

81.     In connection with Bittel's testimony about EDMC's targeting of lower-income individuals described in ¶68, the Bittel Letter further described that while an ADA at Argosy University Online, Bittel knew of recruiting practices that preyed upon vulnerable individuals to secure their enrollment.  Bittel describes, "[o]ne of my co-workers also attempted to enroll gentlemen in homeless shelters and programs for the underprivileged.  I was encouraged to enlist a woman hiding out in a battered women's shelter to go to the library to attend her classes."

82.     The Bittel Letter also provided further details regarding the improper manipulation of employment data and counting of EDMC graduates as being gainfully employed as described in ¶¶72-78.  In addition to the practices described in her Congressional testimony, the Bittel Letter described the following improper practices at EDMC:

- Early in my tenure with the [career services] department, I was instructed on how to manufacture an e-mail from the graduate to say whatever it needed to say, to justify placement.

- A Game Art and Design Bachelor's Student (one who learns how to create video games) with 100K in student debt is working at a Toys R Us in the video game department earning $8.90 an hour.  I was told to "place" him as employed in his field because his work was with video games.  "He needs to know the knowledge he learned [at the Art Institute] to be able to help his customers decide which game to purchase."

- I had numerous Residential Planning Diploma (one quarter of an Interior Design Bachelor's degree) Graduates who were working as wait staff in small restaurants for less than minimum wage.  I was coerced into calling them to convince them that they were using their learned skills by possibly re-decorating the restaurant and/or by re-arranging tables for banquets and parties being held there.

- I had Graphic Design students working in places like Starbucks whom were expected to agree they were using their "skills learned" within their employment by making signs for daily specials and menus.

- A co-worker had a Residential Planning Graduate who was working in a gas station convenience store.  He was expected to convince her that she was "using her skills" by arranging the displays of candy bars!

36

- Unemployed Graduates who were doing some menial freelance work (most often for churches, friends, and family for free) were encouraged to set themselves up as a business and "project what they would like to earn in their first year" and to sign a document implying stable employment.

83.     The Bittel Letter also described how EDMC's admissions practices resulted in the enrollment of students incapable of performing at the college level, creating "graduates who will never find gainful employment justifying their 50-100K debt."  Bittel wrote, "[m]any of the graduates I have worked with could barely read and had difficulty writing in full sentences.  This was at the end of their programs!"  Bittel described further, "[o]ne Bachelor's student with a disability had his sister complete the courses for him!  He had no skills of his own!  He was a Graphic Design Bachelor's Graduate who did not know how to open a document in Adobe Reader!"

84.     Lastly, the Bittel Letter wrote, "Goldman Sachs and EDMC are concerned only with continuing to be able to suck Federal Financial Aid funds through as many hapless individuals as they can find."

## VII.   VIOLATIONS OF THE SECURITIES ACT

85.     Defendants are liable for violations of the Securities Act arising out of the sale of EDMC stock in the IPO pursuant to a Registration Statement (described herein) that contained untrue statements of material fact and omitted material facts required to make the statements therein not misleading.  Prior to and at the time of the IPO, EDMC engaged in improper recruiting and enrollment practices including: misleading prospective students about tuition costs, academic program quality, accreditation, graduation rates, and graduate employment prospects and expected salaries and aggressively targeting low-income and vulnerable populations; using aggressive telephone marketing practices; engaging in improper practices in connection with students' and prospective students' financial aid forms;  and unlawful

admissions staff compensation practices that were contrary to the Registration Statement's portrayals of EDMC's operational and financial positions.  Moreover, as set forth herein, the Registration Statement omitted to disclose a material related party transaction with an affiliate of one of its largest private equity shareholders.  This undisclosed related party transaction also materially contributed to the improper recruiting and enrollment practices described herein.  The Registration Statement also omitted to disclose material risks to EDMC's business operations and financial results from regulatory changes being considered in a negotiated rulemaking that the U.S. Department of Education began prior to the IPO.

86.  Allegations set forth in this section of the Complaint assert strict liability and negligence claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act.  As noted above, the Securities Act claims alleged herein are not based on any allegation that any Securities Act Defendant engaged in fraud or any other deliberate or intentional misconduct relating to the IPO, and Plaintiffs expressly disclaim any reference to or reliance upon allegations that Securities Act Defendant engaged in fraud relating to the IPO in connection with the Securities Act claims.

**A.    EDMC's October 1, 2009 IPO**

87.  On June 1, 2006, EDMC, then a publicly-traded company, was acquired by a consortium of private equity investors.  From June 2006 through the date of the IPO, EDMC's principal shareholders were private equity funds affiliated with Providence Equity Partners, Goldman Sachs Capital Partners, and Leeds Equity Partners.  In materials filed in connection with the IPO, EDMC's private equity investors were referred to collectively as the IPO's "Sponsors."

88.  On September 21, 2009, EDMC issued a press release and filed an amended Registration Statement on Form S-1/A with the SEC to announce that the Company had

commenced an IPO of 20,000,000 shares of common stock, with an estimated IPO price range of $18 to $20 per share.  The IPO was to commence "as soon as practicable" after the Registration Statement became effective.  According to the amended Registration Statement, the Underwriter Defendants, identified as the Underwriters for the IPO, had an option to purchase up to an additional 3,000,000 shares of common stock from EDMC to cover over-allotments in the IPO.

89.     In connection with the IPO, EDMC filed an amended Registration Statement on Form S-1/A with the SEC on October 1, 2009, and a Joint Proxy-Prospectus on Form 424B4 on October 2, 2009 (the "Prospectus") (collectively, these filings are the "Registration Statement"). The Prospectus provides that it is "part of" the Registration Statement.  A Notice of Effectiveness issued by the SEC made the Registration Statement effective as of October 1, 2009 at 3:00 p.m.  According to the Prospectus, after the IPO, private equity funds controlled by the Sponsors would still own, in the aggregate, approximately 70.7% of the voting interests of EDMC's outstanding capital stock, or 69.2% in the event that the Underwriters exercised their option to purchase an additional 3,000,000 shares to cover over-allotments.

90.     On October 1, 2009, EDMC completed the IPO pursuant to the Registration Statement, selling 23,000,000 shares of common stock (including 3,000,000 shares sold as Underwriter over-allotments) at $18.00 per share.  Net proceeds to the Company, after transaction costs, totaled approximately $387.3 million.

91.     EDMC's Form 10-Q dated February 12, 2010 confirmed that, after consummation of the IPO, the private equity funds controlled by the Sponsors owned approximately 69.2% of the Company's outstanding common stock.

**B.      The Registration Statement Contained Untrue and Misleading Statements and Failed to Disclose Material Information**

92.      The Registration Statement contained a series of materially untrue and misleading statements regarding EDMC's business operations and financial position and omitted to disclose material information concerning EDMC's use of improper recruiting and enrollment practices which rendered EDMC not in compliance with the governing regulations for eligibility for Title IV funds.  The Registration Statement's materially untrue and misleading statements and material omissions include EDMC's descriptions of business operations and/or financial data that are directly and/or otherwise fundamentally linked to the Company's improper recruiting and enrollment practices, including EDMC's history of enrollment growth and levels of enrollment, the compensation system for EDMC's recruiting and admissions personnel, EDMC's academic program quality and/or graduate career placement, and EDMC's reported financial results.

93.      The Registration Statement also contained a series of materially untrue and misleading statements and omitted to disclose material information concerning regulatory risks that existed prior to and at the time of the IPO that would materially affect EDMC's business operations and financial results.  Specifically, the Registration Statement omitted to disclose risks related to the fact that, prior to the IPO, the Department of Education had initiated a negotiated rulemaking process to develop new regulations that would gravely threaten EDMC's ability to participate in Title IV student financial assistance programs (that provided the overwhelming majority of EDMC's revenues) by: (1) repealing the 2002 regulations on incentive compensation "safe harbors" to the HEA ban on incentive compensation paid to admissions and financial aid personnel; and (2) defining the meaning of "gainful employment" of graduates in connection with Title IV funding eligibility.

94.     In addition, the Registration Statement omitted to disclose a material related party transaction with an affiliate of one of its largest private equity shareholders.  Specifically, the Registration Statement omitted to disclose that, at the time of the IPO, an affiliate of Goldman Sachs Capital Partners was a substantial creditor of EDMC's in connection with a "term loan facility" and a "revolving credit facility" used to finance the 2006 Transaction.  This undisclosed related party transaction also materially contributed to the improper recruiting and enrollment practices described herein.

### 1.  Improper Recruiting and Enrollment Practices

95.     In the Registration Statement, EDMC described its efforts and ability to recruit and enroll students as being among the competitive strengths of the Company's business and a crucial factor contributing to EDMC's historical growth in enrollment and revenues.  The Registration Statement also stated that EDMC had approximately 110,800 enrolled students as of October 2008, and that EDMC "experienced a compounded annual enrollment growth rate of 18.0%" from October 1998 through October 2008, including a 12.0% compounded annual enrollment growth rate at schools that EDMC had owned or operated for one year or more.  The Registration Statement failed to disclose, however, that as of the time of the IPO, EDMC was inflating its student enrollments by engaging in improper recruiting and enrollment practices.  As stated by current EDMC employee Bittel in the September 15, 2010 Bittel Letter, "I can attest that all that was testified to in the [August 4, 2010] hearings was not only very true, but a companywide policy [throughout EDMC]."

96.     According to former EDMC employees including CWs 9, 11, 13, and 15, EDMC's recruiting and admissions practices changed markedly after the Company was taken over by private equity investors in 2006.  These and other CWs describe how prior to and at the time of the IPO, EDMC's primary goal became achieving increasingly greater volumes of

student enrollments.  CW9 recalled that EDMC's new management shifted from the Company's prior "focus[] on education" to "short term" objectives based on "financial interests" tied to growth achieved through aggressively increasing enrollments.  According to CW9, planning and forecasting related to the growth targets set by EDMC's new management "did not make sense" and "appeared to be overly aggressive" based on the historical growth experience that CW9 observed at EDMC.  CW13 described a "radical shift in recruitment policy," at EDMC to increase enrollments, and CW15 attributed these changes to Defendant Nelson and the management team that he brought to EDMC.  CW16 recalled that Defendants Nelson and West would put pressure on directors of admissions to increase enrollments and would meet with them "if the numbers aren't there."  In addition, CW8 recalled that EDMC set "extremely over aggressive" goals for student recruitment that included annual doubling of EDMC's online enrollments through the use of "aggressive marketing and sales people . . . to go after as many students as you can."

97.    As also described herein, numerous former EDMC employees from different geographic regions and business units, including CWs 1, 2, 3, 4, 6, 7, 12, 13, 14, 15, and 16 provided consistent accounts of how EDMC routinely used high-pressure tactics to compel prospective students to enroll in EDMC's programs prior to and at the time of the IPO.  CW15 recalled that ADAs were instructed to put pressure on prospective students and exploit their vulnerabilities, "[w]e were told [by supervisors] to 'make [prospective students] feel the pain, make them feel the pain.'"  CWs 1, 4, 6, 7, 12, 14, 15, and 16 recalled how EDMC regularly made misrepresentations to students about such matters as the academic obligations of EDMC's programs, financial aid repayment obligations, availability of federal grants and qualification for federal student assistance, the full cost of EDMC's programs, and the availability of well-

compensated employment opportunities after graduation.  CW4 recalled EDMC using "heavy

sales recruiting tactics" to get students to enroll in online courses, and stated that, for example, "I

was encouraged to <u>not</u> tell people what the cost of the school was in actuality."  CW16 recalled

that EDMC provided training to ADAs to, "convince people, sometimes have them on the phone

for three hours, [we would] would wear them down to get them to apply."  Similarly, CW15

described how EDMC trained ADAs to encourage them to answer prospective students'

questions evasively when the "real answer" would discourage enrollment.  CW15 further

recalled that ADAs would be reprimanded for telling prospective students that the majority of

tuition costs would need to be paid using loans rather than grants, that federal student loans were

not dischargeable in bankruptcy, or that defaulting on student loans could prevent the student

from obtaining a mortgage.  Furthermore, current EDMC employee Bittel described how

EDMC's admissions staff would use high-pressure tactics to get prospective students to enroll,

including by making repeated telephone calls to prospective students in the same improper way

described in connection with the GAO Report.

98.     CWs 3, 5, 16 and Bittel described how EDMC would target its high-pressure sales

and recruiting tactics on economically or otherwise disadvantaged individuals who ADAs would

lure with, among other things, promises about the availability of federal student assistance.  CW3

recalled, "it was [ADAs'] job to talk [students] into [enrolling,]" including "[people who] would

never be able to pay for their education."  Bittel testified that, "high-pressure sales tactics are

being used to recruit individuals from the lower-income sector of our population as they are

eligible for the most amount of [federal student] aid."  The Bittel Letter further stated that, "[o]ne

of my co-workers also attempted to enroll gentlemen in homeless shelters and programs for the

underprivileged.  I was encouraged to enlist a woman hiding out in a battered women's shelter to

go to the library and attend her classes."  The Bittel Letter also described working with graduates who "could barely read and had difficulty writing in full sentences" that would never find gainful employment to justify their massive student debt.  Similarly, CW5 recalled EDMC focusing on "enrolling everybody it could," including students with special needs that "barely passed high school . . . [and] would never pass in this college environment."  CW16 recalled having been pressured by a supervisor to enroll a prospective student who was "not ready to go to school" according to her psychiatrist, with the supervisor telling CW16, "you should have closed her. . . why didn't you get her into a program?"

99.     Information about EDMC's improper recruiting and enrollment practices was material information to an investor in deciding whether to purchase EDMC common stock at $18.00 per share in the IPO.  The Registration Statement, however, did not disclose this information.  As noted in the GAO Report, institutions engaging in improper recruiting and enrollment practices of the types described herein face substantial fines and possible suspension or termination of their eligibility to receive funds under Title IV student assistance programs.  EDMC's eligibility to participate in essential Title IV programs was thus at risk prior to and at the time of the IPO, a fact that was not disclosed to investors.

### 2. Pressure on Admissions Staff to Enroll Students and Improper Incentive-Based Compensation Practices That Resulted in Improper Recruiting and Enrollment Practices

100.     EDMC also failed to disclose the Company's policies and practices that placed extreme pressure on admissions staff to enroll increasingly larger numbers of students, including the Company's pervasive use of incentive-based compensation for ADAs.  Such practices were directly linked to EDMC's enrollment levels due to their connection to EDMC's undisclosed improper recruiting and enrollment practices.  CW7 recalled that EDMC asked ADAs to provide misinformation to students about financial aid so that they could meet their enrollment quotas.

101.    Numerous former EDMC employees from different geographic regions and business units, including CWs 1, 2, 3, 4, 5, 7, 12, 14, 15 and 16, recalled that recruiting staff were under extreme pressure to meet enrollment quotas at EDMC.  CWs 1 and 4 recalled that each ADA faced escalating enrollment quotas based on the length of the ADA's tenure at EDMC and his or her prior enrollment volume.  CW5 similarly recalled that enrollment quotas were "very aggressive" and tied to the ADA's prior enrollment performance.  CW15 also described enrollment quotas and stated that, "there was a ton of pressure to hit your numbers every month."  CW16 recalled that ADAs faced increasing enrollment quotas and that Defendants Nelson and West pressured ADAs' supervisors to increase enrollments, resulting in an environment that, "was very frightening, very intimidating" for ADAs.  According to CW16, management's attitude was, "[i]f you can't get it done, we'll replace you."  Bittel also testified that ADAs at Argosy University were "constantly pressured to deliver a minimum of two applications per week."

102.    As further described herein, CWs 1, 2, 3, 4, 5, 7, 11, 12, 14, 15 and 16 recalled that EDMC set ADA compensation levels based on the number of students that the ADA enrolled.  CWs 1, 4, and 5 recalled that EDMC used a "matrix" compensation system in which ADA compensation was tied to the ADA's enrollments.  According to CW1, every six months, ADAs were reviewed and had their salaries re-adjusted based on whether they had met their enrollment quotas.  CW2 recalled EDMC's points-based system and that at the end of each recruiting period, "these points were tallied up and this determined your salary."  CW2 further recalled that, "the way compensation was structured at EDMC put a lot of pressure on admissions reps to recruit as many students as they could," and that "[w]e were compensated based on how many students you start."  CW3 recalled ADA compensation was based on

enrollments and that any additional review criteria that EDMC purported to use in evaluating ADAs were largely irrelevant, with CW3 calling any other factors "just fluff." CW4 recalled being told that EDMC's compensation "matrix" was used to get around Title IV restrictions on paying ADAs "commissions." CW12 recalled that EDMC's enrollment-based compensation could be substantial, noting that, "[s]ome enrollment people were making more than their bosses because they made their quotas. Some made six-figure salaries." CWs 1, 4, and 5 also described that ADAs received substantial increases in their compensation after short periods of time at EDMC due to their having met or exceeded enrollment quotas. CW16 also recalled that ADA compensation was directly tied to enrollments, stating, "[y]ou can make so much . . . money, 70, 80, 90k – you're paid based on people you brought in." CW16 also recalled being promoted due to having met enrollment targets and that, "the promotion was not based on experience [or] skill sets, it [was based] upon numbers."

103.    CW11 described EDMC's incentive-based compensation system as having been devised and instituted at the EDMC Corporate level. CW11 further recalled that the compensation system was reviewed and approved by EDMC's senior management, including Defendants Nelson and West. CW15 also stated that Defendant Nelson was responsible for instituting EDMC's compensation system. Similarly, CW10 recalled that "all pay raises for admissions reps were approved by corporate headquarters."

104.    As disclosed in the Registration Statement, however, institutions participating in Title IV programs are prohibited from having compensation systems that are "based directly or indirectly on success in securing enrollments or financial aid" for "any person or entity engaged in any student recruiting or admissions activities." EDMC's ADA compensation practices prior

to and as of the IPO violated Title IV requirements and threatened EDMC' s continued

participation in federal student financial assistance programs.

105.    Information about EDMC's pervasive pressure on recruiting and enrollment

personnel, including the Company's use of an incentive-based compensation system that

rewarded ADAs for achieving escalating enrollment quotas, was material to an investor in

deciding whether to purchase EDMC common stock at $18.00 per share in the IPO.  The

Registration Statement, however, did not disclose this information that would have revealed to

investors that EDMC's eligibility to receive essential Title IV funds was at risk prior to and at

the time of the IPO.  The GAO Report described how institutions engaging in improper

recruiting and enrollment practices of the types described herein face substantial fines and

possible suspension or termination of their eligibility to participate in Title IV student assistance

programs.  As such, EDMC's Title IV eligibility was threatened by EDMC's incentive

compensation practices, described herein, that violated the HEA and Title IV regulations prior to

and at the time of the IPO.  EDMC's incentive compensation practices further placed the

Company's Title IV eligibility at risk due to the fact that the Department of Education had begun

a negotiated rulemaking process prior to the IPO that was aimed at, among other things,

repealing the 12 "safe harbors" from the HEA ban on incentive compensation for admissions and

financial aid officers.

### 3.  Academic Program Quality and Graduate Career Placement Were Not As Described

106.    According to former EDMC employees including CWs 7, 12, 13, 14, 15, and 16,

and current EDMC employee Bittel, certain of EDMC's undisclosed improper recruiting and

enrollment practices included making misrepresentations to prospective students about EDMC's

academic program quality and focus on graduate career placement.  Such practices were a further contributing factor relating to EDMC's growing enrollments.

107.    CW7 recalled that ADAs expressed concern about pressuring students to enroll in low-quality EDMC programs that CW7 called a "diploma mill."  According to CW7, "[i]t was a disgrace what they charged people to get what was essentially a valueless degree."  CW7 further recalled that ADAs expressed concern that "[students] don't know what they're getting into.  It's too expensive."  In addition, CW7 described how EDMC itself did not believe that the education received by its graduates was of value, recalling that despite there being substantial challenges in hiring sufficient numbers of new ADAs, EDMC refused to hire its own graduates into those positions.  As CW7 recalled, EDMC prohibited CW7 from working with EDMC institutions' career placement offices to recruit ADAs, stating that "[t]hey were adamant that I not work with career services [at EDMC schools]."  As also described herein, CW12 recalled that "[t]he admissions reps tell [prospective students] exactly what they want to hear" about EDMC's academic programs.  Similarly, as described herein, CW14 recalled that EDMC recruiters were instructed to "make the program sound like it is more effective than it is" and "make it sound exciting."  CW15 further described how EDMC ADAs were trained to answer prospective students' questions evasively when the "real answer" would discourage enrollment.  CW16 also described how ADAs were trained to overstate career services available to graduates and "paint a visual" for prospective students to sell them on the hope of a "perfect job" in their dream field.

108.    Bittel provided extensive testimony to the Senate HELP Committee about EDMC's graduate career placement.  Bittel testified that EDMC devoted substantially more resources to recruiting and enrollment than career placement, including describing "a systemic problem here when there are only nine [career services] employees servicing the students that are

48

being recruited by an admissions workforce of almost 1,600.  Bittel further testified, and wrote in

the Bittel Letter, that EDMC's career placement statistics were manipulated to count more

students as "'gainfully employed' for the purposes of the company's statistics," including by

using estimated average salaries rather than graduates' actually reported earnings, using

"waivers" to avoid counting unemployed or underemployed graduates in EDMC's employment

statistics, stretching graduates' job descriptions to have them included within the definitions of

"field related employment," and counting as "employed" graduates who had worked at a relevant

job "for merely one day."

109.   Information about EDMC's misrepresenting the quality of its academic programs

and career placement was material information to an investor in deciding whether to purchase

EDMC common stock at $18.00 per share in the IPO.  The Registration Statement, however, did

not disclose this information.  The GAO Report described misrepresentations to prospective

students about the "employability" of a school's graduates and/or career placement as being

among the practices that violate regulations governing institutions' eligibility to participate in

Title IV student financial assistance programs.  EDMC's eligibility to receive essential Title IV

funds was thus at risk from EDMC's practices prior to and at the time of the IPO, a fact that was

not disclosed to investors.

### 4.   Enrollment and Financial Data Disclosed in the Registration Statement Did Not Comply With Relevant GAAP and SEC Reporting Requirements

110.   In the Registration Statement, EDMC issued materially untrue and misleading

statements and omitted to disclose material information concerning EDMC's financial status and

results of operations, contrary to Generally Accepted Accounting Principles ("GAAP") and SEC

reporting requirements.  The Registration Statement disclosed, among other things, historical

financial information from fiscal year ("FY") 2007 through FY 2009[2] relating to EDMC's student enrollment and the Company's revenues and income that were overwhelmingly and fundamentally linked to student enrollment through tuition and related fees.  Prior to and at the time of the IPO, however, this information was untrue and misleading and omitted material information necessary to make EDMC's reported financial results not misleading.

111.    As described at ¶¶95-98; 100-104; 106-108, *supra*, EDMC's enrollments and enrollment growth were materially inflated by EDMC's undisclosed improper recruiting and enrollment practices prior to and at the time of the IPO.

112.    A former EDMC employee, CW8, recalled that EDMC's system for reporting enrollment data did not have internal controls that were "true and accurate."  As a result, CW8 recalled that EDMC overstated its enrollments by counting students as being "enrolled" when, in fact, they were not presently enrolled in EDMC's courses.  CW8 recalled that, for reporting purposes, EDMC counted a student as "enrolled" when the student had been enrolled during the previous semester and indicated that he or she might enroll in the next term, even when that student had not committed to actually enroll for the current semester.  In addition, current EDMC employee Bittel testified regarding pressure on ADAs to keep students "enrolled and attending the classes for one week" and recalled that of the 96 students she enrolled, only 46 were still taking classes sixteen months after enrollment.

113.    GAAP are principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC

---

[2] At all times relevant hereto, EDMC's fiscal year ran from July 1 through June 30 of each year. Accordingly, EDMC's first fiscal quarter ("Q1") ended on September 30, the second fiscal quarter ("Q2") ended on December 31, the third fiscal quarter ("Q3") ended on March 31, and the fourth fiscal quarter ("Q4") ended on June 30.

that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Financial statements include all notes to the statements and all related schedules.  17 C.F.R. § 210.1-01(b).

114.    EDMC's financial statements in the Registration Statement did not conform to the following principles of fundamental GAAP, including Financial Accounting Standard Board ("FASB") Statement of Financial Accounting Concepts No. 1 ("SFAC No. 1") and FASB Statement of Financial Accounting Concepts No. 2 ("SFAC No. 2"), among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (SFAC No. 1, ¶34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to these resources, and the effects of transactions, events and circumstances that change resources and claims to these resources (SFAC No. 1, ¶40);

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period;  investors and creditors use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors expectations about the future enterprise performance, those expectations are commonly based, in substantial part, on evaluations of past enterprise performance (SFAC No. 1, ¶42);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it; to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (SFAC No. 1, ¶50);

(e)    The principle that financial reporting should include explanations and interpretations to help users understand financial information provided; as management knows more about an enterprise and its affairs than investors, management can often increase the usefulness of financial information by identifying certain transactions, other events, and circumstances that affect the enterprise and explaining their financial impact on it (SFAC No. 1, ¶54);

51

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent; that information should be reliable as well as relevant is a notion that is central to accounting; this representational faithfulness means correspondence or agreement between a measure or description and the phenomenon it purports to represent (SFAC No. 2, ¶¶58-59, 63);

(g)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (SFAC No. 2 ¶79);

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered; the best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (SFAC No. 2, ¶¶95, 97);

115.    As described herein, the Registration Statement presented investors with financial information in the Registration Statement (including information related to EDMC's enrollment, revenues, and income) that omitted to disclose material details related to EDMC's improper recruiting and enrollment practices that materially affected the Company's enrollments, EDMC's use of incentive compensation to reward its admissions personnel for increasing enrollments, and the related risks to EDMC's ability to receive Title IV student financial assistance prior to and at the time of the IPO.   Accordingly, the Registration Statement did not comply with GAAP with respect to: (1) the usefulness of EDMC's financial statements to potential investors deciding whether to participate in the IPO; (2) the reliability and representational faithfulness of the financial information presented in the financial statements; and (3) the completeness of the financial statements.

116.    Failures to comply with GAAP, including those described herein, constitute a significant internal control deficiency.  In addition CW8 described EDMC's internal controls related to the reporting of enrollment data as not being "true and accurate."  As such, EDMC's internal controls were deficient prior to and at the time of the IPO.

52

117.    Information about EDMC's noncompliance with GAAP including those described herein was material information to an investor in deciding whether to purchase EDMC common stock at $18.00 per share in the IPO.  The registration statement, however, did not disclose this information.

**5.    Omissions Regarding Material Related Party Transaction With Goldman Sachs Capital Partners Affiliate**

118.    In the Registration Statement, EDMC stated that, "[a]s a result of the [2006] Transaction, we are highly leveraged, and our debt service requirements are significant.  At June 30, 2009, we had $1,988.6 million in aggregate indebtedness outstanding, including short-term debt under the revolving credit facility. . . .  [W]e had $84.7 million of additional borrowing capacity on the revolving credit facility at June 30, 2009."

119.    EDMC further disclosed that its indebtedness related to the 2006 Transaction included "senior secured credit facilities" consisting of a $1.185 billion "term loan facility" and a $388.5 million "revolving credit facility" that would, upon consummation of the IPO, automatically increase to $442.5 million.  According to the Registration Statement, "our term loan facility matures on June 1, 2013" and "borrowings under our revolving credit facility, if any, mature on June 1, 2012."  The Registration Statement does not identify the lenders that are parties to either the term loan facility or the revolving credit facility.

120.    In describing interest rates and fees that it pays on its debt obligations, EDMC disclosed in the Registration Statement that, "[i]n addition to paying interest on outstanding principal under the senior secured credit facilities, we are required to pay a commitment fee to the lenders under the revolving credit facility in respect of the unutilized commitments thereunder.  At June 30, 2009, the commitment fee rate was 0.375% per annum.  We must also pay customary letter of credit fees."

121.    Regarding the revolving credit facility, EDMC disclosed that:

In August 2009, we signed an agreement to increase capacity on our revolving
credit facility . . . and to add two letter of credit issuing banks.  . . .  Upon
consummation of this offering, the revolving credit facility will automatically
increase to $442.5 million.  The revolving credit facility includes borrowing
capacity available for letters of credit and for borrowings on same-day notice,
referred to as swing line loans.

122.    With respect to the term loan facility and the maturity date of the revolving credit

facility, EDMC disclosed that:

We are required to pay installments on the loans under the term loan facility in
quarterly principal amounts of $3.0 million, which is equal to 0.25% of their
initial total funded principal amount calculated as of the closing date, through
April 1, 2013.  The remaining amount is payable on June 3, 2013, which we
estimate will be $1,082.4 million, assuming that we do not make any prepayments
before then.  Principal amounts outstanding under the revolving credit facility are
due and payable in full on June 1, 2012.

123.    As revealed to the market in an August 5, 2010 *BusinessWeek* article, "Goldman

Schools Students on Debt," EDMC owed a substantial debt to its private equity owners.  The

article also described that this debt was a material factor related to EDMC's aggressive

enrollment growth goals and strategies that, in turn, led to the improper recruiting and enrollment

practices described herein.  The *BusinessWeek* article cites EDMC's former CFO, Robert T.

McDowell, as recalling, "[t]he debt from the acquisition changed the culture of EDMC," and that

McDowell was "worried that the quality of the experience for employees and students was going

to deteriorate."  McDowell is further quoted as stating, "[y]ou take on that amount of private-

equity debt, you need to earn high rates of return for these investors."

124.    Goldman Sachs Capital Partners and its affiliates exerted significant control and

influence over EDMC.  The Registration Statement disclosed that, upon completion of the IPO,

private equity funds affiliated with Goldman Sachs Capital Partners would own 34.4% of

EDMC's common stock, or 33.7% if the Underwriters were to exercise their over-allotment

54

option.  Affiliates of Goldman Sachs Capital Partners were, and would remain, EDMC's single largest shareholder.  Furthermore, as described in the Registration Statement, at the time of the IPO, EDMC's board of directors included two members with ties to Goldman Sachs Capital Partners and/or its affiliates, Defendants Jones (a Managing Director at Defendant Goldman Sachs) and Mullin (a senior advisor to Goldman Sachs Capital Partners).  The Registration Statement also identified a director nominee, Mick J. Beekhuizen (a Vice President in the Merchant Banking Division of Defendant Goldman Sachs), who would become a member of EDMC's board upon consummation of the IPO.

125.    The Registration Statement described certain transactions with related parties, including affiliates of Goldman Sachs Capital Partners.  These transactions and related matters disclosed in the Registration Statement included:

- The conflict of interest of Defendant Goldman Sachs as an Underwriter due to its affiliation with Goldman Sachs Capital Partners;

- Defendant Goldman Sachs's receipt of customary underwriting fees in connection with the IPO;

- $5 million in annual "advisory fees" that are paid to EDMC's "Sponsors," including Goldman Sachs Capital Partners;

- A five-year interest rate swap in the amount of $375 million with an affiliate of Goldman Sachs Capital Partners;

- March 2009 and February 2007 payments of $300,000 and $400,000, respectively, to an affiliate of Goldman Sachs Capital Partners in connection with investment banking services provided to EDMC "for separate amendments to the Company's senior secured loan facility";

- A payment of $5.2 million to an affiliate of Goldman Sachs Capital Partners for "certain underwriting and financial services" in connection with a June 2006 offering of Notes by EDMC and "entering into our senior secured credit facilities";

- Possible compensation for "providing investment banking or other financial advisory services" in connection with prospective strategic transactions;

- The "Registration Rights Agreement" between EDMC and the Sponsors, including Goldman Sachs Capital Partners, that grants the Sponsors certain rights to cause EDMC to exchange shares held by the Sponsors to common stock for public resale; and

- Separately, that Defendant Goldman Sachs would receive a $1.08 per share "underwriting discount" in connection with its role as an underwriter selling 5,771,960 shares in the IPO, not including over-allotment sales.

126.   The Registration Statement also disclosed, in connection with a separate category of EDMC's debt, without identifying the particular private equity shareholders at issue:

> We believe that affiliates of certain of the Sponsors own in the aggregate approximately $81 million in aggregate principal amount of the senior subordinated notes. To the extent that an affiliate of a Sponsor validly tenders all or any portion of its senior subordinated notes in the tender offer and such senior subordinated notes are accepted for purchase in the tender offer, such affiliate indirectly will receive a portion of the proceeds from this offering.

127.   Despite the Registration Statement's disclosures of certain material relationships and transactions with affiliates of Goldman Sachs Capital Partners, the Registration Statement omitted to disclose the material fact that EDMC was indebted to Goldman Sachs Credit Partners L.P., an affiliate of Goldman Sachs Capital Partners. Goldman Sachs Credit Partners was a lender to EDMC through the term loan facility and the revolving credit facility.

128.   Goldman Sachs Credit Partners' participation in the term loan facility and the revolving credit facility was further detailed in a Form 8-K that EDMC filed with the SEC on December 8, 2010. In that 8-K, EDMC stated:

> Goldman Sachs Credit Partners L.P. ("GSCP"), one of the lenders under the Company's revolving credit facility and term loan, is an affiliate of Goldman Sachs Capital Partners, which together with its affiliates beneficially owns approximately 39.1% of EDMC's issued and outstanding common stock. In connection with the Amended Agreement, GSCP has agreed to extend the maturity dates of its revolving commitment and its portion of the term loan.

129.    GAAP requires that entities disclose material related party transactions.  FASB

Statement of Financial Accounting Standards No. 57, *Related Party Disclosures* ("SFAS 57")[3]

articulates the applicable GAAP standard for disclosures of related party transactions, which

includes transactions between, among other parties, "[a]ffiliates of the enterprise" and the

"principal owners of the enterprise."  SFAS 57 also defines related parties to include:

> other parties with which the enterprise may deal if one party controls or can
> significantly influence the management or operating policies of the other to an
> extent that one of the transacting parties might be prevented from fully pursuing
> its own separate interests.  Another party also is a related party if it can
> significantly influence the management or operating policies of the transacting
> parties or if it has an ownership interest in one of the transacting parties and can
> significantly influence the other to an extent that one or more of the transacting
> parties might be prevented from fully pursuing its own separate interests.

130.    Appendix A to SFAS 57 states that no "material" information should be left out of

an entity's related party disclosures to ensure that the disclosure "validly represents the

underlying events and conditions" as required by SFAC No. 2.  Material related party

transactions must also be disclosed to ensure that the entity's financial statements are useful

under SFAC No. 2.  Appendix A to SFAS 57 cautions that, "Because it is possible for related

party transactions to be arranged to obtain certain results desired by the related parties, the

resulting accounting measures may not represent what they usually would be expected to

represent."  Furthermore, Appendix A states, "The [FASB] also believes that relevant

information is omitted if disclosures about significant related party transactions required by this

Statement are not made."

131.    Information about EDMC's substantial and material indebtedness to Goldman

Sachs Credit Partners, an affiliate of Goldman Sachs Capital Partners, in the term loan facility

---

[3] As the Registration Statement contained EDMC's financial statements and related footnotes
concerning FY 2007- FY 2009, SFAS 57 applied to EDMC's related party transaction
disclosures in the Registration Statement.

and revolving credit facility was material information to an investor in deciding whether to purchase EDMC common stock at $18.00 per share in the IPO. Moreover, EDMC's omission to disclose this information was contrary to SFAS 57 and relevant GAAP. The registration statement, however, did not disclose information regarding EDMC's indebtedness to Goldman Sachs Credit Partners.

### 6. Omissions Regarding Material Federal Regulatory Changes With Respect to "Gainful Employment" and Incentive Compensation

132.     In the Registration Statement, EDMC disclosed that it faced certain risks due to uncertainties from recently enacted and <u>potential</u> federal legislative and regulatory changes that could materially affect the Company's business operations and future earnings. The federal legislative and regulatory risks identified in the Registration Statement involved the following:[4]

- General and unspecified potential legislative action by Congress including changes to Title IV program eligibility standards, reduction in appropriations for Title IV assistance; Congressional imposition of additional requirements on state accrediting agencies; or other legislative actions that would reduce federal student aid funding or increase EDMC's administrative costs;

- The potential for increased administrative costs due to then-unapproved legislation expanding the federal "Direct Loan" program with which EDMC had little experience. The Registration Statement stated that, "President Obama has introduced a budget proposal and a committee in the U.S. House of Representatives has approved a bill that would require all new federal student loans after July 1, 2010 to be made through the Direct Loan program." The Registration Statement states further that, "we anticipate that each of our U.S. based schools will participate in the Direct Loan program by June 30, 2010" and that adapting to this program will require changes to EDMC's systems and operating procedures that "could cause increases to our administrative costs and delays to our receipt of federal student loan proceeds."

---

[4] The risk disclosures set forth herein do not include the separate kinds of regulatory risks described in the Registration Statement arising from U.S. Department of Education compliance monitoring and/or enforcement of <u>existing</u> regulations. The risk disclosures described herein also do not include EDMC's discussion of various state-level legislative or regulatory risks.

- Under the August 2008 Higher Education Act reauthorization, institutions' cohort default rates for federal FY 2009 and later will be based on the rate at which the institutions' former students who enter repayment during the year default on their federal student loans on or before the second year following the year in which they entered repayment. As a result of the extended default period, most institutions' expected cohort default rates are expected to materially increase when rates based upon the new calculation method are first published after October 1, 2011. If an institution's cohort default rate equals or exceeds 25% in any of the three most recent fiscal years, or if its cohort default rate for Perkins loans exceeds 15% for the most recent federal award year, the institution may be placed on provisional certification status for up to three years. While provisional certification does not preclude access to Title IV program funds, it does subject the institution to closer review by the Education Department and "possible summary adverse action if that institution commits a material violation of Title IV program requirements"; and

- In a discussion of the "so-called 'incentive compensation' law" and the Department of Education's July 2003 regulations establishing "12 compensation arrangements that . . . are not in violation of the incentive compensation law," the Registration Statement notes that the regulations "do not establish clear criteria for compliance in all circumstances, and the U.S. Department of Education has announced that it no longer will review and approve individual schools' compensation plans prior to their implementation."

133.   Despite Defendants' extensive discussions of risks related to potential legislative and regulatory changes that may have material affects on EDMC, the Registration Statement makes no mention of the fact that, prior to the IPO, the Department of Education had taken action to initiate a negotiated rulemaking process that was intended to: (1) repeal the 2002 regulations on incentive compensation "safe harbors" regarding incentive compensation paid to admissions and financial aid personnel; and (2) define the meaning of "gainful employment" of graduates in connection with Title IV funding eligibility.

134.   Moreover, the Registration Statement does not address the impact of the specific, material risks central to EDMC's business operations and prospective financial condition that were implicated by the regulatory changes being addressed in the Department of Education's negotiated rulemaking, including, among other things: (1) the threat to EDMC institutions'

eligibility to receive federal Title IV funds as a result of defining graduates' federal student loan repayment rates under a revised "gainful employment" calculation; (2) the threat to EDMC institutions' eligibility to receive federal Title IV funds should EDMC fail to comply with the HEA prohibition on incentive compensation arrangements as a result of a repeal of the 2002 "safe harbor" regulations; and (3) the threat to EDMC's pattern of historical growth in enrollments and revenues that would result from the repeal of the 2002 incentive compensation "safe harbor" regulations and/or any increased scrutiny of EDMC's improper admissions staff compensation practices by the Department of Education resulting from issues raised during the negotiated rulemaking process.

135.   Information about the risks to EDMC from the Department of Education's consideration of changes to the incentive compensation regulations and "gainful employment" definitions was material information to an investor in deciding whether to purchase EDMC common stock at $18.00 per share in the IPO.  The registration statement, however, did not disclose this information.

### C.   The Untrue and Misleading Registration Statement

136.   The Registration Statement contained a series of materially untrue and misleading statements and failed to disclose material information concerning EDMC's business operations and financial results related to EDMC's improper recruiting and enrollment practices.  These materially untrue and misleading statements and material omissions related to EDMC's history of enrollment growth, academic program quality and graduate career placement, and use of incentive compensation systems with EDMC's admissions staff.

1.  **Statements Regarding EDMC's Historical Enrollment Growth and
    Marketing Practices Omitted Material Information About EDMC's
    Improper Recruiting and Enrollment Practices**

137.   In the Registration Statement, EDMC disclosed that it was "among the largest

providers of post-secondary education in North America, with approximately 110,800 enrolled

students as of October 2008."  EDMC further stated that, "[w]e target a large and diverse market

as our educational institutions offer students the opportunity to earn undergraduate and graduate

degrees, including doctoral degrees, and certain specialized non-degree diplomas in a broad

range of disciplines."

138.   Speaking to the Company's historical enrollment growth rates, EDMC stated:

> During our more than 35-year operating history, we have expanded the reach of
> our education systems and currently operate 92 primary locations across 28 U.S.
> states and in Canada.  In addition, we have offered online programs since 2000,
> enabling our students to pursue degrees fully online or through a flexible
> combination of both online and campus-based education.  During the period from
> October 1998 through October 2008, we experienced a compounded annual
> enrollment growth rate of 18.0%.  During the same time period, the schools that
> we have owned or operated for one year or more experienced a compounded
> annual enrollment growth rate of 12.0%.  We seek to maintain growth in a manner
> that assures adherence to our high standard of educational quality and track record
> of student success.

139.   EDMC further described certain efforts to increase enrollment growth that were

instituted by the Company's private equity owners starting in June 2006:

> Since the Transaction in June 2006, we have undertaken multiple initiatives to
> increase our penetration of addressable markets in order to enable us to accelerate
> our growth and expand our market position.  We have opened 20 new locations,
> acquired two schools, developed 36 new academic programs and introduced over
> 600 new or existing academic programs to locations that had not previously
> offered such programs.  The compound annual enrollment growth rate at our
> schools was 19.6% between July 2006 and July 2009.  During the same time
> period, the compound annual enrollment growth rate for schools owned or
> operated for one year or more was 18.2%.  We have made significant capital
> investments in technology and human resources, particularly in marketing and
> admissions, designed to facilitate future enrollment growth while enhancing the
> effectiveness of our marketing efforts.  We have also upgraded our infrastructure,
> student interfaces and student support systems to enhance the student experience,

while providing greater operational transparency.  We have made considerable investments in our online education platform, which has resulted in strong enrollment growth.  The number of students enrolled in fully online academic programs has grown more than five-fold to approximately 26,200 students in July 2009, compared to approximately 4,600 students in July 2006.

140.    Stressing the significance of enrollment growth to EDMC, the Registration Statement stated, "[o]ur business model has a number of favorable financial characteristics, including consistent historical enrollment growth, high visibility into operational performance, opportunity for future profit margin expansion and strong operating cash flow generation . . . ." On these points, EDMC provided further detail:

- *History of consistent enrollment growth*.  During the period from October 1998 through October 2008, we experienced a compounded annual enrollment growth rate of 18.0%.  During the same time period, the schools that we have owned or operated for one year or more experienced a compounded annual enrollment growth rate of 12.0%.  We generally achieve growth through a number of independent sources, including continued investment in existing schools, the addition of schools (organically or through acquisition) and new delivery channels, such as online.  The significant investments we have made since the Transaction in numerous areas of our workforce, including marketing and admissions, new campuses and online education and infrastructure, are designed to support future enrollment.

- *High visibility into operational performance*.  We believe that we benefit from a business model with good insight into future revenue and earnings, given the length of our academic programs.  Approximately 64% of our students as of October 2008 were enrolled in Doctorate, Master's and Bachelor's degree programs, which are typically multi-year programs that contribute to the overall stability of our student population.

- *Opportunity for future profit margin expansion*.  Our business model benefits from scale and permits us to leverage fixed costs across our delivery platforms.  Since the Transaction in June 2006 . . . we have made significant investments in numerous areas of our workforce in order to support future enrollment growth and enhance the student experience. . . . We believe that our continued focus on information systems, operating processes and key performance indicators will permit us to enhance our educational quality, growth and profitability over time . . . .

- *Strong operating cash flow generation*.  We historically have generated strong cash flows.  We benefit from investments with attractive returns on

capital and favorable working capital balances due to advance payment of tuition and fees.  Since the Transaction, we have made significant investments to support growth while simultaneously upgrading the infrastructure required to leverage our delivery platforms.  In fiscal 2009, we generated cash flows from operations of $293.4 million.

141.    As part of an "Industry Overview," EDMC described "a number of factors contributing to the long-term growth of the post-secondary education industry," citing U.S. government statistics and analyses showing greater demand for college graduates in the workforce, the substantially greater wages that college graduates can earn, and lower rates of unemployment among college graduates than individuals without college experience.  EDMC also identified the increasing availability of government and private financial aid for post-secondary education as a growth factor for the industry.  In addition, EDMC cited statistics from the College Board in stating that "the strong demand for post-secondary education has enabled educational institutions to consistently increase tuition and fees."  EDMC stated its belief "that for-profit providers will capture an increasing share of the growing demand for post-secondary education, which has not been fully addressed by traditional public and private universities," offering the following distinction as to why for-profit schools like EDMC were different:

> Non-profit public and private institutions can face limited financial capability to expand their offerings in response to the growing demand for education, due to a combination of state funding challenges, significant expenditures required for research and the professor tenure system.  Certain private institutions also may control enrollments to preserve the perceived prestige and exclusivity of their degree offerings.  . . .

> For-profit providers have continued their strong growth, primarily due to the higher flexibility of their programmatic offerings and learning structure, their emphasis on applied content and their ability to consistently introduce new campuses and academic programs.

142.    In describing "Our Competitive Strengths," EDMC stated, with respect to factors that have driven EDMC's enrollment:

- ***Recognized brands aligned with specific fields of study and degree offerings***

63

We offer academic programs primarily through four education systems.  We have devoted significant resources to establishing, and continue to invest in developing, the brand identity for each education system.  Through The Art Institutes, Argosy University, Brown Mackie Colleges and South University education systems, we have the ability to align our academic program offerings to address the unique needs of specific student groups.  Our marketing strategy is designed to develop brand awareness among practitioners and likely prospects in particular fields of study.  We believe that this comprehensive brand building approach in each specific market also enables us to gain economies of scale with respect to student acquisition and retention costs, assists in the recruitment and retention of quality faculty and staff members and accelerates our ability to expand online course offerings.

- ***Diverse program offerings and broad degree capabilities***

Our breadth of programmatic and degree offerings enables us to appeal to a diverse range of potential students.  . . .  Approximately 64% of our students as of October 2008 were enrolled in Doctorate, Master's and Bachelor's degree programs, which are typically multi-year programs that contribute to the overall stability of our student population.  We monitor and adjust our education offerings based on changes in demand for new programs, degrees, schedules and delivery methods.

- ***National platform of schools and integrated online learning platform***

The combination of our national platform of schools and integrated online learning platform provides students at three of our education systems with flexible curriculum delivery options and academic programs taught on campus, online and in blended formats.  This flexibility enables our academic programs to appeal to both traditional students and working adults who may seek convenience due to scheduling, geographical or other constraints.  . . .  Throughout our history, we have invested in our campuses in order to provide attractive and efficient learning environments.  Our schools offer many amenities found in traditional colleges, including libraries, bookstores and laboratories, as well as the industry-specific equipment necessary for the various programs that we offer.

Our online presence offers a practical and flexible solution for our students without compromising quality.  We have made a significant investment in online education by strengthening our online presence within The Art Institutes, Argosy University and South University education systems.  We have introduced new online academic programs, strengthened our technology infrastructure, hired additional faculty and staff and increased our spending on marketing and admissions.  We intend to continue to invest in the expansion of our online program offerings and our marketing efforts to capitalize on our well−known branded schools in order to expand our online presence.  As of July 2009, approximately 26,200 students were enrolled in fully online programs.

- ***Strong management team with a focus on long−term performance***

Since the Transaction, we have enhanced the depth and experience of our senior management team, recruiting a number of executives with specialized knowledge in key functional areas, such as technology, marketing and finance.  The current executive team has been instrumental in directing investments to accelerate enrollment growth and build infrastructure to establish a platform for sustainable long-term growth.  Furthermore, our school presidents and senior operating executives have substantial experience in the sector and have contributed to our history of success.

143.    In discussing "Our Growth Strategy," EDMC spoke to the Company's historical efforts to expand enrollment by developing new academic programs and expand existing programs across EDMC's "national platform of schools."  EDMC stated, "[i]n addition to developing new academic programs, we frequently introduce existing academic programs to additional locations in our national platform of schools, allowing us to drive incremental enrollment growth, utilize our existing curriculum development in multiple locations, and capitalize on identified market needs."

144.    EDMC also described its growth strategy as including increasing enrollment in "online distance learning and blended-format programs," and pointed to the Company's past efforts in that regard.  EDMC stated that its "investments in online education have enabled us to increase the number of students enrolled in fully online academic programs from approximately 4,600 students as of July 2006 to approximately 26,000 students as of July 2009."

145.    In the section, "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&A"), EDMC repeated its description of the Company's historical enrollment growth, and further described the relationship between enrollment and EDMC's revenues.  The Company further stated in the MD&A:

[t]he largest component of our net revenues is tuition collected from our students, which is presented in our statements of operations after deducting refunds, scholarships [awarded by EDMC] and other adjustments. . . .  The amount of tuition revenue received from students varies based on the average tuition charge

per credit hour, average credit hours taken by student, type of program, specific
curriculum and average student population.

The two main drivers of our net revenue are average student population and
tuition rates.  Factors effecting our average student population include the number
of continuing students attending our schools at the beginning of a period and the
number of new students entering our schools during such period.

146.    EDMC further stated in the MD&A that, "[a] majority of our students rely on

funds received under various government-sponsored student financial aid programs, especially

Title IV programs, to pay a substantial portion of their tuition and other education-related

expenses."

147.    The Registration Statement includes summaries of EDMC's consolidated

financial and other data for FY 2007 through FY 2009 and EDMC's results of operations.  FY

2007 was the first full year in which EDMC was operated by its private equity investors.  These

data include the following:

|  | FY 2007 | FY 2008 | FY 2009 |
|---|---|---|---|
| Net Revenues | $1,363,700,000 | $1,684,200,000 | $2,011,500,000 |
| Net Income | $32,400,000 | $66,000,000 | $104,400,000 |
| Net Cash Flows – Operating Activities | $179,900,000 | $152,700,000 | $293,400,000 |
| Enrollment At Start of Fall Quarter | 80,300 | 96,000 | 110,800 |
| Average Student Enrollment | 77,200 | 91,900[5] | 107,700 |
| % Revenues from Tuition and Fees | 91% | 91.7% | 91.1% |
| % Net Revenues from Title IV Programs | (not given) | 70.2% | 81.5% |

---

[5] According to the Registration Statement, less than 1% of the growth in Average Student
Enrollment in FY 2008 was due to EDMC's acquisition of educational institutions.  None of the
growth in Average Student Enrollment in FY 2009 was due to acquisitions.

148.    In a section of the Registration Statement titled, "Business," EDMC further describes EDMC's "Student Recruitment and Marketing" practices.  EDMC states:

Our diverse and metrics-based marketing activities are designed to position us as a leading provider of high quality educational programs, build strong brand recognition for our education systems and disciplines, differentiate us from other educational providers and stimulate enrollment inquiries.  We target a large and diverse market, including traditional college students, working adults seeking a high quality education in a traditional college setting and working adults focused on the practicality and convenience of online education and career advancement goals.  In marketing our programs to prospective students, we emphasize the value of the educational experience and the academic rigor of the programs, rather than the cost or speed to graduation.

Our marketing personnel employ an integrated marketing approach that utilizes a variety of lead sources to identify prospective students.  These lead generation sources include web-based advertising, which generates the majority of our leads, and further include purchasing leads from aggregators, television and print media advertising, radio, local newspaper, telephone campaigns and direct mail campaigns.  In addition, referrals from current students, alumni and employers are important sources of new students.  We also employ approximately 250 representatives who present at high schools.  These representatives also participate in college fairs and other inquiry-generating activities.  In fiscal 2009, our marketing efforts generated inquiries from approximately 3.5 million prospective students as compared to approximately 2.4 million inquiries in fiscal 2008.  Marketing and admissions expense represented approximately 21.9% and 21.0% of net revenues in fiscal 2009 and fiscal 2008, respectively.

Upon a prospective student's initial indication of interest in enrolling at one of our schools, an admissions representative initiates communication with the student.  The admissions representative serves as the primary contact for the prospective student and helps the student assess the compatibility of his or her goals with our educational offerings.  Our student services personnel work with applicants to gain acceptance, arrange financial aid and prepare the student for matriculation.  Each admissions representative undergoes a standardized training program, which includes a full competency assessment at the program's conclusion.  Since the Transaction, we have significantly increased our number of admissions representatives.  As of June 30, 2009, we employed approximately 2,600 admissions representatives throughout our schools, representing a 180% increase since June 30, 2006.

149.    EDMC further described its "Student Admissions and Retention," stating:

The admissions and entrance standards of each school are designed to identify those students who are best equipped to meet the requirements of their chosen fields of study and successfully complete their programs.  In

evaluating prospective students, we seek individuals with, among other things, a strong desire to learn, passion for their area of interest and initiative. . . .  Most of our schools interview prospective students to assess their qualifications, their interest in the programs offered by the school and their commitment to their education.  In addition, the curricula, student services, education costs, available financial resources and student housing options, if applicable, are reviewed during interviews. . . .

Our students may fail to finish their programs for a variety of personal, academic or financial reasons.  To reduce the risk of student withdrawals, each of our schools devotes staff resources to advising students regarding academic and financial matters, part-time employment and, if applicable, housing.  . . .  Our net annual persistence rate, which measures the number of students who are enrolled during a fiscal year and either graduate or advance to the next fiscal year, for all of our students was approximately 66% in fiscal 2009 as compared to approximately 68% in fiscal 2008 due primarily to the increase in fully online students during fiscal 2009.

150.    At the time of the IPO, the statements set forth in ¶¶137-149 were materially untrue and misleading and/or omitted material information necessary to make the statements made, in light of the circumstances in which they were made, not misleading because: (1) EDMC did not disclose that its overall current and historical enrollments were materially inflated due to EDMC's improper recruiting and enrollment practices; (2) EDMC did not disclose that its enrollments in longer-term Bachelor's, Master's, and Doctoral programs were materially inflated by EDMC's improper recruiting and enrollment practices; (3) EDMC did not disclose that its increased enrollments in online programs were materially the result of the Company's improper recruiting and enrollment practices; (4) EDMC's discussion of factors that purportedly led to increased student enrollments – such as overall increases in demand for post-secondary education, program attractiveness, convenience and flexibility, ability to tailor programs to student demand, enhancements to the student experience, increased visibility and brand identity, and investments in EDMC's online programs – did not disclose that EDMC's enrollments were materially inflated by the Company's improper recruiting and enrollment practices; (5) the details provided about EDMC's "Student Recruitment and Marketing Practices" did not disclose

that prior to and at the time of the IPO, EDMC employed improper recruiting and enrollment practices, including that EDMC paid its admissions staff based on the volume of their enrollments; (6) in its discussions of "lead generation" and marketing from web-based sources, and admissions staff communications with prospective students "[u]pon a prospective student's initial indication of interest in enrolling at one of our schools," EDMC did not disclose that it engaged in aggressive and improper telephone marketing practices that inflated student enrollments; (7) in its discussion of the growth in the number of "admissions representatives" at EDMC since 2006, the Company failed to disclose the improper recruiting and enrollment practices employed by these admissions representatives that were initiated by Defendants following EDMC's 2006 acquisition by private equity investors, the high turnover and burnout rates of admissions representatives at EDMC due to EDMC's use of admissions quotas tied to compensation, and the related impact on student enrollments; and (8) EDMC's discussion of student persistence rates did not disclose that EDMC counted as "enrolled" students who had not committed to enrolling in the current academic period.

151.    Investors' decision to purchase EDMC stock in the IPO at $18.00 per share was directly and materially influenced by Defendants' untrue and misleading statements and material omissions described in ¶¶137-149.

## 2.    Additional Untrue Statements and Material Omissions Regarding EDMC's Academic Program Quality and Graduate Career Placement

152.    In addition to Defendants' materially untrue and misleading statements and material omissions concerning EDMC's academic program quality and graduate career placement set forth in ¶¶137-149, *supra*, the Registration Statement contained further materially untrue and misleading statements and material omissions regarding those matters.

153.    In its discussion of "Our Business," EDMC expressly tied its "favorable financial characteristics," including its historically consistent enrollment growth, to EDMC's historical rates of graduate employment in relevant fields, stating:

> All of these characteristics complement the successful outcomes that we deliver to our students, as reflected in our student persistence and graduate employment rates and in student satisfaction survey data.  Approximately 87% of undergraduate students who graduated from our institutions during the calendar year ended December 31, 2008 and were available for employment obtained a position in their field of study or a related field within six months of graduation.

154.    EDMC further describes its "Graduate Employment" in the Registration Statement, stating:

> We measure our success as an educator of students to a significant extent by the ability of our students to find jobs in their chosen field of employment upon graduation from our schools.  Most of our schools provide career development instruction to our students in order to assist the students in developing essential job-search skills.  In addition to individualized training in interviewing, networking techniques and resume-writing, most of our schools require students to take a career development course.  Additionally, we provide ongoing placement resources to our students and recent graduates.  Career services departments also assist current students in finding part-time employment while attending school.  Students in certain of our Doctorate programs spend up to a year in a paid internship in their chosen field.

> Each school's career services department plays a role in marketing the school's curriculum to the community in order to produce job leads for graduates.  Career services advisors educate employers about the caliber of our graduates.  These advisors participate in professional organizations, trade shows and community events to keep apprised of industry trends and maintain relationships with key employers.  Career services staff visit employer sites to learn more about their operations and better understand their employment needs.  As of June 30, 2009, the career services departments of our schools had approximately 300 full-time employees.  We estimate that our career services departments maintain contact with approximately 70,000 employers nationwide.

> Based on information collected by us from graduating students and employers, we believe that, of the approximately 16,000 undergraduate students who graduated from our schools during the calendar year ended December 31, 2008, approximately 87% of the available graduates

obtained employment in their fields of study, or in related fields of study, within six months of graduation.  The graduate employment rates presented in this prospectus exclude students who are pursuing further education, who are deceased, who are in active military service, who have medical conditions that prevent them from working, who are continuing in a career unrelated to their program of study because they currently earn salaries which exceed those paid to entry-level employees in their field of study, who choose to stay at home full-time or who are international students no longer residing in the country in which their school is located. The average salary paid to our available graduating undergraduate students from The Art Institutes, the Brown Mackie Colleges and South University for calendar year 2008 who obtained employment in their fields of study, or in related fields of study, was approximately $30,200.

155.    At the time of the IPO, the statements referenced and/or set forth in ¶¶152-154

were materially untrue and misleading and/or omitted material information necessary to make

the statements made, in light of the circumstances in which they were made, not misleading

because prior to and at the time of the IPO: (1) EDMC admissions representatives were

instructed and/or under pressure to overstate the quality or relevance of EDMC's academic

programs to prospective students; (2) EDMC admissions representatives misrepresented the

prospects for graduate employment in relevant fields to prospective students; (3) EDMC

provided insufficient resources to its institutions' career services offices necessary to assist

graduates in securing relevant employment; (4) EDMC's career services personnel were under

quotas and otherwise pressured to count graduates as being "employed" in a relevant field to

meet specified targets; (5) EDMC career services personnel used various practices to overstate

the numbers of graduates deemed to be employed in relevant fields, including by using

"waivers" to remove certain unemployed graduates from institutions' employment statistics; (6)

EDMC career services personnel overstated graduate salary information by using hypothetical

salary data when graduates reported low salaries; and (7) EDMC's statements regarding

academic program quality and graduate career placement omitted to disclose the material fact

71

that EDMC had a strict policy against hiring graduates from its own institutions to be admissions representatives.

156.    Investors' decision to purchase EDMC stock in the IPO at $18.00 per share was directly and materially influenced by Defendants' untrue and misleading statements and material omissions described in ¶¶152-154.

### 3. Additional Untrue Statements and Material Omissions Regarding EDMC's Incentive Compensation Practices

157.    In addition to Defendants' materially untrue and misleading statements and material omissions concerning EDMC's incentive compensation practices for admissions staff alleged in ¶¶137-149, *supra*, the Registration Statement contained further materially untrue and misleading statements and material omissions regarding those practices.

158.    In the Registration Statement's discussion of EDMC's "Business," Defendants describe certain issues involving "Federal Oversight of Title IV Programs."  In this discussion, EDMC addresses federal "Restrictions on Payment of Bonuses, Commissions or Other Incentives."  EDMC stated:

> An institution participating in the Title IV programs may not provide any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of Title IV program funds.  Effective July 2003, the U.S. Department of Education published regulations to attempt to clarify this so-called "incentive compensation" law.  The regulations identify 12 compensation arrangements that the U.S. Department of Education has determined are not in violation of the incentive compensation law, including the payment and adjustment of salaries, bonuses and commissions in certain circumstances.  The regulations do not establish clear criteria for compliance in all circumstances, and the U.S. Department of Education has announced that it no longer will review and approve individual schools' compensation plans prior to their implementation.  Although we cannot provide any assurances that the U.S. Department of Education will not find deficiencies in our compensation plans, we believe that our current

compensation plans are in compliance with the HEA and the regulations promulgated by the U.S. Department of Education.

159.    The Registration Statement's discussion of "Restrictions on Payment of Bonuses, Commissions or Other Incentives" was substantially identical to a disclosure on the same topic that was made by EDMC in its Form 10-K for FY 2004, filed before the Company was taken private by private equity investors in 2006 and nearly five years before the IPO.

160.    At the time of the IPO, the statements referenced and/or set forth in ¶¶157-159 were materially untrue and misleading and/or omitted material information necessary to make the statements made, in light of the circumstances in which they were made, not misleading because prior to and at the time of the IPO: (1) EDMC set enrollment quotas for its admissions staff and evaluated each ADA's performance every six months, at which time the ADA would have his or her compensation level and quota adjusted based on whether the ADA had satisfied his or her enrollment quota and the number of students he or she enrolled; (2) EDMC's compensation system highly incentivized ADAs to recruit increasing volumes of students; (3) the incentives in EDMC's ADA compensation system led to the improper recruiting and enrollment practices described herein; (4) EDMC's compensation practices were in violation of the HEA prohibition on incentive compensation for admissions staff and would be prohibited by the regulatory changes under consideration by the Department of Education in the negotiated rulemaking; (5) EDMC failed to disclose the risk that its incentive compensation programs for admissions staff would not comply with federal law under the repeal of the 2002 "safe harbors" being addressed by the Department of Education in the negotiated rulemaking; and (6) EDMC had not updated its disclosures with respect to "Restrictions on Payment of Bonuses, Commissions or Other Incentives" since 2004 despite the fact that, prior to the IPO, the Department of Education had begun a negotiated rulemaking that was addressing this topic.

161.    Investors' decision to purchase EDMC stock in the IPO at $18.00 per share was directly and materially influenced by Defendants' untrue and misleading statements and material omissions described in ¶¶157-159.

## VIII.   CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT I
### (Against EDMC, the Individual Defendants, and the Underwriter Defendants)
### Violations of Section 11 of the Securities Act

162.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein and further allege as follows.

163.    This Count is asserted against EDMC, the Individual Defendants, and the Underwriter Defendants (herein the "Section 11 Defendants") for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class who purchased EDMC common stock in the IPO.

164.    EDMC is the issuer of the securities and is liable under 15 U.S.C. § 77k(a).  The Individual Defendants each signed the Registration Statement and the Director Defendants were directors of EDMC when the Registration Statement became effective and are thus liable pursuant to 15 U.S.C. § 77k(a)(1)(2) and (3).  The Underwriter Defendants were underwriters of the IPO and are liable pursuant to 15 U.S.C. § 77k(a)(5).  This Count is not based on and does not sound in fraud in connection with the IPO.  Any allegations of fraud or fraudulent conduct and/or motive in connection with the IPO are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent in connection with the IPO, as they are not elements of a Section 11 claim.

165.    The Registration Statement contained untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading, and failed to

disclose material facts as described above.  EDMC was the Registrant, while the Individual

Defendants were executive officers and/or representatives of the Company who were responsible

for the content and dissemination of the Registration Statement.  The Individual Defendants

signed the Registration Statement.  As such, EDMC and the Individual Defendants issued,

caused to be issued, and participated in the issuance of the Registration Statement and are subject

to liability for violations of Section 11 of the Securities Act.

166.    The Underwriter Defendants were underwriters of the IPO.  The Underwriter

Defendants acted negligently and are liable to members of the Class who purchased EDMC

common stock in the IPO.

167.    Plaintiffs and other members of the Class who acquired EDMC common stock in

the IPO pursuant to the Registration Statement did not know of the negligent conduct alleged

herein or of the facts concerning the untrue statements of material fact and material omissions

alleged herein, and could not have reasonably discovered such facts or conduct.

168.    None of the materially untrue statements or omissions contained herein was a

forward-looking statement but, rather concerned existing and/or historical facts.  Moreover, the

Section 11 Defendants named in this count did not properly identify any of these untrue

statements as forward-looking statements and did not disclose information that undermined the

validity of those statements.

169.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably

could have discovered the facts upon which this complaint is based to the time that the first

complaint was filed asserting claims arising out of the falsity of the Registration Statement.  Less

than three years elapsed from the time that the securities upon which this Count is brought were

bona fide offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

170.     Plaintiffs and the other members of the Class have sustained damages.  The value of EDMC's shares sold in the IPO declined substantially subsequent to and due to the Section 11 Defendants' violations of Section 11 of the Securities Act.

171.     By reason of the foregoing, the Section 11 Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased EDMC shares in the IPO pursuant to the Registration Statement.

### COUNT II
### (Against EDMC and the Underwriter Defendants)
### Violations of Section 12(a)(2)

172.     Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

173.     This Count is asserted against EDMC and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Plaintiffs and all members of the Class who purchased or otherwise acquired EDMC common stock in the IPO.

174.     By means of the Registration Statement, including the Prospectus, EDMC and the Underwriter Defendants, through the IPO, solicited, offered and sold EDMC common stock to Plaintiffs and members of the Class.

175.     The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the Prospectus.  The Underwriter Defendants are sellers within the meaning of the Securities Act because they (a) transferred title to Plaintiffs and other members of the Class who purchased EDMC common stock in the IPO and (b) solicited the purchase of EDMC common stock by Plaintiffs and other members of the Class, motivated at least in part by

the desire to serve the Underwriter Defendants' own financial interest and the interests of their client, EDMC, including, but not limited to, commissions on their own sales of those securities. In so doing, the Underwriter Defendants used the means and instrumentalities of interstate commerce and the United States mail.

176.    The Prospectus contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

177.    The Underwriter Defendants owed to Plaintiffs and other members of the Class who purchased EDMC common stock in the IPO pursuant to the materially untrue and misleading Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Prospectus were true and without omissions of any material facts and were not misleading.

178.    Plaintiffs and other members of the Class who purchased EDMC common stock in the IPO pursuant to the materially untrue and misleading Prospectus and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

179.    Plaintiffs and other members of the Class who purchased EDMC common stock in the IPO have sustained damages as a result of the untrue statements of material facts and omissions in the Prospectus, for which they hereby elect to rescind and tender their shares of EDMC common stock to EDMC and the Underwriter Defendants in return for the consideration

paid for those securities, together with interest thereon.  Plaintiffs and members of the Class who

have sold the securities they purchased pursuant to the October Offering are entitled to rescissory

damages.

180.    By virtue of the conduct alleged herein, EDMC and the Underwriter Defendants

violated Section 12(a)(2) of the Securities Act.

**COUNT III**
**(Against the Individual Defendants)**
<u>**Violations of Section 15**</u>

181.    Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set

forth herein.

182.    This Count is asserted against the Individual Defendants for violations of Section

15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the

Class who purchased EDMC common stock in the IPO.

183.    At all relevant times, the Individual Defendants were controlling persons of the

Company within the meaning of Section 15 of the Securities Act.  Each of these Defendants

served as an executive officer or director of EDMC prior to and at the time of the IPO.  The

Individual Defendants at all relevant times participated in the operation and management of the

Company, and conducted and participated, directly and indirectly, in the conduct of EDMC's

business affairs.  As officers of a publicly owned company, the Officer Defendants had a duty to

disseminate accurate and truthful information with respect to EDMC's financial condition and

results of operations.

184.    By reason of the aforementioned conduct, each of the Defendants named in this

Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same

extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs

and the other members of the Class who purchased EDMC common stock in the IPO.  As a

78

direct and proximate result of the conduct of EDMC and the Individual Defendants, Plaintiffs

and other members of the Class suffered damages in connection with their purchase of EDMC

common stock in the IPO.

**IX.     VIOLATIONS OF THE EXCHANGE ACT**

185.    Throughout the Class Period, the Exchange Act Defendants, in order to increase

revenues by increasing enrollments, set unrealistic and ever-increasing enrollment goals and

instituted abusive recruiting and enrollment practices, including instituting enrollment quotas and

an improper incentive compensation system for admissions representatives that the Exchange

Act Defendants knew or were reckless in not knowing would lead to the systemic use of abusive

and deceptive recruiting and enrollment practices.

186.    Moreover, throughout the Class Period, the Exchange Act Defendants repeatedly

misrepresented EDMC's compliance with Title IV, including failing to disclose the pervasive

use of abusive and deceptive recruiting and enrollment practices including: misleading

prospective students about tuition costs, academic program quality, accreditation, graduation

rates, and graduate employment prospects and expected salaries and aggressively targeting low-

income and vulnerable populations; using abusive telephone marketing practices; encouraging

students' and prospective students' to falsify their financial aid forms; and the improper

incentive based compensation system for admissions representatives, both of which violated

Title IV requirements, and, thus, gravely threatened EDMC's receipt of federal student aid,

which comprised 81% to 89% of its revenues during the Class Period.  Likewise, the Exchange

Act Defendants repeatedly misrepresented EDMC's current and historical data in connection

with their representations regarding EDMC's ability to comply with changes to Title IV

regulations being considered by the Department of Education, particularly as to the elimination

of the "safe harbors" regarding incentive based compensation and the repayment rate method for demonstrating "gainful employment."

187.    EDMC's enrollment and revenue figures and its eligibility for Title IV funds, its primary source of revenue, were important metrics viewed by investors and analysts and frequently touted by the Exchange Act Defendants in their press releases, filings and conference calls, boosting EDMC's stock price following all but one of the Company's earnings announcements during the Class Period.

### A.    The Fraudulent Scheme

#### 1.    EDMC Systematically Employed Abusive and Deceptive Recruiting and Enrollment Practices Encouraged By Management and Managements' Unrealistic Enrollment Quotas and Improper Incentive-Based Compensation

188.    Throughout the Class Period, and concealed from investors, the Exchange Act Defendants, in order to increase revenues by increasing enrollments, set unrealistic and ever-increasing enrollment goals and instituted abusive recruiting and enrollment practices, including instituting enrollment quotas and an improper incentive compensation system for admissions representatives that the Exchange Act Defendants knew or were reckless in not knowing would lead to the systemic use of abusive and deceptive recruiting and enrollment practices.

##### a.    EDMC Management Set Unrealistic Enrollment Quotas And Constantly Monitored Enrollment Numbers And Admissions' Staff Quotas

189.    According to numerous former EDMC employees, since 2006, when the Company was taken private in connection with an acquisition by a consortium of private equity investors and new management was brought in, including Defendants Nelson and West, and Senior VP of Marketing and Admissions DiGiovanni, Chief Information Officer Carroll, and Senior Vice President of Student Recruitment/Enrollment Shah, the focus at EDMC switched

from education to profits and aggressive recruitment.  Since that time and throughout the Class

Period, in order to increase revenue and growth, management set unrealistic goals for enrollment

and instituted aggressive recruiting policies.  According to CW9, a former VP of Marketing &

Admissions at EDMC corporate headquarters from 1998 until just before the end of the Class

Period, achieving growth by aggressively increasing enrollments became a major goal for the

Company.  As reported by CW13, once new management came in, EDMC's primary goal was

achieving increasingly greater volumes of student enrollments and a "radical shift in recruitment

policy" followed that "struck fear" with the EDMC recruiting staff.  CW15 further stated that

Defendant Nelson instituted the improper and abusive recruitment and compensation systems.

190.    CW9 reported that EDMC's senior management, including Defendants Nelson

and West, criticized EDMC's historical business practices, including that EDMC had "not grown

fast enough," and was "too cautious" and "not aggressive enough."  CW9 had been historically

involved with the coordination of Marketing & Admissions' budgeting, forecasting, and strategy,

including "coming up with [the] numbers" for plans and forecasts based on the Company's prior

performance.  According to CW9, when new management came in, including Defendants Nelson

and West, they took over this process and the reports and plans they prepared "did not make

sense" and used numbers that were "overly aggressive" based on CW9's prior experience with

EDMC's budgets and performance.  CW9 further stated that much of these aggressive forecasts

concerned EDMC's increasing enrollment of students in online programs through a new, "large

organization" for online recruiting based in Phoenix and Pittsburgh.

191.    Likewise, as reported by CW8, a former senior financial analyst at EDMC who

worked with the enrollment goals and numbers on a daily basis, EDMC's "goals for recruitment

were extremely over aggressive.  Their whole budget and objectives were well out of reach" and

"there was a marketing atmosphere to be aggressive to recruit and to go after as many students as you can."  CW8 further said that EDMC management set very aggressive goals for the entire online division - EDMC's plan was to double the size of the online division "practically every year" with the use of "aggressive marketing and aggressive sales people."  EDMC management kept a close eye on enrollment, and CW8 understood that management knew "hour by hour" exactly where the online division was in terms of enrollment, with enrollment figures updated and captured in a computer system that was "kept very current."  In fact, CW8 recalled being in a meeting with senior management where at 3:00 p.m. there was an announcement that EDMC had enrolled 87 new students in a certain online program.  Likewise, CW11 said that a number of regular reports were prepared by the online admissions department for senior management.  There was also a "dashboard" system that showed the total number of student retentions, the number of students enrolled versus EDMC's target numbers for enrollment.

192.    Further, according to CW7 who recruited ADAs, EDMC aggressively sought to expand the number of ADAs at the Company, requiring CW7 to hire 50 to 60 new ADAs per week.  CW7 recalled that these hiring targets were set out in an Excel spreadsheet with "formulas that directly tied the number of ADAs with productivity and for EDMC to make its earnings numbers."  CW7 recalls having to prepare, every Monday by noon, several Excel spreadsheets called "Hire and Fire Reports," "Recruitment Matrix," and the "Weekly Staffing Report" that tracked how many ADAs were hired, fired, or quit each week, as well as the weekly recruiting goal for new ADAs.  This data was used to project how many ADAs were needed to keep up the volume of student enrollments and earnings.  All of this information was uploaded to EDMC's computer system through a "Recruitment Dashboard" to which only EDMC's senior-level managers had access.  CW7's reports were also sent to Online CEO Weiss, the Director of

Human Resources, and the Vice Presidents of each of EDMC's online brands for discussion on conference calls that were held every Monday at noon. Tellingly, according to CW7, despite the pressure to hire new ADAs, EDMC would not allow its recruiters to work with EDMC's career services staff to hire graduates of EDMC institutions, stating, "They were adamant that I not work with career services [at EDMC schools]."

193.   As reported by numerous former EDMC employees from different geographic regions and business units, including CWs 1, 2, 3, 4, 5, 7, 12, 14, 15, and 16, throughout the Class Period, recruiting staff were under extreme pressure to meet enrollment quotas at EDMC. CW16 recalled that ADAs faced increasing enrollment quotas and that Defendants Nelson and West pressured directors of admissions, ADAs' supervisors, to increase enrollments, resulting in an environment that, "was very frightening, very intimidating" for ADAs. CW16 recalled that Defendants Nelson and West would meet with directors of admissions for discussions, "if the numbers aren't there." According to CW16, management's attitude was, "[i]f you can't get it done, we'll replace you." CW16 stated that if an ADA didn't make their quota, then they would be put on probation and after they missed their quota a third time, they would be fired. CW16 recalled being promoted due to having met enrollment targets and that, "the promotion was not based on experience [or] skill sets, it [was based] upon numbers, and if the people in your team aren't producing, then you get demoted."

194.   CW15 also recalled that EDMC set aggressive sales goals for ADAs who "signed a contract that [they] would hit this sales goal," adding further that, "there was a ton of pressure to hit your numbers every month." CW5 recalled that EDMC management kept close tabs on each ADA's performance, and that those that did not meet their quotas were placed on a probationary period and if they did not get their numbers up, they would be fired. Every week,

EDMC monitored the enrollment numbers for each ADA, and CW5 recalled attending weekly

meetings with Kate Kelliher, the Admissions Director for the Art Institute and interim VP for

online admissions, and other VPs for admissions at EDMC, at which ADA enrollment numbers

were reviewed and decisions were made as to which ADAs would be disciplined or fired based

on their production.  As CW5 described these decisions, "[i]t was all about the numbers."  Bittel

also testified that ADAs at Argosy University were "constantly pressured to deliver a minimum

of two applications per week."  CW2 reported that CW2's boss stressed the importance of

meeting target enrollments: "make sure you deliver the numbers."

195.    CW1 described a company-wide meeting in or about November, 2009, attended

by EDMC Online Higher Education CEO Weiss and President Kline where new requirements

for ADAs were instituted adding to the existing enrollment quota system.  The changes included

increasing the amount and duration of required telephone contacts with prospective students to

150-200 calls with at least 3-4 hours of "talk time" per day.

### b.     EDMC's Improper Incentive-Based Compensation System

196.    In furtherance of these unrealistic enrollment quotas, as reported by numerous

former employees from different geographic regions and business units, including CWs 1, 2, 3,

4, 5, 7, 11, 12, 14, 15, and 16, EDMC set ADA compensation levels based on the number of

students that the ADA enrolled.  As relayed by CW10, a former VP of Human Resources, the

compensation system for admissions staffs was developed at the EDMC Corporate level and all

pay raises were approved by EDMC Corporate.  CW11, a former VP of Admissions likewise

reported that compensation for admissions representatives was developed by seven to ten high-

level executives, including Vice President of Student Recruitment/Enrollment Shah.  It was then

reviewed and approved by EDMC's senior management, including Defendants Nelson and West.

Similarly, CW15 recalled that Defendant Nelson was responsible for implementing EDMC's compensation system.

197.    EDMC's compensation system for admissions staff encouraged abusive and deceptive recruiting and enrollment practices and violated the ban on incentive compensation, including the "safe harbors."  CWs 1, 4, and 5 described a compensation "matrix" in which ADA compensation was tied to the ADA's enrollments.  Under the compensation system, admissions representatives were given a quota of new students they had to enroll each period.  Tellingly, as relayed by CWs 5 and 7, an enrolled student only counted toward the ADA's quota if the student also obtained financial aid.  According to an internal document and CW1, this compensation "matrix" was in place prior to and throughout the Class Period.

198.    As CW1 reported, compensation for admissions reps was "solely based on how many students you ran across the finish line."  CWs 1 and 5 reported that, every six months, ADAs were reviewed and had their salaries re-adjusted based on whether they had met their enrollment quotas.  As CW5 stated, those quotas were "very aggressive."  According to CWs 1 and 5, following those reviews, EDMC would adjust ADAs' salaries based on whether they had met their enrollment quotas.  Top performers would be required to meet increasingly higher production targets, including double-digit enrollments for the next enrollment session.  CW1 stated that ADAs who failed to meet their quotas saw their salaries cut.  As CW1 stated, outwardly, EDMC management said that compensation was based on other factors, but this was not actually true.  CW1, who was aware that the "safe harbor" rules precluded EDMC from paying its admissions staff solely based on enrollments, believed that EDMC's practices violated those rules.  CW3 likewise relayed that ADA compensation was based on enrollments and that the other factors that EDMC purported to use in evaluating ADAs were "just fluff."

199.    As CW4 relayed, when he was hired, South University's Director of Online

Admissions Segar said, "I can't pay you on commission but we have something called a matrix."

Segar then explained how EDMC used the "matrix" system to get around the restriction on

paying commissions in violation of the incentive compensation ban for Title IV funding.  CW4

stated that the matrix was, in fact, based on how many students ADAs enrolled into EDMC's

online programs for each recruitment period.  CW4 believed that EDMC's compensation

practices violated the ban on incentive compensation because ADA's salaries were based on the

number of enrollments.  CW4 also described having been under increasing enrollment quotas

during each successive recruitment period.  CW4's quotas started at 4 students per period and

were raised from 6, to 9, to 11 students per three-month period.  By the time CW4 left EDMC,

CW4 had to enroll 30 new students into EDMC's online programs every three months.  If CW4

failed to meet the increasing quotas, there was a risk of a salary reduction: "I had the potential of

losing 15% of my salary if I didn't meet the performance goals."

200.    CW2 also described EDMC's points-based system that awarded points for each

student that an admissions representative enrolled.  As CW2 further stated, at the end of each

recruiting period, "these points were tallied up and this determined your salary."  CW2 further

reported that, "the way compensation was structured at EDMC put a lot of pressure on

admissions reps to recruit as many students as they could," and that "[w]e were compensated

based on how many students you start."

201.    CW15 also recalled how ADA compensation was set by particular enrollment

quotas, recalling, "they had a chart, and depending on how much money you wanted to make

was your quota that you had to get." According to CW16, these enrollment quotas were directly

tied to ADA compensation, recalling that, "[y]ou can make so much . . . money, 70, 80, 90k –
you're paid based on people you brought in."

202.   CW12 recalled that EDMC's enrollment-based compensation could be
substantial, noting that, "[s]ome enrollment people were making more than their bosses because
they made their quotas.  Some made six-figure salaries."  CWs 1, 4, and 5 also described how
admission representatives received substantial increases in their compensation after short periods
of time due to having met or exceeded enrollment quotas.

### c.   EDMC's Systemic Abusive and Deceptive Recruiting and Enrollment Practices

203.   In order to meet these unrealistic enrollment quotas, encouraged by the improper
incentive based compensation and in furtherance of the aggressive recruitment policies of EDMC
senior management, admission representatives systematically engaged in abusive and deceptive
practices in recruiting prospective students and encouraged students to falsify their financial aid
forms in order for them to qualify for federal aid, in violation of Title IV, as ultimately disclosed
in connection with the GAO Report and HELP Committee hearing.  According to the Bittel
Letter, "all that was testified to in the [HELP Committee] hearings was not only very true, but a
companywide policy [throughout EDMC]."  As further relayed by numerous former EDMC
employees from different geographic regions and business units, including CWs 1, 2, 3, 4, 6, 7,
12, 13, 14, 15 and 16, and current employee Bittel, EDMC used abusive and deceptive tactics to
recruit prospective students to enroll in EDMC's programs.  CWs 1, 4, 6, 7, 12, 14, 15, and 16
described how EDMC regularly made misrepresentations to students, including in regard to the
academic obligations of EDMC's programs, financial aid repayment obligations, availability of
federal grants and qualification for federal student assistance, the full cost of EDMC's programs,
the quality of EDMC's programs, and the career prospects after graduation.

204.     CW15 recalled that ADAs were instructed to put pressure on prospective students and exploit their vulnerabilities, "[w]e were told [by supervisors] to 'make [prospective students] feel the pain, make them feel the pain.'"   CW15 further recalled receiving e-mails and attending a week-long training in Cincinnati on "making people feel the pain."   As part of this pressure tactic, CW15 recalled using details about vulnerable prospective students' personal lives to pressure them into enrolling.   ADAs would use an "interview process" script that enabled the ADA to "summarize back to them in [a] bleak picture, to make them feel the pain, to make them cry, no one has ever been turned away, as long as you want to sign on the dotted line and you can get financial aid, you are in."   For example, CW15 described a prospective student with a child and AIDS that was told, "now more than ever you need an education, for what time you have left here, get a job where they might have life insurance, get a job where you can get health insurance."   CW15 also stated that Defendant Nelson instituted the recruitment practices and policies.

205.     CW16 recalled that part of EDMC's sales training involved overstating the career opportunities available to graduates and overstating the help graduates would receive from EDMC's career services personnel.   CW16 said, "they wanted us to paint a visual for these people . . . they'd [have us] say '. . . ya know, after you finish this program, pause, aren't you looking for the perfect job?  Don't you think, to be a counselor, wouldn't it be great?  One of the great benefits for you as a student is our career service, they'll help you, they have umpteen amount of places they can refer you to."   According to CW16, however, career services at EDMC were of little value, "[c]areer services was four people who basically go on monster.com and indeed.com, they have no connections."   CW16 further recalled that EDMC provided training to ADAs to, "convince people, sometimes have them on the phone for three hours, [we

would] would wear them down to get them to apply."  CW16 also recalled that supervisors

encouraged ADAs to use such tactics as telling prospective students that the ADA's supervisor

had waived the $50 application fee for the prospective student because the supervisor thought the

prospective student would "be such a good student."  In fact, however, the ADA had not spoken

to the supervisor about the prospective student and supervisor approval was not required for the

ADA to waive an application fee.

206.    CW16 also recalls having been pressured to enroll vulnerable students that were

unprepared for college level study.  For example, CW16 recalled having been pressured by a

supervisor to enroll a prospective student who was "not ready to go to school" according to her

psychiatrist, with the supervisor telling CW16, "you should have closed her. . . why didn't you

get her into a program?"

207.    CW4 recalled EDMC using "heavy sales recruiting tactics" to get students to

enroll in online courses, and stated that, for example, "I was encouraged to not tell people what

the cost of the school was in actuality."  Similarly CW15 described how the training EDMC

provided to ADAs encouraged them to answer prospective students' questions evasively when

the "real answer" would discourage enrollment.  For example, CW15 stated that if ADAs were

asked if Brown Mackie's credits would transfer to another institution, "the real answer is 'no

college will take our credits,'" but instead, "what we would say is, 'this course is designed for

you to enter the job market,' . . . 'if you do plan on transferring, contact that school.'"  Similarly,

with respect to questions about career prospects for graduates, CW15 described that, "[w]e

would just tell them, you can go onto the web and punch it in, and see what numbers you come

up with, [but they] spend $40k with us and can get an $8/hour medical assistant job, but we can't

tell them that."  CW15 further recalled that ADAs would be reprimanded for telling prospective

students that the majority of tuition costs would need to be paid using loans rather than grants, that federal student loans were not dischargeable in bankruptcy, or that defaulting on student loans could prevent the student from obtaining a mortgage.

208.    CW15 also recalled the if a prospective student changed his or her mind about enrolling, ADAs told the student that they had to come to the office to sign paperwork. According to CW15, there was no paperwork to sign.  Rather, this was a tactic to get the student in the door for additional pressure from a senior director of admissions.

209.    Current employee Bittel provided testimony to the Senate HELP Committee about how EDMC's admissions staff would use high-pressure tactics to get prospective students to enroll, including by making repeated and persistent telephone calls to prospective students. CW12 recalled that "[t]he admissions reps tell [prospective students] exactly what they want to hear" about EDMC's academic programs.  Similarly, CW14, a former recruiting agent at EDMC, recalled that EDMC recruiters were instructed to "make the program sound like it is more effective than it is" and "make it sound exciting."  CW16 also described how ADAs were trained to overstate career services available to graduates and "paint a visual" for prospective students to sell them on the hope of a "perfect job" in their dream field.

210.    Additionally, CW1 relayed hearing ADAs encourage students to cheat on required college placement exams – recalling that ADAs told students "I don't care who takes your college placement exam."  CW1 further reported hearing ADAs promise students that they would receive financial aid and not have to pay it back, including telling students that they could default on student loans and write them off, and telling graduate-level students that they were eligible for Pell grants.  CW1 also heard ADAs misrepresent students' homework obligations

and need to buy books or course materials.  According to CW1, "[t]hey didn't care as long as they got students in.  It was all about the [compensation] matrix."

211.    CW7 conducted exit interviews of ADAs and recalled hearing from ADAs that "[t]here were a lot of people who were asked to do things [that were] unethical."  CW7 described how ADAs complained of being asked to lie or give misinformation when students applied for financial aid so that the ADAs could meet their quotas, including, "I heard that many times the ADAs . . . were asked to prepare [prospective students] about what to tell financial aid."  CW7 also described ADAs having complained, "I can't do this to people.  [Students] don't know what they're getting into.  It's too expensive."  CW7 also stated that "[i]t was a disgrace what [EDMC] charged people to get what was essentially a valueless degree."

212.    CW1 described being coached on what to tell students when filling out their FAFSA forms.  CW1 also reported having witnessed financial aid staff direct prospective students to file revised tax returns if "EDMC didn't like the information presented in their taxes." Such students were told to file tax revisions on an IRS form 1040-X, with EDMC asking the student to change the ages of their dependents, amounts of money earned by students or dependents, and/or whether the student was living with a parent that could be considered a dependent.

213.    According to CW6, a former Associate Director in the financial aid department, during a conference call some time after October, 2009, with 93 other financial aid counselors and financial aid directors from EDMC's various schools, one of the counselors asked a question about whether a student could claim her three undocumented, non-citizen children as dependents on a FAFSA form to qualify for more federal student aid when the student had not claimed those children as dependents on her tax return.  CW6 recalled that Andre Jagot, EDMC's regional

compliance trainer, told the financial aid counselor that it would be fine to do so.  After the call, CW6 presented documentation to Justin McLaughlin, the financial aid director at South University's Tampa campus, showing that Jagot was wrong in his conclusion and that the student would not be in compliance with federal regulations.  McLaughlin, who CW6 described as "notorious for turning his head," nonetheless said that the student could claim the additional dependents.  CW6 also described having discovered that, in October 2009, several graduate students receiving direct loans from the Department of Education were receiving $6,000 above the typical amount of aid awarded to students in the program.  CW6 brought these over-awards to McLaughlin's attention and told him, "I don't think this meets the criteria – we're over-awarding the students."  McLaughlin ignored CW6's finding, and the over-awards continued through CW6's departure from the Company in April 2010.  CW6 is aware from contacts with current employees at South University that the government eventually discovered these over-awards and required EDMC to return $250,000 in over-awarded grants.

214.    Further, CWs 3 and 5 and current employee Bittel further described how EDMC would target economically or otherwise disadvantaged individuals who ADAs would lure with, among other things, promises about the availability of federal student assistance.  CW3 recalled, "it was [ADAs'] job to talk [students] into [enrolling,]" including "[people who] would never be able to pay for their education."  Bittel testified that, "high-pressure sales tactics are being used to recruit individuals from the lower-income sector of our population as they are eligible for the most amount of [federal student] aid."  The Bittel Letter further stated that one of her co-workers "also attempted to enroll gentlemen in homeless shelters and programs for the underprivileged," and that Bittel "was encouraged to enlist a woman hiding out in a battered women's shelter to go to the library and attend her classes."  Similarly, CW5 recalled EDMC focusing on "enrolling

everybody it could," including students with special needs that "barely passed high school . . . [and] would never pass in this college environment."

215.    Current employee Bittel also provided extensive testimony to the Senate HELP Committee about how EDMC's main goal was student recruitment, with little attention to helping its graduates find employment.  Bittel testified that EDMC devoted substantially more resources to recruiting and enrollment than career placement, including describing "a systemic problem here when there are only nine [career services] employees servicing the students that are being recruited by an admissions workforce of almost 1,600.

> **d.      EDMC Manipulated Its Graduate Employment and Enrollment Figures**

216.    During the Class Period, EDMC also engaged in manipulation of its enrollment figures and graduate placement figures - figures demonstrating "gainful employment."

217.    CW8 recalled believing that EDMC's system for reporting enrollment data was not subject to internal controls that were "true and accurate."  According to CW8, EDMC counted students as "enrolled" when they had been enrolled during the previous semester but had not decided to enroll in any classes in the current semester.  CW8 believed that such students should not have been counted as enrolled as they were not "technically" enrolled in the current semester.

218.    Further, current employee Bittel testified and wrote in the Bittel Letter that EDMC's career placement statistics were manipulated to count graduates as "gainfully employed" for the purposes of the Company's reported figures that should not have been so counted.  These tactics included using estimated average salaries rather than graduates' actually reported earnings, manufacturing emails from graduates to "say whatever it needed to say, to justify placement," using "waivers" to avoid counting unemployed or underemployed graduates

in EDMC's employment statistics, and counting as "employed" graduates who had worked at a job "for merely one day." These tactics also included extremely manipulating graduates' job descriptions to have them included within the definitions of "field related employment," such as convincing a Graphic Design graduate working at Starbucks that she was "using her skills" by making signs for daily specials.

219.   As Bittel further testified, like ADAs, career services staff also were required to meet "quotas" – these quotas were based on the number of graduates each career services employee reported as "gainfully employed" – and their compensation was tied to meeting these quotas. According to Bittel, the reported graduate placement numbers are "not realistic numbers." As Bittel further described, after she reported to her manager that a co-worker had falsified student employment information, the co-worker was not disciplined and actually received an award shortly thereafter. As Bittel stated, "the way she took it" was that EDMC encouraged this type of manipulation. In fact, as Bittel further testified, EDMC career services had weekly "brainstorming meetings" attended by the EDMC career services advisors and supervisors throughout the EDMC system where "angles" would be developed to fit graduates who were not adequately employed into the gainfully employed statistics.

220.   CW15 also recalled that career placement statistics at EDMC were misleading, including that the school reported a graduate as placed when, "they could have been in that job for just one day" and also that definitions of relevant employment were stretched. "[I]f you had a business administration or management degree and you ended up as a manager of a Circle K [convenience store], they included that in the statistics saying that's management."

## 2.   Misrepresentations Regarding Changes to Title IV Regulations

221.   As discussed above, prior to and throughout the Class Period, certain changes and enhancements to Title IV regulations were being considered by the Department of Education,

including eliminating the "safe harbors" related to the ban on incentive compensation for admissions and financial aid personnel and adding standards to the requirement that certain programs, including those at proprietary colleges, demonstrate that its graduates are finding "gainful employment" in their field. These impending changes were widely reported and publicized and investors and analysts were acutely focused on their impact on for-profit education providers, including EDMC, as they had the potential to materially impact schools' eligibility for Title IV aid and, thus, their revenues.

222.   However, as detailed below, throughout the Class Period, the Exchange Act Defendants continually misrepresented the impact of the regulatory changes on EDMC and its then-present metrics related to these regulations. The Exchange Act Defendants repeatedly stated that EDMC would be able to comply with the elimination of the "safe harbors," yet concealed the fact that its current compensation system was actually in violation of the current ban on incentive compensation, including the "safe harbors," and would therefore also be in violation once the "safe harbors" are removed.

223.   Further, as to the enhancements to the "gainful employment" regulations, by February, 2010, and throughout most of the first half of 2010, the Department of Education was considering requiring programs to demonstrate a debt to income ratio of 8% or a 90% repayment rate on Title IV loans among a program's graduates in order to satisfy the "gainful employment" requirement. As to the loan repayment rate threshold, a loan would not be considered in repayment if it was delinquent, in default, in deferment or in forbearance. Thus, analysts and investors were intently interested in EDMC's repayment rate, particularly as EDMC's programs, especially the Art Institute's programs, were considered unlikely to produce the necessary post-

graduation earnings relative to the cost of the programs to stay within the 8% debt to income ratio.

224.    As discussed below, however, in their discussions of the "gainful employment" regulations and the 90% repayment rate during the Q2 FY 2010 and Q3 FY 2010 earnings conference calls, Defendants Nelson and West made several false and misleading statements suggesting that EDMC's current and historical repayment rates met the 90% repayment rate threshold.  Specifically, in connection with their discussions of the pending "gainful employment" regulations and the repayment rate thresholds being considered by the Department of Education, Defendants Nelson and West repeatedly stressed EDMC's low "cohort default rates," including EDMC's draft 2008 cohort default rate of 7.5%, to suggest that EDMC's repayment rates were correspondingly high and, thus, exceed a 90% threshold.  What Defendants Nelson and West misleadingly failed to disclose, however, is that "cohort default rates" are in no way comparable to repayment rates.  Specifically, cohort default rates measure default only, and do not include loans that are not "in repayment" because they are in deferment, forbearance, delinquent or are otherwise not being repaid.  Thus, Defendants Nelson and West misled the market with their use of the incomparable cohort default rates.

225.    Subsequently, on July 23, 2010, the Department of Education released its proposed regulations regarding the "gainful employment" requirement, lowering the 90% repayment rate threshold it had previously considered to 45%.  Under the proposed rules, programs will be fully eligible if at least 45% of the principal of the loans of former students is being paid down or if its graduates have debt to income ratios of less than 20% of discretionary income or 8% of total income.  A program will become ineligible to offer government financial aid to students if less than 35% of the principal of the loans of former students is being paid

down and if its graduates have a debt to income ratio above 30% of discretionary income and

12% of total income.  Further, programs that fall between these eligibility measures will be

restricted.  Restricted programs will have enrollment growth limits and be required to

demonstrate employer support for the program and warn consumers and current students of high

debt levels.

226.     At EDMC's earnings conference call following the release of the proposed rules,

the Q3 FY 2010 earnings conference call, Defendants Nelson and West, for the first time,

disclosed additional "metrics" relative to EDMC's repayment rates - disclosing information

regarding EDMC's defaults, deferment, and forbearance rates.  Defendants Nelson and West

stated that these figures totaled approximately 36.6% across EDMC and suggested a

corresponding repayment rate of approximately 63.4%, well above the 45% rate in the proposed

rules. Thus, Defendants Nelson and West again misleadingly suggested EDMC's repayment

rates were above the relevant threshold.  Further, the fact that such metrics were not disclosed on

the earlier calls when the Department of Education was considering a 90% repayment further

evidences their intent to mislead investors as to EDMC's repayment rate.

227.     As ultimately revealed on the last day of the Class Period, EDMC's average

repayment rate is approximately 38%, well below the figures misleadingly suggested by

Defendants Nelson and West during the conference calls on February 10, 2010, May 5, 2010 and

August 12, 2010.

### 3.      The Exchange Act Defendants Concealed a Material Related Party Transaction With an Affiliate of Goldman Sachs Capital Partners

228.     Throughout the Class Period, the Exchange Act Defendants concealed the fact

that Goldman Sachs Credit Partners, an affiliate of Goldman Sachs Capital Partners, was a major

creditor to EDMC.  The Exchange Act Defendants concealed that Goldman Sachs Credit

Partners was a major lender under both the term loan facility that had been used to finance

EDMC's private equity shareholders' leveraged buyout in the 2006 Transaction, and EDMC's

$422.5 million revolving credit facility.  As described at ¶¶118-131 above, *supra*, EDMC's

indebtedness to Goldman Sachs Credit Partners was a material related party transaction that

existed as of time of the IPO.  The Exchange Act Defendants concealed this relationship in the

Registration Statement and continued to do so throughout the Class Period.

229.    Goldman Sachs Capital Partners and its affiliates were able to exert significant

control and influence over EDMC throughout the Class Period.  Goldman Sachs Capital Partners

was EDMC's largest shareholder throughout the Class Period, holding more than a third of

EDMC's common stock.  Goldman Sachs Capital Partners and its affiliates were also connected

to three members of the EDMC board of directors, including Securities Act Defendants Jones (a

Managing Director at Defendant Goldman Sachs) and Mullin (a senior advisor to Goldman

Sachs Capital Partners), and Mick J. Beekhuizen (a Vice President in the Merchant Banking

Division of Defendant Goldman Sachs) who became a member of the EDMC board following

the IPO.

230.    As revealed to the market in an August 5, 2010 *BusinessWeek* article, "Goldman

Schools Students on Debt," EDMC owed a substantial debt to its private equity shareholders.

The article also described that this debt was a material factor related to EDMC's aggressive

enrollment growth goals and strategies that, in turn, led to abusive and deceptive recruiting and

enrollment practices.  The *BusinessWeek* article cites EDMC's former CFO, Robert T.

McDowell, as recalling, "[t]he debt from the acquisition changed the culture of EDMC," and that

McDowell was "worried that the quality of the experience for employees and students was going

to deteriorate." McDowell is further quoted as stating, "[y]ou take on that amount of private-equity debt, you need to earn high rates of return for these investors."

231.     The Company confirmed this related party transaction in a post-Class Period statement.  On December 6, 2010, EDMC filed a Form 8-K regarding an extension of the maturities of the term loan facility and revolving credit facility in which it stated that Goldman Sachs Credit Partners L.P, an affiliate of Goldman Sachs Capital Partners, is one of the lenders under the Company's revolving credit facility and term loan.  GAAP requires that entities disclose material related party transactions.  FASB Accounting Standards Codification 850 ("ASC 850") articulates the applicable GAAP standard for disclosures of related party transactions for periods ending after September 15, 2009.[6]  ASC 850 applies to transactions between, among other parties, "[a]n entity and its principal owners" and "affiliates."  ASC 850-10-10-1 states:

> Information about transactions with **related parties** that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance.  Therefore, this Topic establishes requirements to disclose certain significant related party transactions and **control** relationships.  Relevant information is omitted if the disclosures required by this Topic are not made.  [Boldface in original.]

232.     The glossary at ASC 850-10-20 defines "Principal Owners" to include "owners of record or known beneficial owners of more than 10 percent of the voting interests of the entity." An "Affiliate" is defined as "a party that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with an entity."  ASC 850-10-20 further defines "Related Parties" to include:

> a. Affiliates of the entity . . .

---

[6] According to FASB's June 2009 Statement of Financial Accounting Standards 168 ("SFAS 168"), the applicable GAAP for financial statements issued for interim and annual periods ending after September 15, 2009 is codified in the FASB Accounting Standards Codifications ("ASC").  For these periods, the ASC replaces existing FASB guidance, including SFAS 57.

d. Principal owners of the entity and members of their immediate families . . .

f. Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.

g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

233.    ASC 850-10-50-1 states:

Financial statements shall include disclosures of material related party transactions . . . .  Those disclosures shall include:

a. The nature of the relationship(s) involved

b. A description of the transactions . . . for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transaction on the financial statements

c. The dollar amounts of the transaction for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period

d. Amounts due from or to **related parties** as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement [Boldface in original.]

234.    The Exchange Act Defendants' concealment of the related party transaction with Goldman Sachs Credit Partners throughout the Class Period therefore violated their disclosure obligations under GAAP and the securities laws.

**B.    The Exchange Act Defendants' Material False and Misleading Statements and Omissions**

**1.    The Registration Statement**

235.    Plaintiffs repeat and reallege each of the materially false and misleading statements and omissions in the Registration Statement as set forth above in ¶¶92-134, 136-161, and for the reasons set forth in  ¶¶92-134, 136-161, as if fully set forth herein.  In addition to the

false and misleading statements and omissions set forth in the Registration Statement, each of

which was made with scienter by the Exchange Act Defendants and is actionable under the

Exchange Act, the following false and misleading statements and omissions were made with

scienter during the Class Period.

### 2.     First Quarter Fiscal Year 2010

236.     On November 4, 2009, EDMC issued an earnings release for the first quarter of

fiscal year 2010, touting its increase in enrollment and revenues:

> For the first quarter of fiscal 2010, net income was $15.8 million, or $0.13 per
> diluted share, an increase of $19.1 million from the quarter ended September 30,
> 2008.  Net revenues rose 23.1% to $534.4 million from the first quarter of fiscal
> 2009.

> Todd S. Nelson, Chief Executive Officer of Education Management, commented,
> "We are reporting record student, revenue and EBITDA results for our first fiscal
> quarter."

> ***

> Net revenues for the three months ended September 30, 2009 increased 23.1% to
> $534.4 million, compared to $434.2 million for the same period a year ago.  This
> increase was primarily driven by a 23.1% increase in July student enrollment.

> For the first quarter of fiscal 2010, net income for the quarter grew to $15.8
> million, or $0.13 per fully diluted share, compared to a net loss of $(3.3) million,
> or $(0.03) per fully diluted share, for the same period a year ago.  Earnings before
> interest, taxes, depreciation and amortization (EBITDA) increased 52.6% from
> $59.4 million in the first quarter of fiscal 2009 to $90.6 million in the first quarter
> of fiscal 2010 primarily due to higher student enrollment.

237.     The November 4, 2009 earnings release went on to further tout EDMC's

enrollment growth, "At the start of the current October quarter (second quarter of fiscal 2010),

total enrollment at our schools was over 136,000 students, a 22.7% increase from the same time

last year.  Same-school enrollment (schools with enrollment for one year or more) increased

22.1% to over 135,300 students.  Students enrolled in fully online programs increased 60.0% to

approximately 31,200 students."  The release further, stated, "We are committed to offering

quality academic programs and continuously strive to improve the learning experience for our

students."

238.    The same day, on November 4, 2009, EDMC held an earnings conference call.

During the call, Defendant Nelson stressed EDMC's reputation, commitment to its students,

growth, quality and compliance, stating:

> Being one of the largest and most diverse for profit post secondary education
> companies, it's important to maintain an excellent reputation, which we believe
> we have achieved through our commitment to student and graduate success and a
> critical focus on academic quality.  We meet the needs of our students by offering
> a very diverse set of programs across all degree levels and delivery methods
> through four highly-recognized and respected school brands.  []diversification by
> design is our blueprint for sustainable growth.  We have built around our desire to
> serve a large portion of the higher-education market, from art and design to health
> and behavioral sciences to business and education with four high-quality and
> well-recognized education systems, each focused on unique offerings and
> different student demographics.  Over the past three years we've made significant
> investments in our business to support our long-term growth.  These investments
> in new locations and programs – online, technology, and marketing and
> admissions – have laid a strong and stable foundation for long-term sustainable
> growth.  We believe we have the ability to serve many more students while
> continuing to focus on a reputation for academic quality and compliance. Our
> reputation has been achieved through a long-established culture of doing things
> the right way.

239.    During the November 4, 2009 call, Defendant Nelson further emphasized

EDMC's enrollment growth and growth strategy:

> We experienced strong enrollment growth across all four of our education
> systems for our recent October start. We recorded record enrollment of over
> 136,000 students, an increase of 22.7% over the prior-year period. This growth
> was achieved across all academic disciplines and degree levels and supported by
> fully online enrollment growth of 60% to over 31,000 students, or approximately
> 23% of our total student population.  Over 60% of our students were enrolled in
> bachelors or graduate degree programs and spread across many program
> disciplines.  Excluding the six locations less than a year old same-school
> enrollment increased 22.1%. And finally, new students for the three-month period
> ended September 2009 increased by 28.7%, over the prior-year period.
>
> Now I'd like to update you on our growth strategy, and as you know, we have
> three primary elements to this strategy, including online education, new locations
> and new programs.  As demonstrated in the strong online enrollment we reported

again this quarter, we are pleased with the organization, platform and infrastructure that are in place to support future growth.  Led by John Kline, who has significant experience building and operating large online organizations, we are well positioned to grow our online platform to serve thousands of additional students while achieving improved efficiencies and greater margin expansion. Further, we continue to develop new programs to offer in an online delivery format. We now offer 55 fully online academic programs across three of our education systems, ranging from doctoral programs to bachelors and associates programs.

240.     During the November 4, 2009 call, Defendant Nelson also discussed the

purported placement rates and success of EDMC graduates:

Now I'd like to provide you an update on our quality metrics.  We foster an environment to help our students succeed, both academically and professionally. We strive to help our students stay in school and complete their education. Persistence through September 30th for both on ground and online was up slightly from last year.  In addition we regularly review our programs with industry and academic professionals to ensure that curriculum are meeting the needs of an ever-changing workplace and our career services department maintains relationships with approximately 70,000 employers.  Approximately 86% of our undergraduate students for available employment who graduated during the quarter ended this past March were employed in the field – or related fields within six months of graduation.

The average starting salaries for graduates from our undergraduate programs for the quarter ended this past March, bachelors degree students obtain an average salary of $33,000, while graduates from associates and diploma programs earn $28,000. We also see good results across our graduate-level programs, with those graduating students from South University and Argosy University attaining even higher salaries. Based on survey results received from the recent graduates the average salary for graduates from our masters and doctoral programs was approximately $48,000. We're very pleased with these results, particularly given difficult employment market.

241.     Further, during the November 4, 2009 call, Defendant West reported EDMC's

financial results based on increased enrollment: "For the first quarter ended September 30th net

revenues were $534.4 million, up 23.1% versus the prior year, EBITDA was up 52.6% and we

had net income of $15.8 million, or $0.13 per share, which was an increase of $19.1 million from

last year.  The revenue increase was driven by the July enrollment increase of 23.1% . . .

EBITDA was up 52.6% to $90.6 million for the quarter versus $59.4 million last year.  EBITDA margin was up 328-basis points to 16.9% for the quarter."

242.   During the November 4, 2009 call, in response to a question from a Morgan Stanley analyst regarding the negotiated rulemaking sessions, Defendant Nelson responded, that "we're monitoring it, and "it's about exactly as we expected."  Defendant Nelson further stated, "the main takeaway we have is that each of these issues, at least to this point, are things that we feel that we can manage."

243.   Further, during the November 4, 2009 conference call, a Piper Jaffray analyst inquired specifically about the hiring of admissions representatives, asking, "I know over the past several years you ramped up your admissions reps quite significantly across the various brands and as you look at the results that you see on the enrollment side, which are very good, are you planning to now curtail that growth, pull that back some, or how should we think about the growth of the admission reps in fiscal 2010?"  Defendant Nelson responded:

> First off, initially we were behind so we needed to right size the enrollment staff and so they were added at a much more rapid rate, and now going forward what – and we're also seeing now slight productivity increases with our enrollment staff, which is very encouraging. And so going forward what you'd expect is a little – projected on your expected growth rate to have your increase in hiring approximately mirror that same number of new student growth. So in real numbers it continues to go up percen – the percentage year-over-year increase will be coming down.

244.   Further, on the November 4, 2009 call, in response to a question from an analyst from Merrill Lynch requesting "a bit of background on how you pay your enrollment advisors;" Defendant Nelson replied that EDMC's compensation system was compliant with Title IV, stating:

> Sure. Actually there's a lot of consistency between education systems and there's a myriad of factors that are taken in to consideration that are very consistent with the Safe Harbor language that's out there that range from quality activities, as

well as enrollment-related activities and, again, that's monitored very carefully, it's been reviewed by regulatory council to make sure it's compliant.  And we continue to monitor what's going on in Neg. Reg. there, as well.  Our feeling is that if there are changes our belief is that won't hurt productivity because it's already, as you know, highly restricted.

245.    Also on the November 4, 2009 earnings call, Defendant West described EDMC's indebtedness and loan facilities, stating that after the IPO, EDMC's "revolving credit line now stands at $442.5 million."  West further stated that EDMC's "[l]ong-term debt at September 30th was $1.9 billion."  Further in connection with the IPO, West stated that EDMC had used the net proceeds from the IPO for a "bond tender offer" completed in connection with the IPO and for "the termination of a management advisory agreement with affiliates of certain shareholders." Later on that call, in response to a question from analyst Sara Gubins about whether EDMC had plans to pay down any more of its debt, West stated that, "obviously on cash flow flow [sic] comes in we evaluate the highest and best use to maximize the return for the shareholders here and as we see the excess cash flow, as that's generated, we will make decisions."

246.    Subsequently, on November 10, 2009, EDMC filed its Form 10-Q for Q1 FY 2010.  It was signed by Defendant West and certified by Defendants Nelson and West.  The Form 10-Q for fiscal Q1 2010 stated, "our chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures are effective."  It also contained signed Rule 13a-14(a)/15d-14(a) and SOX certifications by Defendants Nelson and West attesting to the accuracy and completeness of the Company's financial and operational reports contained therein and its internal controls and procedures.

247.    The Rule 13a-14(a)/15d-14(a) certifications in the Form 10-Q for fiscal Q1 2010 signed by Defendants Nelson and West stated:

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

248.    The SOX certifications signed by Defendants Nelson and West in the Form 10-Q

for fiscal Q1 2010 stated:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of
    the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material
    respects, the financial condition and results of operations of the Company for
    the periods reflected therein.

249.    In the Form 10-Q for Q1 FY 2010, Defendants again reported EDMC's increased

revenue and enrollment:

> Net revenues for the three months ended September 30, 2009 increased 23.1% to
> $534.4 million, compared to $434.2 million in the same period a year ago.
> Average student enrollment increased 23.1% in the current period compared to
> the prior period primarily due to the opening of new school locations, the growth
> in our fully online programs and the introduction of new academic programs.
>                                    ***
> Average student enrollment increased 23.1% in the current period compared to
> the prior period primarily due to the opening of new school locations, the growth
> in our fully online programs and the introduction of new academic programs.

250.    The Q1 2010 Form 10-Q also describes EDMC's "highly leveraged" position,

total indebtedness, term loan facility, and revolving credit facility in a manner that is

substantially consistent with the descriptions provided in the Registration Statement, as alleged

in ¶¶118-128, *supra*.  The Q1 2010 Form 10-Q updates EDMC's disclosures with respect to

EDMC's total amount of debt outstanding and the amounts outstanding under the term loan

facility and the revolving loan facility.  These disclosures included that, as of September 30,

2009, EDMC had over $1.885 billion in "aggregate indebtedness outstanding," nearly $1.124

billion outstanding under the term loan facility due in 2013, and no amounts outstanding under

the revolving credit facility.

251.    The above statements in EDMC's Q1 FY 2010 earnings release, conference call, and Form 10-Q, were materially false and misleading and omitted material facts required to make the statements therein not false and misleading insofar as:

(a)     EDMC's reported enrollment and revenue figures were improperly and materially inflated as a result of EDMC's systematic abusive and deceptive recruiting and enrollment practices and improper incentive based compensation practices;

(b)     the statements failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments, in violation of Title IV, which seriously jeopardized EDMC's ability to continue to receive federal student aid, its primary source of revenue;

(c)     the statements regarding EDMC's reputation, commitment to students and quality of EDMC's programs were false and misleading as they failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments;

(d)     the discussion of factors that purportedly led to increased student enrollments, and EDMC's "growth strategy" did not disclose that EDMC's enrollments were materially inflated by the Company's abusive and deceptive recruiting and enrollment practices;

(e)     Defendant Nelson's statements regarding EDMC's incentive compensation were false and misleading as EDMC's compensation policies were not "consistent with" the "safe harbors" and failed to disclose that EDMC set enrollment quotas for its admissions staff and adjusted their compensation based solely on the number of students they enrolled, in violation of Title IV;

(f)       despite the inclusion in the Form 10-Q for Q1 FY 2010 of a discussion of risks related to Title IV regulation and pending regulation, the 10-Q failed to disclose that the Department of Education was considering changes to HEA regulation, including elimination of the "safe harbors" related to the ban on incentive based compensation and developing standards to define the requirement that EDMC's programs provide "gainful employment" in a recognized occupation to its graduates, which would materially impact its eligibility for federal student aid;

(g)       Defendant Nelson's statements regarding the growth in the number of admissions representatives and enrollment staff were false and misleading as they failed to disclose the abusive and deceptive recruiting and enrollment practices employed by these admissions representatives, the improper use of admissions quotas tied to compensation, and the related impact on student enrollments;

(h)       the reported enrollment numbers were improperly inflated and false and misleading as EDMC counted students as enrolled who had not committed to enrolling in the current semester;

(i)       the reported graduate employment figures were improperly inflated and the statements regarding graduates' success were false and misleading as EDMC counted as "gainfully employed" for graduate employment statistics graduates who were not so employed;

(j)       EDMC did not maintain adequate systems of internal operational or financial controls, which would have permitted EDMC's reported financial and operational statements to be true, accurate or reliable; and

(k)       the statements in EDMC's Q1 2010 Form 10-Q and Defendant West's statements regarding EDMC's indebtedness omitted material information about that indebtedness insofar as

they failed to disclose the material related party transactions arising from Goldman Sachs Credit

Partners being a lender to EDMC in connection with the term loan and revolving credit facility.

### 3.    Second Quarter Fiscal Year 2010

252.    As discussed above, by February, 2010, the Department of Education was

considering requiring programs to demonstrate a 90% repayment rate in order to satisfy the

"gainful employment" requirement via the loan repayment rate threshold.  Further, the

Department continued to recommend the elimination of the "safe harbors" related to the ban on

incentive based compensation.

253.    On February 10, 2010, EDMC issued its earnings release for Q2 2010, again

touting its revenue and enrollment growth:

> Net revenues were $655.5 million, an increase of 25.5% as compared to the
> second quarter of the prior fiscal year.  Net income was $20.3 million, or $0.14
> per diluted share.  Excluding expenses incurred during the second quarter of fiscal
> 2010 in connection with our initial public offering ("IPO") and the related
> repurchase of $316 million of our senior subordinated notes ("debt repurchase"),
> net income would have been $76.0 million, an increase of 79.7% from the quarter
> ended December 31, 2008, or $0.53 per diluted share.
> ***
> Net revenues for the three months ended December 31, 2009 increased 25.5% to
> $655.5 million, compared to $522.2 million for the same period a year ago.  This
> increase was primarily driven by a 22.7% increase in October student enrollment.
>
> Net income for the second quarter of fiscal 2010, which included the expenses
> related to our IPO and debt repurchase, was $20.3 million, or $0.14 per diluted
> share, compared to net income of $42.3 million, or $0.35 per diluted share, for the
> same period a year ago. Earnings before interest, taxes, depreciation and
> amortization (EBITDA) increased 3.2% to $139.1 million in the second quarter of
> fiscal 2010.
>
> Excluding the expenses related to our IPO and debt repurchase, net income for the
> three months ended December 31, 2009 grew 79.7% to $76.0 million, or $0.53
> per diluted share and EBITDA increased 37.2% to $184.8 million in the second
> quarter of fiscal 2010.  The increase in EBITDA is primarily due to higher student
> enrollment.

254.    The February 10, 2010 release further emphasized the increased enrollment, "At

the start of the current January quarter, total enrollment at our schools was over 139,400

students, a 22.4% increase from the same time last year.  Same-school enrollment (schools with

enrollment for one year or more) increased 21.4% to over 138,300 students.  The number of

students enrolled in fully online programs increased 54.9% to approximately 34,800 students.

255.    The February 10, 2010 press release also quoted Defendant Nelson, "We are

pleased with our strong financial performance.  This performance was the direct result of

meeting the educational needs of our students and helping them succeed both academically and

professionally.  Further, through the efforts of our faculty and career services staff, our graduates

are continuing to find employment opportunities in this challenging job market." The press

release further stated, "We are committed to offering quality academic programs and

continuously strive to improve the learning experience for our students."

256.    The same day, on February 10, 2010, EDMC held an earnings conference call.

On that call, Defendant West again touted the results based on increased enrollment:

> For the second quarter ended December 31, net revenues were 655.5 million, up
> 25.5% versus the prior year…EBITDA increased 37.2% to $184.8 million.  Net
> income was up almost 80%, and earnings per share was $0.53 per diluted share.
> The revenue increase was driven by an October enrollment increase of 22.7% and
> an approximate 6% increase in tuition rates… EBITDA, adjusted for the IPO and
> debt repurchase expenses increased 37.2% to $184.8 million for the second
> quarter versus $134.7 million last year.  The adjusted EBITDA margin was up
> 239 basis points to 28.2% for the quarter…  Adjusted operating income was up
> 45% to 155.4 million in the current period versus 107.2 million in the year ago
> period.  And the adjusted operating margin was up 319 basis points to 23.7% for
> the current quarter.

257.    During the February 10, 2010 call, Defendant Nelson further stated, "I am pleased

to report that for our recent start, we were able to serve the education needs of an increasing

number of students across all academic disciplines and degree levels, as well as all four of our

Education Systems.  For our January start, we had enrollment of over 139,400 students, an

increase of approximately 22% over the prior-year period.  Of this total, students taking their

classes in a fully online modality grew 55% to approximately 34,800 students, representing

about a quarter of the total population.  Excluding the ten locations that are less than a year old,

same school enrollment increased 21%.  Finally, new students for the three-month period ended

December 2009 increased by approximately 25% over the prior-year period."

258.    During the February 10, 2010 call, Defendants further touted the purported

success, job placement rates and salaries of graduates.  Defendant Nelson stated:

> I'd like now to provide an update on our quality metrics. Through the efforts of
> our faculty and career services staff, we're pleased with the continued success our
> graduates are having finding employment despite the very challenging job market.
> Approximately 85% of undergraduate students available for employment who
> graduated during the quarter that ended this past June were employed in their
> fields or related fields within six months of graduation. The average starting
> salaries for graduates from our undergraduate programs for the quarter ended this
> past June, Bachelor Degree students obtained an average salary of $32,000, while
> graduates from Associate's and diploma programs earned $28,000. We also see
> good results across our graduate programs, with those graduating students from
> South University and Argosy University obtaining even higher salaries. Based on
> the latest survey results received from recent graduates, the average salary for
> graduates from our Master's and Doctoral level programs was approximately
> $48,000.

259.    On the February 10, 2010 call, Defendants Nelson and West further indicated that

EDMC would be able to comply with the pending regulation regarding incentive compensation

and "gainful employment."  As to incentive compensation, Defendant Nelson stated, "we can

comply with whatever language that is finally included in the regulation."  In connection with his

discussion of the "gainful employment" regulations, Defendant Nelson stated, "Our quality

programs address a broad range of programmatic and degree levels that are demanded by

students as well as employers.  We have an excellent reputation that has been achieved through a

commitment to student and graduate success and a long established culture – excuse me – of

doing things the right way.  We do believe the value we provide to student and the success they

have in their fields of interest is best illustrated by low [cohort] default rates, as well as excellent

graduate outcomes."

260.    During the February 10, 2010 call, Defendant West expanded on the statements

regarding the "gainful employment" regulations:

> To expand on the comments Jock and Todd made regarding gainful employment,
> I wanted to share with you certain key metrics that are readily accessible.  Much
> of the data for the proposed metrics are not readily accessible, such as three-year
> reporting, pre-existing debt levels, delinquencies, a reason for deferment, or
> tracking of the data for loans that have been consolidated.  Thus, it would be
> inappropriate for us to comment on the speculation of these proposals.  We do,
> however, have good information on cohort default rates.  As we've previously
> reported, based on the official two-year cohort data, the Federal default rate for
> 2007 was [8%] across the EDMC institutions.  We were pleased by the draft rates
> for 2008 that showed that default rate declined to 7.5% on a consolidated basis
> across the EDMC institutions.  We have historically had below average cohort
> default rates as compared to many of our peers; and as you would expect, the
> cohort default rate for graduates is even lower.  For the 2005 through 2007 cohort
> periods, the average cohort default rate for our graduates across EDMC was 1.8%.
> By Education Systems, the default rates were as follows.  For The Art Institutes,
> the average was 1.2%.  For Argosy University, it was 0.6%.  For South
> University, it was 1.0%, and for Brown Mackie was 4.7%.  Now as we stated, we
> believe these results demonstrate the success our students are obtaining after
> graduation.

261.    During the February 10, 2010 call, in his response to a question from an analyst at

BMO Capital Markets, who stressed that the analysts are "trying to sit here and weigh the risks"

of the "gainful employment" regulation, Defendant Nelson stated, "But our feeling is, if you

have the high quality programs with the low default rate, and that you're placing those graduates,

we think we should be okay there."

262.    Also on the February 10, 2010 earnings call, Defendant West spoke to EDMC's

level of indebtedness, stating that EDMC's "long-term debt was $1.57 billion" as of December

31, 2009.

263.     Analysts reacted positively to the Company's announcements on February 10,

2010.  As reported by Barrington Research on February 12, 2010, "enrollment, revenue,

EBITDA and earnings all topped expectations."

264.     Analysts further understood the Exchange Act Defendants' suggestion that

EDMC's cohort default rates indicate that EDMC's repayment rates meet the 90% repayment

rate threshold for demonstrating "gainful employment" being considered by the Department at

the time.  A JPMorgan analyst report dated February 11, 2010 reported, "Proposed regulations

may be more manageable then feared.  Management's optimistic comments suggested

that…EDMC may fare better (than feared) relative to the gainful employment proposal,

specifically on loan repayment.  While EDMC does not have all the data to comment on the

ED's proposed 90% loan repayment, management did reveal remarkably low average [cohort

default rates] for graduates, an encouraging metric."  The report continued and noted the

importance that EDMC satisfy the repayment rate threshold as many of its programs do not

appear to be able to meet the other avenue for demonstrating "gainful employment", debt-to-

income ratio:  "We note that many of the EDMC programs would not produce the necessary

post-graduation earnings to stay within the propped 8% debt-to-income ratio, especially within

the Art Institute's bachelor's programs…Furthermore, while management did not have all the

data to comment on the ED's proposed 90% alternate loan repayment threshold, EDMC did

reveal remarkably low [cohort default rates] (average for 2005 thru 2007 cohorts; two-year rates

for graduates[]).  This suggests that EDMC is likely to perform favorably under this alternate

measure in the gainful employment proposal."

265.     Subsequently, on February 12, 2010, EDMC filed its Form 10-Q for Q2 FY 2010.

It was signed by Defendant West and certified by Defendants Nelson and West.  The Form 10-Q

for fiscal Q2 2010 stated, "our chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures are effective."  The Form 10-Q also contained signed Rule 13a-14(a)/15d-14(a) and SOX certifications by Defendants Nelson and West attesting to the accuracy and completeness of the Company's financial and operational reports contained therein and its internal controls and procedures.  The certifications are substantially identical to those quoted in ¶¶246-248, *supra*.

266.     In the Form 10-Q for Q2 FY 2010 Defendants again reported EDMC's increased revenue and enrollment:

> Net revenues for the three months ended December 31, 2009 increased 25.5% to $655.5 million, compared to $522.2 million in the same period a year ago.  The October starting student enrollment increased 22.7% in the current year quarter compared to the prior year quarter due primarily to growth at existing schools aided by the introduction of new academic programs, the growth in our fully online programs and the opening of new school locations.
> ***
> Net revenues for the six months ended December 31, 2009 increased 24.4% to $1,189.9 million, compared to $956.4 million in the same period a year ago.  Average student enrollment increased 22.9% in the current year period compared to the prior year period primarily due to growth at existing schools aided by the introduction of new academic programs, the growth in our fully online programs and the opening of new school locations.

267.     The Q2 2010 Form 10-Q also describes EDMC's term loan facility and revolving credit facility in a manner that is substantially consistent with the descriptions provided in the Registration Statement as alleged in ¶¶118-128, *supra*.  The Q2 2010 Form 10-Q updates EDMC's disclosures with respect to EDMC's total amount of debt outstanding and the amounts outstanding under the term loan facility and the revolving loan facility.  These disclosures included that, as of December 31, 2009, EDMC had over $1.566 billion in "aggregate indebtedness outstanding," nearly $1.121 billion outstanding under the term loan facility due in 2013, and no amounts outstanding under the revolving credit facility.

268.    The above statements in EDMC's Q2 FY 2010 earnings release, conference call and Form 10-Q were materially false and misleading and omitted material facts required to make the statements therein not false and misleading insofar as:

(a)    EDMC's reported enrollment and revenue figures were improperly and materially inflated as a result of EDMC's systematic abusive and deceptive recruiting and enrollment practices and improper incentive based compensation practices;

(b)    the statements failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments, in violation of Title IV, which seriously jeopardized EDMC's ability to continue to receive federal student aid, its primary source of revenue;

(c)    the statements regarding EDMC's reputation, commitment to students and quality of EDMC's programs were false and misleading as they failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments;

(d)    the discussion of factors that purportedly led to increased student enrollments did not disclose that EDMC's enrollments were materially inflated by the Company's abusive and deceptive recruiting and enrollment practices;

(e)    the reported enrollment numbers were improperly inflated and false and misleading as EDMC counted students as enrolled who had not committed to enrolling in the current semester;

(f)    the reported graduate employment figures were improperly inflated and the statements regarding graduates' success were false and misleading as EDMC counted as "gainfully employed" for graduate employment statistics graduates who were not so employed;

(g)      Defendant Nelson's statement that EDMC "can comply" with whatever the final regulation is related to incentive compensation was false and misleading as EDMC's then current compensation system violated Title IV requirements and would continue to be in violation with removal of the "safe harbors;"

(h)      Defendant Nelson and West's statements regarding the "gainful employment" regulation and the 90% repayment rate being considered by the Department of Education as a threshold for demonstrating "gainful employment" were false and misleading as EDMC's repayment rates were substantially below 90%, as later disclosed, and Defendant Nelson and West's focus on EDMC's low cohort default rates to suggest greater than 90% repayment rates was false and misleading as cohort default rates are not comparable to repayment rates;

(i)      EDMC did not maintain adequate systems of internal operational or financial controls, which would have permitted EDMC's reported financial and operational statements to be true, accurate or reliable; and

(j)      the statements in EDMC's Q2 2010 Form 10-Q and Defendant West's statements regarding EDMC's indebtedness omitted material information about that indebtedness insofar as they failed to disclose the material related party transactions arising from Goldman Sachs Credit Partners being a lender to EDMC in connection with the term loan and revolving credit facility.

### 4.      Third Quarter Fiscal Year 2010

269.      On May 5, 2010, EDMC issued an earnings release for fiscal Q3 2010, again touting a substantial increase in revenues and enrollment:

> Net revenues were $667.9 million, an increase of 24.7% as compared to the third quarter of the prior fiscal year. Net income was $84.6 million, or $0.59 per diluted share.  Excluding expenses incurred in connection with (i) our repurchase of $21.4 million of our senior subordinated notes ("debt repurchase"); (ii) a recently completed corporate restructuring; and (iii) the reversal of a material uncertain tax

position liability, net income would have been $71.7 million, an increase of
62.4% from the quarter ended March 31, 2009, or $0.50 per diluted share.

\*\*\*

Net revenues for the three months ended March 31, 2010 increased 24.7% to
$667.9 million, compared to $535.4 million for the same period a year ago.  This
increase was primarily driven by a 22.4% increase in January student enrollment.
Reported net income for the third quarter of fiscal 2010 was $84.6 million, or
$0.59 per diluted share, compared to net income of $44.1 million, or $0.37 per
diluted share, for the same period a year ago. Earnings before interest, taxes,
depreciation and amortization (EBITDA) increased 24.8% to $170.3 million in
the third quarter of fiscal 2010.

Excluding $2.5 million of expenses related to our debt repurchase and corporate
restructuring costs of $5.7 million as well as a $17.9 million benefit from the
reversal of an uncertain tax position liability, net income for the three months
ended March 31, 2010 grew 62.4% to $71.7 million, or $0.50 per diluted share
while EBITDA increased 29.1% to $176.1 million in the third quarter of fiscal
2010.  The increase in EBITDA is primarily due to higher student enrollment.

\*\*\*

At the start of the current April quarter, total enrollment at our schools was
approximately 139,600 students, a 22.1% increase from the same time last year.
Same-school enrollment (schools with enrollment for one year or more) increased
20.6% to approximately 137,900 students.  The number of students enrolled in
fully online programs increased 49.8% to over 36,900 students.

270.    The May 5, 2010 press release quoted Defendant Nelson: "We are pleased with

this quarter's reported results.  We continue to see strong demand for our academic programs

across each of our education systems.  Our success is driven by a strong commitment to

academic excellence and student and graduate success.  We strive to ensure our students learn

and develop the necessary competencies to be successful in their field of choice."  The release

further stated, "We are committed to offering quality academic programs and continuously strive

to improve the learning experience for our students."

271.    EDMC also held a call with investors on May 5, 2010.  During the call, Defendant

West again touted EDMC's financial results, including the significant increase in revenues and

enrollment:

For the third quarter ended March 31st, net revenues were $667.9 million, up
24.7% versus the prior year…  EBITDA increased 29% to $176.1 million.

118

Operating income was $145.5 million, up 35%, and net income was $71.7 million, up 62%, with diluted earnings per share of $0.50.  The reported net income was up almost 92%, with diluted earnings per share at 59%.  The outperformance in relation to our third quarter guidance provided during last quarter's earnings call was primarily due to a higher than anticipated mid-session enrollment…  The revenue increase was driven by the January enrollment increase of 22.4%.

***

EBITDA adjusted for the debt repurchase and restructuring expenses increased 29.1% to $176.1 million for the fiscal third quarter.  The adjusted EBITDA margin was up 89 basis points to 26.4% for the quarter…  Adjusted operating income was up 35.2% to $145.5 million in the current period.  The adjusted operating margin was up 169 basis points to 21.8% for the current quarter."

272.    During the May 5, 2010 call Defendant Nelson further touted EDMC's increased enrollment, demand for its programs and commitment to its students' and graduates success:

We are pleased with our performance over the past quarter.  Our success is driven by a strong commitment to academic excellence and student and graduate success. We strive to ensure our students learn and develop the necessary competencies to be successful in their field of choice.  This dedication and devotion is recognized by students as we continue to see strong demand for all of our academic programs across each of our four education systems.  For our recent April start, we had enrollment of approximately 139,600 students, an increase of 22% over the prior year period.  Of this total, students taking our classes in a fully online modality grew 50% to over 36,900, representing about a quarter of the total student population.  Excluding 11 locations that are less than a year old, same school enrollment increased 21%.  Finally, new students for the three-month period ended March 2009 increased by approximately 28% over the prior year period.

273.    During the May 5, 2010 call, Defendant West also touted the purported success of EDMC's students, "Despite a very challenging job market, approximately 85% of undergraduate students available for employment that graduated during the quarter ended this past September were employed in their fields or related fields within six months of graduation."

274.    On the May 5, 2010 conference call, Defendant Nelson went on to tout how "careful" EDMC is in matching students to the appropriate programs, "we feel like we're pretty

careful right now to make sure that we have the appropriate students in the appropriate

programs."

275.    During the May 5, 2010 call, in response to a question from an analyst, Defendant

Nelson again assured the market that its compensation system is compliant with federal

regulations and minimized the impact of the elimination of the "safe harbors."  An analyst from

Signal Hill Group, asked, "I'm wondering if you guys have looked at the possibility of – or the

maybe even the probability of the Safe Harbors on incentive compensation being eliminated, and

if you've done any work to try to think about how your own compensation model might change

in that environment and what kind of an impact that might have?"  Defendant Nelson replied,

"We feel our plans right now are very much compliant, and if all of them are removed, it would

just probably involve some minor tweaking in the current plans, and that would be the idea

behind it…our feeling is that, again with the plans we have right now, it would just be some

minor modifications."

276.    Also during the May 5, 2010 call, as to the "gainful employment" regulations

being considered, Defendant West again highlighted EDMC's cohort default rates, suggesting

that EDMC's current and historical repayment rates meet or exceed the 90% repayment rate

being considered in connection with the pending "gainful employment" regulations:

> Regarding the quality metrics, we have continued to analyze various metrics
> related to the current discussions surrounding gainful employment…Our relative
> cohort default rate performance is encouraging.
>
> Our 2008 two-year draft rate of 7.5% compares favorably to our prior year's 8%
> level and those at other proprietary institutions at 11.9%, and is consistent – at
> least our level is consistent with the overall rate across all of post secondary
> education at 7.3%...Our three-year cohort default rates for graduates are also
> below the average for proprietary institutions.  Our three-year graduate cohort
> default rates for 2007 range from 2.7% at Argosy University to 4.2% at the Art
> Institutes to 5.3% at South University, and just over 12% at Brown Mackie.
> Cohort default rates tend to be even lower for Bachelor's level and higher degree

programs, with three-year cohort default rates for graduates across EDMC at the Bachelor's level of 3%, 3.5% for Master's and 2.2% at Doctoral program."

277.    On the May 5, 2010 earnings call, Defendant West also spoke to EDMC's level of indebtedness, stating that EDMC's "long-term debt was $1.54 billion" as of March 31, 2010.

278.    Analysts again reacted positively to the Company's May 5, 2010 announcements. A May 7, 2010 Barrington Research report stated, "enrollment (beat consensus by 2,900) revenue (beat by $10.5 million), and earnings (beat by $0.12) all topped expectations."

279.    Further, analysts again understood Defendants' suggestion that its cohort default rates indicate that EDMC's repayment rates meet or exceed the 90% repayment rate being considered at the time.  On May 6, 2010, a JP Morgan analyst report stated, "Management remained optimistic about the ultimate outcome of the Education Department's (ED) proposed gainful employment regulations and suggested that …EDMC may fare well relative to the gainful employment proposal, specifically on loan repayment.  While EDMC does not have all the data to comment on the ED's proposed 90% loan repayment, management did remind investors of low [cohort default rates], an encouraging metric."  The report again highlighted the importance that EDMC satisfy the repayment rate threshold as many of its programs do not appear to be able to meet the other avenue, debt-to-income ratio:  "We note that many of the EDMC programs would not produce the necessary post-graduation earnings to stay within the proposed 8% debt-to-income ratio, especially within the Art Institute's bachelor's programs…Furthermore, while management did not have all the data to comment on the ED's proposed 90% alternate loan repayment threshold, EDMC did reveal remarkably low [cohort default rates], (average for 2005 thru 2007 cohorts; two-year rates for graduates[]).  This suggests that EDMC is likely to perform favorably under this alternate measure in the gainful employment proposal."

280.    Subsequently, on May 12, 2010, EDMC filed its Form 10-Q for Q3 FY 2010.  It

was signed by Defendant West and certified by Defendants Nelson and West.  The Form 10-Q

for fiscal Q2 2010 stated, "our chief executive officer and chief financial officer have concluded

that the Company's disclosure controls and procedures are effective."  It also contained signed

Rule 13a-14(a)/15d-14(a) and SOX certifications by Defendants Nelson and West attesting to the

accuracy and completeness of the Company's financial and operational reports contained therein

and its internal controls and procedures.  The certifications are substantially identical to those

quoted in ¶¶246-248, *supra*.

281.    In the Form 10-Q for fiscal Q3 2010, Defendants again reported EDMC's

increased revenue and enrollment:

> Net revenues for the three months ended March 31, 2010 increased 24.7% to
> $667.9 million, compared to $535.4 million in the same period a year ago.  The
> January starting student enrollment increased 22.4% in the current year quarter
> compared to the prior year quarter due primarily to growth at existing schools
> aided by the introduction of new academic programs, the growth in our fully
> online programs and the opening of new school locations.
>                                         ***
> Net revenues for the nine months ended March 31, 2010 increased 24.5% to
> $1,857.8 million, compared to $1,491.9 million in the same period a year ago.
> Average student enrollment increased 22.7% in the current year period compared
> to the prior year period primarily due to growth at existing schools aided by the
> introduction of new academic programs, the growth in our fully online programs
> and the opening of new school locations.

282.    The Q3 2010 Form 10-Q also describes EDMC's term loan facility and revolving

credit facility in a manner that is substantially consistent with the descriptions provided in the

Registration Statement as alleged in ¶¶118-128, *supra*.  The Q3 2010 Form 10-Q updates

EDMC's disclosures with respect to EDMC's total amount of debt outstanding and the amounts

outstanding under the term loan facility and the revolving loan facility.  These disclosures

included that, as of March 31, 2009, EDMC had nearly $1.542 billion in "aggregate indebtedness

outstanding," nearly $1.118 billion outstanding under the term loan facility due in 2013, and no amounts outstanding under the revolving credit facility.

283.    The above statements in the Q3 FY 2010 earnings release, conference call, and 10-Q were materially false and misleading and omitted material facts required to make the statements therein not false and misleading insofar as:

(a)    EDMC's reported enrollment and revenue figures were improperly and materially inflated as a result of EDMC's systematic abusive and deceptive recruiting and enrollment practices and improper incentive based compensation practices;

(b)    the statements failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments, in violation of Title IV, which seriously jeopardized EDMC's ability to continue to receive federal student aid, its primary source of revenue;

(c)    the statements regarding EDMC's reputation, commitment to students and quality of and/or demand for EDMC's programs were false and misleading as they failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments;

(d)    the discussion of factors that purportedly led to increased student enrollments did not disclose that EDMC's enrollments were materially inflated by the Company's abusive and deceptive recruiting and enrollment practices;

(e)    the reported enrollment numbers were improperly inflated and false and misleading as EDMC counted students as enrolled who had not committed to enrolling in the current semester;

(f)      the reported graduate employment figures were improperly inflated and the statements regarding graduates' success were false and misleading as EDMC counted as "gainfully employed" for graduate employment statistics graduates who were not so employed;

(g)      Defendant Nelson's statement that EDMC's compensation system is "very much compliant" and would only require "minor tweaking" if the "safe harbors" were removed were false and misleading as EDMC's then current compensation system violated Title IV requirements and would continue to be in violation with removal of the "safe harbors;"

(h)      Defendant West's statements regarding the "gainful employment" regulation and the 90% repayment rate being considered by the Department of Education as a threshold for demonstrating "gainful employment" were false and misleading as EDMC's repayment rates were substantially below 90%, as later disclosed, and Defendant West's focus on EDMC's low cohort default rates to suggest greater than 90% repayment rates was false and misleading as cohort default rates are not comparable to repayment rates;

(i)      EDMC did not maintain adequate systems of internal operational or financial controls, which would have permitted EDMC's reported financial and operational statements to be true, accurate or reliable; and

(j)      the statements in EDMC's Q3 2010 Form 10-Q and Defendant West's statements regarding EDMC's indebtedness omitted material information about that indebtedness insofar as they failed to disclose the material related party transactions arising from Goldman Sachs Credit Partners being a lender to EDMC in connection with the term loan and revolving credit facility.

(k)      the statements in EDMC's Q3 2010 Form 10-Q regarding EDMC's indebtedness, the term loan facility, and the revolving loan facility omitted material information about that indebtedness and loan facilities insofar as they failed to disclose the material related party

transactions arising from Goldman Sachs Credit Partners being a lender to EDMC in connection with the term loan and revolving credit facility.

284.   As discussed above, on July 23, 2010, the Department of Education released the proposed "gainful employment" regulations.  Under these proposed rules, programs will be fully eligible if at least 45% of the principal of the loans of former students is being paid down or if its graduates have debt to income ratios of less than 20% of discretionary income or 8% of total income.  A program will become ineligible to offer government financial aid to students if less than 35% of the principal of the loans of former students is being paid down and if its graduates have a debt to income ratio above 30% of discretionary income and 12% of total income.  Further, programs that fall between these eligibility measures will be restricted.  The proposed repayment rate threshold included in the proposed rules was less restrictive than the 90% repayment rate the Department of Education had previously considered and that the Exchange Act Defendants had suggested EDMC's repayment rates met.  In response to the issuance of these proposed rules, EDMC's stock price rose 7.51%, or $1.14, to close at $16.31 per share on July 23, 2010.

### C.   The Truth Begins to Emerge

285.   On August 3, 2010, the market for EDMC's stock reacted negatively when news of the GAO Report and its findings, was leaked.  News reports detailed the findings of GAO undercover investigators who visited 15 for-profit colleges posing as prospective students.  As reported, the GAO found that the colleges encouraged and utilized abusive and deceptive recruiting and enrollment practices, including encouraging prospective students falsify their financial aid forms and misleading prospective students about tuition costs, program quality, accreditation, graduation rates, employment prospects and expected salaries.  The reports

125

highlighted the fact that the GAO found that all 15 colleges visited engaged in abusive or

questionable practices.  For example, the *New York Times* reported on August 3, 2010:

> Undercover investigators posing as students interested in enrolling at 15 for-profit colleges found that recruiters at four of the colleges encouraged prospective students to lie on their financial aid applications — and all 15 misled potential students about their programs' cost, quality and duration, or the average salary of graduates, according to a federal report.

> The report and its accompanying video are to be released publicly Wednesday by the Government Accountability Office, the auditing arm of Congress, at an oversight hearing on for-profit colleges by the Senate Committee on Health, Education Labor and Pensions.

> The report does not identify the colleges involved, but it includes both privately held and publicly traded institutions in Arizona, California, Florida, Illinois, Pennsylvania, Texas and Washington, D.C. According to the report, the colleges in question were chosen because they got nearly 90 percent of their revenues from federal aid, or they were in states that are among the top 10 recipients of Title IV money.

> The fast-growing for-profit education industry, which received more than $4 billion in federal grants and $20 billion in Department of Education loans last year, has become a source of concern, with many lawmakers suggesting that too much taxpayer money is being used to generate profits for the colleges, instead of providing students with a useful high-quality education.

> The report gave specific instances in which some colleges encouraged fraud. At one college in Texas, a recruiter encouraged the undercover investigator not to report $250,000 in savings, saying it was "not the government's business." At a Pennsylvania college, the financial representative told an undercover applicant who had reported a $250,000 inheritance that he should have answered "zero" when asked about money he had in savings — and then told him she would "correct" his form by reducing the reported assets to zero, a change she later confirmed by e-mail and voicemail.

> At a college in California, an undercover investigator was encouraged to list three nonexistent dependents on the financial aid application.

> In addition to the colleges that encouraged fraud, all the colleges made some deceptive statements. At one certificate program in Washington, for example, the admissions representative told the undercover applicant that barbers could earn $150,000 to $250,000 a year, when the vast majority earn less than $50,000 a year. And at an associate degree program in Florida, the report said, a prospective

student was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida.

According to the report, courses in massage therapy and computer-aided drafting that cost $14,000 at a California for-profit college were presented as good values, when the same courses cost $520 at a local community college.

Six colleges in four states told the undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible for until they completed enrollment forms agreeing to become a student and paid a small application fee.

And one Florida college owned by a publicly traded company told an undercover applicant that she needed to take a 50-question test, and answer 18 questions correctly, to be admitted — and then had a representative sit with her and coach her through the test. A representative at that college encouraged the applicant to sign an enrollment contract, while assuring her it was not legally binding.

286.    Further, a *Bloomberg* article on the morning of August 3, 2010, reported that a spokeswoman for Senator Tom Harkin, chairman of the HELP Committee stated, "The results of this broad-reaching survey of for-profit school recruiting practices leave little question that these practices occur across the industry and are in no way limited to a few rogue recruiters or even schools."

287.    While the media coverage did not name the companies visited by the GAO, investors began to deduce that EDMC was one of the companies that engaged in the abusive and deceptive recruiting and enrollment practices identified.  Accordingly, EDMC's stock price declined $0.93, or almost 6%, from a close of $15.75 per share on August 2, 2010 to a close of $14.82 per share on August 3, 2010.  Indeed, as reported by *The Wall Street Journal Online* on August 3, 2010:

Shares of for-profit education companies declined Tuesday as a report from the Government Accountability Office alleged that several colleges encouraged fraud and engaged in deceptive and questionable marketing practices.  The report, which was leaked ahead of a Senate committee hearing scheduled for Wednesday, said undercover tests at 15 for-profit colleges found that four privately held schools encouraged fraudulent practices and all 15 made deceptive or otherwise

questionable statements to the GAO's undercover applicants. Among the biggest movers, Education Management Corp. was off 5.9% to $14.82.

288.    On August 4, 2010, the GAO Report was released and the HELP Committee held a hearing on for-profit education providers at which extensive testimony was provided regarding the abusive and deceptive recruiting and enrollment practices at for-profit schools. The GAO Report details over 70 instances of abusive and deceptive recruiting and enrollment practices encountered by the GAO during their investigation, including encouraging prospective students to falsify their financial aid forms; misleading prospective students about tuition costs, program quality, accreditation, graduation rates, employment prospects and expected salaries; and using abusive telemarketing practices whereby fictitious prospective students who registered on websites that match prospective students with for-profit colleges, received numerous, repetitive calls from for-profit colleges attempting to recruit the students.  The report points out that institutions engaged in such practices could face substantial fines and possible suspension or termination of their eligibility to receive funds under Title IV.  The report also found that for-profit schools substantially inflated their tuition costs.

289.    During the August 4, 2010 hearing, Gregory D. Kutz, Managing Director of Forensic Audits and Special Investigation at the GAO, who authored the GAO Report, testified as to the abusive and deceptive recruiting and enrollment practices uncovered by the GAO investigation as described in the GAO Report.  Mr. Kurtz identified Argosy University in Illinois, an EDMC school, as one of the 15 schools visited by the GAO that were the subject of the report and at which abusive and deceptive recruiting and enrollment practices were found. The abusive and deceptive practices identified at Argosy included that an admissions representative provided misleading information about the cost of tuition and incomplete information regarding qualifications of professors and graduation rates to a prospective student.

Further, as reported by CNBC, in his testimony, Mr. Kurtz further "made it clear he believed the [GAO's] findings suggested the practices were widespread throughout the industry."

290.    Additional testimony at the August 4, 2010 hearing confirmed that the issues identified in the GAO Report were industry-wide and that they were fueled by improper compensation structures, such as those at EDMC discussed above.  David Hawkins, Director of Public Policy and Research for the National Association for College Admission Counseling, in discussing  the "fraud and abuse" that was borne out in the GAO Report stated:

> …on the college side you see aggressive boiler room style sales tactics.  You see obfuscation of financial aid information and cost.
>
> You see misinformation about academic programs, accreditation and transfer of credits.  You see false statements or misrepresentations about the employment prospects and – and earnings potential.  And in just about every case what lies behind a lot of this is the fact that admission officers and recruiters are compensated almost exclusively, if not exclusively, based on whether a student enrolls.
>
> So they do not get paid or they may risk substantial pay reduction or even firing if – if students – if they do not actually process students through the door.  What results is a cascading series of problems for students, of course.  They're pressured into making decisions without accurate information or being offered an opportunity to consider their options, to comparison shop….  I think contrary to what we've heard from the industry, these practices seem to be standard at this point.  These are not isolated incidents.  These do not appear to be isolated incidents of bad actors or rogue – rogue operators.  This appears to be a fairly standard practice...

291.    Likewise, Senator Harkin stated:

> [The] GAO findings…made it disturbingly clear that abuses in for- profit recruiting are not limited to a few rogue recruiters or even a few schools with lax oversight.   To the contrary, the evidence the evidence points to a problem that is systemic – a problem that is systemic to the for-profit industry – a recruitment process specifically designed to do whatever it takes to drive up enrollment numbers, more often than not to the disadvantage of students.

292.    Testimony at the August 4, 2010 hearing also disclosed that for-profit colleges used the abusive and deceptive recruiting and enrollment practices to aggressively target low-

income and vulnerable individuals and military personnel and veterans.  Further, the same day,

Senators Dick Durbin and Jim Webb issued a press release disclosing that they had requested

data about the federal investment in for-profit colleges in light of reports that some for-profit

colleges have been aggressively targeting military personnel and veterans which stated, in part:

> Concerned about reports of some for-profit colleges aggressively targeting
> military personnel and veterans, U.S. Senators Dick Durbin (D-IL) and Jim Webb
> (D-VA) today asked the Secretaries of the Department of Veterans Affairs, Eric
> Shinseki, and the Department of Defense, Robert Gates, for detailed information
> on how veteran and military tuition assistance program funding is being spent.

> Specifically, Durbin and Webb asked for data on the tuition assistance used for
> education at for-profit colleges and the standards in place to ensure that veterans,
> service members and their families are given the best possible options for higher
> education and that taxpayer funding is being well-spent.

> \*\*\*

> [W]e have heard reports that some for-profit institutions may be aggressively
> targeting service members and veterans, signing them up for educational
> programs that may bring little benefit to future employment opportunities, low
> graduation rates and high default rates.  Finally, with the recent passage of the
> Post 9/11 GI Bill, which provides for tuition reimbursement, we have heard
> concerns about excessive tuition being charged at some of these institutions.

293.    In response to the news identifying EDMC as one of the schools at which abusive

and deceptive recruiting and enrollment practices were encountered and the further support that

the practices identified by the GAO are industry-wide, and, thus pervasive at EDMC, EDMC's

stock price continued to decline.  EDMC stock price fell 3.44%, or $0.51, on August 4, 2010 to a

close of $14.31 per share.

294.    On August 5, 2010, after the market closed, in a *BusinessWeek* article, "Goldman

Schools Students on Debt," it was revealed that EDMC owed a substantial debt to its private

equity shareholders.  The article also described that this debt was a material factor related to

EDMC's aggressive enrollment growth goals and strategies that, in turn, led to abusive and

deceptive recruiting and enrollment practices.  The *BusinessWeek* article cites EDMC's former

CFO, Robert T. McDowell, as recalling, "[t]he debt from the acquisition changed the culture of EDMC," and that McDowell was "worried that the quality of the experience for employees and students was going to deteriorate." McDowell is further quoted as stating, "[y]ou take on that amount of private-equity debt, you need to earn high rates of return for these investors." In response to this news, on August 6, 2010, EDMC's stock fell 8.04%, or $1.14, to a close of $13.04 per share.

295.     On August 9, 2010, EDMC filed a Form 8-K disclosing that it had received a request from the HELP Committee on August 5, 2010 requesting information and documents relating to the Company's use of federal resources, including how it recruits and enrolls students, sets program price or tuition, determines financial aid including private or institutional loans, tracks attendance, handles withdrawal of students and return of Title IV dollars and manages compliance with the requirement that no more than 90% of revenues come from Title IV dollars. The 8-K further disclosed that the request also sought information regarding the number of students who complete or graduate from EDMC's programs, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how the Company tracks and manages the number of students who risk default within the cohort default rate window. This disclosure further revealed that the practices that are the subject of the GAO Report were pervasive at EDMC. In response to this news, on August 9, 2010, EDMC's stock fell 2.53%, or $0.33, to a close of $12.71 per share.

296.     Despite these revelations, the Exchange Act Defendants continued to issue false and misleading statements. On August 11, 2010, EDMC issued its earnings release for Q4 FY 2010, which quoted Defendant Nelson, "Fiscal 2010 was marked by strong financial performance driven by continued student demand for our diverse array of high quality academic

programs.  Students recognize that we offer them a pathway to achieve their education and career

aspirations, and that our entire company is dedicated to helping them succeed.  This dedication is

evident through the success our graduates are having finding jobs even during the current

difficult economic times."

297.    The August 11, 2010 press release also included EDMC's reported revenue and

enrollment:

> Net revenues were $650.8 million, an increase of 25.2% as compared to the fourth
> quarter of the prior fiscal year.  Net income was $47.9 million, or $0.33 per
> diluted share.
> ***
> Net revenues for the three months ended June 30, 2010 increased 25.2% to $650.8
> million, compared to $519.6 million for the same period a year ago.  This increase
> was primarily driven by a 22.1% increase in April student enrollment.
>
> Net income for the fourth quarter of fiscal 2010 increased 125.1% to $47.9
> million, or $0.33 per diluted share, compared to net income of $21.3 million, or
> $0.18 per diluted share, for the same period a year ago.  Earnings before interest,
> taxes, depreciation and amortization (EBITDA) increased 41.4% to $142.2
> million in the fourth quarter of fiscal 2010.  The increase in EBITDA is primarily
> due to higher student enrollment and increased operating leverage.
> ***
> At the start of the current July quarter, total enrollment at our schools was
> approximately 138,800 students, a 23.1% increase from the same time last year.
> Same-school enrollment (schools with enrollment for one year or more) increased
> 21.7% to over 137,100 students.  The number of students enrolled in fully online
> programs increased 47.8% to approximately 38,800 students.

298.    The following day, August 12, 2010, EDMC held an earnings conference call.

On the call, Defendant West again reported EDMC's financial results:

> For the fourth quarter ended June 30th, net revenues were $651 million, up 25%
> versus the prior year.  EBITDA increased over 41% to $142 million; operating
> income was over $107 million, up 51%; and net income was $47.9 million, up
> 125%, with diluted earnings per share of $0.33.  We are pleased with the
> outperformance, which was driven by slightly higher enrollment in the quarter.
> The revenue increase was driven by the April enrollment increase of 22.1% and
> an approximate 6% increase in tuition rates…EBITDA increased 41.4% to $142
> million for the fiscal fourth quarter.  The margin was up 250 basis points to 21.9%
> for the quarter…  Operating income was up 51.2% to $107.7 million in the
> current period, with operating margin up 284 basis points to 16.6% for the current

quarter… cash-flow from operations was actually $337.7 million, up over $44 million from last year.  This increase in operating cash-flow as compared to the prior year period was improved to operating performance…

299.     During the August 12, 2010 call, Defendant Nelson touted the demand for and

quality of EDMC's programs, EDMC's dedication to the success of its students, and its increased

enrollments:

> We are pleased with our performance during this fiscal fourth quarter, which capped a strong fiscal 2010.  The successes we realized this past year would not have been possible without strong student demand we have experienced for our diverse array of high-quality academic programs.  Students recognize that we offer them a pathway to achieve their educational and career goals and that our entire company is dedicated to helping them succeed. For our recent July start, we had enrollment of approximately 138,800 students, an increase of 23% over the prior year period.  Of this total, students taking their classes in a fully online modality grew 48% to approximately 38,800 students, representing about 28% of the total population.  Excluding the 12 locations that are less than a year old, same school enrollment increased 22%.  Finally, new students for the three-month period ended June 2009 increased by approximately 31% over the prior year period.

300.     During the August 12, 2010 call, Defendant Nelson also touted the strong demand

for EDMC's programs in response to a question from a First Analysis Securities analyst noting

that "a couple of your peers suggested there's been some diminished demand" at the higher

degree levels, stating:

> Good news is we continue to see strong demand across all levels, diploma programs through doctoral programs. As you know, based on our number of offerings, we tend to focus on the bachelors area, so we see a lot of strength there. But it's really across the board. We haven't in the past emphasized in our approach the certificate and diploma programs may be comparing to prior year periods. That doesn't necessarily mean that would not change going forward, but I would say the best way to characterize it we are seeing strong demand across all our programs.

301.     Further, during the August 12, 2010 call, Defendant Nelson touted the success of

EDMC's students and again stressed EDMC's dedication to the success of its students:

> The dedication of our employees that I mentioned earlier is evident through this success our graduates are having finding jobs even during the difficult []

133

economic times. I am pleased to report that approximately 86% of undergraduate students available for employment who graduated during the quarter ended this past December were employed in their fields or related fields within six months of graduation. The average starting salaries for graduates from our undergraduate programs for the quarter ended this past December. Bachelor's degree students obtained an average salary of $32,200, while graduates of associate and diploma programs earned $27,400.

302.     During the call, Defendant Nelson specifically addressed the GAO Report in response to a question from a Signall Hill Group, LLC analyst. In his response, Defendant Nelson did not disclose that EDMC systematically engaged in the practices described in the GAO Report and at the HELP Committee hearing and instead stated that EDMC is "focused on, making sure that our enrollment counselors are well trained and that they provide the required information." Further, Defendant Nelson distanced himself from the "others that were cited as having more deficiencies or in some cases even those who were saying stuff that's flat out wrong and they shouldn't be saying."

303.     Later in the August 12, 2010 call, in response to a question from a Barclays Capital analyst inquiring whether EDMC would be implementing tougher admissions standards as some of its peers were doing, Defendant Nelson replied:

> One is we always strive to ensure that the students we have enrolled have the ability to succeed. The requirements do vary across the education systems because an associates – younger associate students say in an Art Institute would be a different profile than a doctoral student in pharmacy or a doctoral student in psychology. But again, we've always taken this very seriously, and that's one of the reasons why, as you said, we feel it's not something we would need to do a lot of work. But having said that, we always want to be assessing how we can do a better job making sure that their ability to succeed and that the right student is in the right program.
>
> Having said that, we do have a variety of different entrance exams that we use depending on the programs. A big factor for us is assessing the both English and math skills of these students. If we feel the students come in and either through lacking the evidence through their transfer credits or GPA coming in certain programs, we would obviously – and we do have certain developmental courses that we think would enhance their ability to be successful. We do offer again some very extensive programs – again this varies by different degree programs

and different ed[ucation] system that would help them with study skills, program specific orientations, the resources that are available, time management – a lot of different things that we've been doing for many years.  But again, having said that, that doesn't mean we're done either.  We'll continue to assess where we think that there's weakness and, again, continue with what we have tried to always have here, you see, which is those types of programs in place that will help our students be successful.

304.   During the August 12, 2010 conference call, Defendant Nelson and West also discussed the proposed "gainful employment" regulations that the Department of Education released on July 23, 2010.  Defendant Nelson stated:

As you know, the Department recently filed proposed regulation regarding Gainful Employment in the federal registrar.  Accordingly, we are assessing the potential impact on various programs at the [OPID] level across our system.  At this stage, we do not have access to key data that is necessary to determine the potential impact of proposed rules.  The problem with limited data we have received to date include the lack of income data from certain federal agencies for graduate programs, and specific repayment and deferment data from NLDS.   On our prior calls, we have provided details regarding median debt, cohort default rates, and graduation rates.  Today we would like to provide additional details regarding defaults, deferment, and forbearance from NSLDS.  The data is as of April 30th, 2010 for loans that entered into repayment from May 1st, 2008 to April 30th, 2009.  These rates are based on dollars, not loans or students.  The deferments include military and in school deferments elections, since NSLDS does not give deferment election specific.  We caution using this information to assess any potential impact, as it is not the repayment rate – rather, it is what was in default, deferment or forbearance for loans entered in to repayment during what is only part of the time period that has been proposed by the department.  On a dollar basis, at EDMC the information is as follows on April 30th, 2010.  In default in dollars was a total of 4.8%, deferment was 14.4%, and forbearance was 17.3%.  And combining those three together was total of 36.6% across EDMC.

305.   Later in the August 12, 2010 call, a BMO Capital Markets analyst requested further information regarding the numbers provided, "Appreciate the color that you provided going into the data regarding some of the information on deferrals and forbearance et cetera.  Can you give us a little bit more color on those numbers either by school or by programs?"  In response, Defendant West replied: "if you look at the total level across our four education systems – for example, if I were to add the three together at the Art Institutes would total about

35%, there were 35.1%. Argosy is a total of 40.3%. Brown Mackie is 35.0%, and South is 36.6%."

306.    Analysts again understood from Defendants Nelson's and West's statements that EDMC's repayment rates met or exceeded the 45% threshold issued in the proposed "gainful employment" regulations.  After the call, an August 12, 2010 JPMorgan analyst report stated, "Proposed regulations are likely manageable.  Mgmt provided an incomplete proxy for the company's repayment rate of ~63% (not adjusted for the 4-year period or military deferments)...We see this incomplete proxy of 63.4% for the repayment rate (i.e., an inverse of the 36.6% non-repayment rate) as promising for EDMC.  We note that many of the EDMC programs would not produce the necessary post-graduate earnings to stay within the proposed 8% debt-to-income ratio, especially within the Art Institute's programs."

307.    The above statements were false and misleading and omitted material facts required to make the statements therein not false and misleading as:

(a)    Defendant Nelson's statements regarding the GAO Report were false and misleading as they failed to disclosed, and effectively denied, EDMC's systematic abusive and deceptive recruiting and enrollment practices and improper incentive based compensation practices

(b)    Defendants Nelson's and West's statements regarding the proposed "gainful employment" regulations released on July 23, 2010 were false and misleading as EDMC's repayment rates were substantially below 45%, as later disclosed, and Defendants Nelson's and West's suggestion that EDMC's repayment rate was approximately 63%.  Tellingly, it was not until the Department of Education departed from consideration of a 90% repayment rate that Defendants Nelson and West disclosed additional information regarding defaults, forbearance

and deferment.  Thus, although the use of this information was false and misleading as it suggested a repayment rate well above the 45% threshold contemplated by the proposed "gainful employment" regulations, it also demonstrates that even based on such data, which the Exchange Act Defendants previously concealed, EDMC's repayment rate was substantially below 90%, contrary to Defendant Nelson's and West's prior indications;

(c)      EDMC's reported enrollment and revenue figures were improperly and materially inflated as a result of EDMC's systematic abusive and deceptive recruiting and enrollment practices and improper incentive based compensation practices;

(d)      the statements failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments, in violation of Title IV, which seriously jeopardized EDMC's ability to continue to receive federal student aid, its primary source of revenue;

(e)      the statements regarding EDMC's reputation, commitment to students and quality of and/or demand for EDMC's programs were false and misleading as they failed to disclose that EDMC employed abusive and deceptive recruiting and enrollment practices and improperly compensated its admissions staff based on the volume of their enrollments;

(f)      Defendants Nelson's statements regarding admissions standards and entrance exams were false and misleading as EDMC effectively did not have any standards for admissions and admission representatives encouraged prospective students to cheat on any entrance exams;

(g)      the reported enrollment numbers were improperly inflated and false and misleading as EDMC counted students as enrolled who had not committed to enrolling in the current semester; and

(h)     the reported graduate employment figures were improperly inflated and the statements regarding graduates' success were false and misleading as EDMC counted as "gainfully employed" for graduate employment statistics graduates who were not so employed.

308.    Subsequently, on August 13, 2010, after the close of the market, in connection with the proposed "gainful employment" regulations, the Department of Education released data on federal student loan repayment rate by school.  As to EDMC, the Department's repayment data showed an overall repayment rate of 38% – well below the 45% threshold for full eligibility, with many of its schools falling below the 35% threshold for any eligibility and as low as 0%. As such, many of EDMC's programs are in jeopardy of losing eligibility or full eligibility for federal student aid.  Specifically, the following repayment rates for institutions within EDMC were disclosed:

Argosy University, 38%
Argosy University – Hawaii, 50%
Argosy University – Phoenix, 32%
Argosy University – San Francisco Bay Area, 35%
Argosy University – Savannah Campus, 50%
Argosy University – Atlanta, 32%
Argosy University – Chicago Northwest, 42%
Argosy University – Clearwater, 100%
Argosy University – Dallas, 28%
Argosy University – Denver, 15%
Argosy University – Inland Empire, 27%
Argosy University – Los Angeles, 22%
Argosy University – Nashville, 22%
Argosy University – Northern Marianas College, 0%
Argosy University – Orange County, 36%
Argosy University – Orange County, 22%
Argosy University – San Diego, 47%
Argosy University – Sarasota, 38%
Argosy University – Schaumberg, 38%
Argosy University – Seattle, 44%
Argosy University – Tampa, 32%
Argosy University – Twin Cities, 54%
Argosy University – Washington D.C. Area, 37%
The Art Institute of Atlanta, 30%

The Art Institute of Atlanta, Art Institute of Decatur,  9%
The Art Institute of Atlanta, Art Institute of Tennessee-Nashville, 26%
The Art Institute of Atlanta, Art Institute of Washington, 38%
The Art Institute of Atlanta, Art Institute of Charleston, 34%
The Art Institute of California – Los Angeles, 40%
The Art Institute of California – San Diego, 47%
The Art Institute of California – San Diego – Inland Empire, 18%
The Art Institute of California – Orange County, 47%
The Art Institute of California – Sacramento, 33%
The Art Institute of California – San Francisco, 43%
The Art Institute of California – Hollywood, 29%
The Art Institute of Charlotte, 29%
The Art Institute of Charlotte – Brown Mackie College-Atlanta, 11%
The Art Institute of  Cincinnati, 59%
The Art Institute of Colorado,42%
The Art Institute of Colorado – Phoenix Branch, 41%
The Art Institute of Colorado – The Art Institute of California, 48%
The Art Institute of Dallas, 40%
The Art Institute of Fort Lauderdale, 36%
The Art Institute of Houston, 37%
The Art Institute of Houston – The Art Institute of Austin, 28%
The Art Institute of Las Vegas, 32%
The Art Institute of Las Vegas – The Art Institute of Indianapolis, 22%
The Art Institute of Las Vegas – The Art Institute of Salt Lake, 36%
The Art Institute of New York City, 31%
The Art Institute of Philadelphia, 37%
The Art Institute of Phoenix, 28%
The Art Institute of Pittsburgh, 40%
The Art Institute of Pittsburgh – Santa Monica, 43%
The Art Institute of Portland, 46%
The Art Institute of Seattle, 51%
The Art Institute of Tucson, 44%
The Art Institute of York – Pennsylvania, 56%
The Art Institutes International Minnesota, 50%
Brown Mackie College, 27%
Brown Mackie College, 28%
Brown Mackie College – North Canton, 10%
Brown Mackie College, 23%
Brown Mackie College – Los Angeles, 21%
Brown Mackie College – Orange County, 38%
Brown Mackie College – San Diego, 35%
Brown Mackie College – Cincinnati, 17%
Brown Mackie College – Cincinnati (Merrillville), 11%
Brown Mackie College – Cincinnati (Michigan City), 13%
Brown Mackie College – Cincinnati (Quad Cities), 26%
Brown Mackie College – Cincinnati (Akron), 16%

Brown Mackie College – Cincinnati (Dallas), 23%
Brown Mackie College – Cincinnati (Fort Worth), 30%
Brown Mackie College – Cincinnati (Miami), 11%
Brown Mackie College – Cincinnati (Northern Kentucky), 27%
Brown Mackie College – Findlay, 21%
Brown Mackie College – Findlay – Art Institute of Ohio-Cincinnati, 25%
Brown Mackie College – Findlay – Brown Mackie College Hopkinsville, 14%
Brown Mackie College – Findlay – Brown Mackie College Louisville, 7%
Brown Mackie College – Findlay – Indianapolis, 7%
Brown Mackie College – Louisville, 18%
Brown Mackie College – Louisville – Brown Mackie College Hopkinsville, 21%
Brown Mackie College – Louisville – RETS Pittsburgh, 0%
Brown Mackie College – Merrillville, 19%
Brown Mackie College – Merrillville – Brown Mackie College Michigan City, 24%
Brown Mackie College – Merrillville – Brown Mackie College Moline, 33%
Brown Mackie College – North Canton, 16%
Brown Mackie College – South Bend, 28%
Brown Mackie College – South Bend – Brown Mackie College Denver, 16%
Brown Mackie College – South Bend – Brown Mackie College Boise, 0%
Brown Mackie College – South Bend – Brown Mackie College Fort Wayne, 27%
Brown Mackie College – South Bend – Brown Mackie College Tulsa, 0%
The Illinois Institute of Art, 36%
The Illinois Institute of Art – Art Institute of Michigan, 8%
The Illinois Institute of Art – Art Institute of Ohio-Cincinnati, 21%
The Illinois Institute of Art – Illinois Institute of Art-Schaumberg, 56%
Miami International University of Art & Design, 32%
Miami International University of Art & Design – Art Institute of Tampa, 30%
Miami International University of Art & Design – Art Institute of Jacksonville, 11%
The New England Institute of Art , 43%
South University, 52%
South University – Columbia, 11%
South University – Montgomery, 18%
South University – Tampa, 32%
South University – West Palm Beach Campus, 26%
Western State University College of Law, 48%

309.    EDMC's low repayment rates also confirmed that EDMC was systemically

employing abusive and deceptive recruiting and enrollment practices throughout the Class Period

as such practices lead to a high percentage of students being enrolled who were subsequently

unable to repay their student loans.

310.    In response to the news of the Department of Education's data on EDMC's

repayment rate, EDMC's stock price fell almost 20%, or $2.42, from its close of $12.13 per

share on Friday, August 13, 2010 to close at $9.71 per share on Monday, August 16, 2010, having traded on extremely high volume of 3,329,113 shares.  The only day with higher volume trading during the Class Period was October 2, 2009 - the first day of open market trading after the IPO.  As reported by the Associated Press on August 16, 2010, "Shares of for-profit education companies slid Monday as government data showed that many of their students aren't repaying school loans … Education Management Corp. tumbled 20 percent."

### D.    The Exchange Act Defendants' Additional Violations of GAAP

311.    Throughout the Class Period, the Exchange Act Defendants issued materially false and misleading statements and omitted to disclose material information concerning EDMC's financial status and used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate and report revenues and earnings.

312.    As described above, EDMC's enrollments and revenues were materially inflated as a result of EDMC's undisclosed abusive and deceptive recruiting and enrollment practices. Further, as reported by CW8, EDMC's system for reporting enrollment data did not have internal controls that were "true and accurate."  As a result, CW8 recalled that EDMC overstated its enrollments by counting students as being "enrolled" when, in fact, they were not presently enrolled in EDMC's courses.  CW8 also described EDMC's internal controls related to the reporting of enrollment data as not being "true and accurate."  In addition, current EDMC employee Bittel testified regarding pressure on ADAs to keep students "enrolled and attending the classes for one week" and recalled that of the 96 students she enrolled, only 46 were still taking classes sixteen months after enrollment.

313.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements

filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).

314.    As set forth in SFAC No. 2, one of the fundamental objectives of financial reporting is to provide relevant and reliable information concerning an entity's financial performance during the period being presented.  SFAC No. 2, ¶42.

315.    SFAC No. 1 states that financial reporting, *i.e.*, financial statements and the related footnote disclosures, is intended to provide information that is useful to the users of the statements in making business and economic decisions.  By presenting investors with financial information that did not reflect the true nature of fraudulent and inappropriate business practices, EDMC did not provide useful information in the Company's financial statements.

316.    Similarly, SFAC No. 1 states that "[f]inancial reporting is expected to provide information about an enterprise's financial performance during a period and about how management of an enterprise has discharged its stewardship responsibility to owners."  By presenting revenues and expenses that were grossed up by fraudulent business practices, Defendants did not present the Company's actual financial performance.  Results obtained through such business practices do not accurately reflect the Company's operations, are highly deceptive to investors, and are inherently unsustainable.

317.    SFAC No. 2 describes the characteristics required to make accounting information useful to the people that use it.  One of these characteristics is representational faithfulness, which is defined as "correspondence or agreement between a measure or description and the phenomenon that it purports to represent (sometimes called validity)."

318.    Another characteristic defined in SFAC No. 2 is verifiability.  Verifiability is "the ability through consensus among measurers to ensure that information represents what it purports to represent or that the chosen method of measurement has been used without error or bias."

319.    According to numerous former employees, the Exchange Act Defendants imposed onto the institutions and its admissions staff unrealistic growth and expectations.  The Exchange Act Defendants caused the Company to violate GAAP because they knew or recklessly disregarded that EDMC's revenues were grossly inflated during the Class Period, as a result of the employment of fraudulent business practices, such as the use of abusive and deceptive recruiting and enrollment practices.

320.    Moreover, EDMC was grossly reckless in failing to maintain adequate internal accounting controls.  The American Institute of CPA's Auditing Standards, AU 319.06, "Internal Control in a Financial Statement Audit," defines internal controls as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."

321.    The pervasiveness of the aforementioned allegations involved in EDMC's fraudulent operations and accounting practices suggest there are significant deficiencies, if not material weaknesses, in the Company's internal controls and disclosure controls.

322.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in

making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(c)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(d)    The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle that accounting information is reliable to the extent that users can depend on it to represent the economic conditions or events that it purports to represent (FASB Statement of Concepts No. 2, ¶62);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

323.     Further, the undisclosed adverse information concealed by the Exchange Act

Defendants during the Class Period is the type of information which, because of SEC

regulations, regulations of the national stock exchanges and customary business practice, is

expected by investors and securities analysts to be disclosed and is known by corporate officials

and their legal and financial advisors to be the type of information which is expected to be and

must be disclosed.

### E.     Post-Class Period Events

#### 1.     Defendant Nelson's Admission Regarding the Significant Impact of the Proposed "Gainful Employment" Regulations

324.     As reported by *Washington Monthly* and *Higher Ed Watch*, on or about August,

2010, EDMC hired DCI Group, a controversial advocacy and public relations firm, to contact the

Company's employees individually to encourage them to craft letters to the Department of

Education opposing the proposed "gainful employment" regulations.  In furtherance of the effort,

on August 24, 2010, despite previously relaying to investors that the "gainful employment"

regulations would be manageable, Defendant Nelson sent an internal email to EDMC's

approximately 20,000 employees acknowledging that it would have a substantial impact on

EDMC:

> This week, employees throughout EDMC and our schools will be receiving phone
> calls during business hours from our partners, the DCI Group, to assist you in
> crafting personalized letters to U.S. Secretary of Education Arne Duncan detailing
> for him your own views on Gainful Employment.  You will be asked a series of
> short questions that will help DCI Group create a unique letter. These
> personalized letters will then be delivered to you for a signature, along with a pre-
> addressed stamp envelope. We encourage you to mail the letters as quickly as
> possible so that your comments are received before September 9. The entire
> process should take no more than 10 minutes of your time, but its impact on
> EDMC would be immeasurable.
>                          ***
> The proposed rule's potential consequences on EDMC could be substantial.
>                          ***

Likewise, the proposed rule could have a significant impact on those who staff and support academic programs offered at proprietary institutions, including ours.

325.     Further, as reported by *Higher Ed Watch*, although Defendant Nelson stated that "no employee is under any obligation to take part in these activities," people who have worked for the Company "fully expect that those who refuse to acquiesce will suffer some form of retaliation – perhaps not immediately, but eventually….'This is scaring a lot of people because they know that, no matter what the company says, it will keep track of those who refuse to cooperate,' said a former EDMC recruiter, who wished to remain anonymous. 'That's just the way the company operates.'"

### 2.     Statements of Current EDMC Employee Bittel

326.     In the September 15, 2010 Bittel Letter and in her September 30, 2010 testimony, current EDMC employee Kathleen Bittel provided extensive information to the HELP Committee detailing EDMC's improper recruitment, enrollment, financial aid, and career placement practices as discussed in ¶¶64-84, above.

### 3.     Attorneys General Investigations Regarding EDMC

327.     Since the August, 2010 disclosures regarding EDMC, Attorneys General in Florida, Illinois and Kentucky have opened investigations into EDMC.  The Florida investigation is looking into allegations of misrepresentations regarding financial aid and unfair and deceptive practices including in regard to recruitment, enrollment, accreditation, placement, and graduation rates.  The Illinois investigation is looking into potential violations of the Illinois False Claims Act based on allegations that EDMC paid employees incentive compensation in violation of HEA rules.  The Kentucky investigation is looking into EDMC's student-loan default rates, material used in advertising and recruiting, information about job placement, transferability of credits and accreditation, and details of how financial-aid funds are disbursed.

#### 4.     Material Related Party Transaction

328.     In a Form 8-K filed on December 8, 2010, EDMC confirmed the material related

party transaction with its private equity shareholders that was revealed in the August 5, 2010

*BusinessWeek* article.  That 8-K described how EDMC had entered into an agreement to extend

the maturities of credit facilities that had been used to finance the 2006 Transaction, including a

$442.5 million "revolving credit facility" with an original maturity date of June 1, 2012 and $763

million of the ($1.1 million outstanding) "term loan" with an original maturity date of June 1,

2013.  EDMC further stated that an affiliate of Goldman Sachs Capital Partners, the beneficial

owner of 39.1% of EDMC's common stock, had been, and remains, a major creditor of EDMC's

in connection with those material debt obligations that existed as of and throughout the Class

Period.  Specifically, the 8-K stated:

> Goldman Sachs Credit Partners L.P. ("GSCP"), one of the lenders under the
> Company's revolving credit facility and term loan, is an affiliate of Goldman
> Sachs Capital Partners, which together with its affiliates beneficially owns
> approximately 39.1% of EDMC's issued and outstanding common stock.  In
> connection with the Amended Agreement, GSCP has agreed to extend the
> maturity dates of its revolving commitment and its portion of the term loan.

#### 5.     Report Regarding EDMC's Revenues From Military Students Resulting From Abusive and Deceptive Practices

329.     Also on December 8, 2010, the HELP Committee released a report entitled,

"Benefitting Whom?  For-Profit Education Companies and the Growth of Military Educational

Benefits."  The report stated:

> Serious questions have emerged about the share of the military educational
> benefit pool going to for-profit schools with questionable outcomes.  Congress
> may have intentionally subjected this new generation of veterans to the worst
> excesses of the for-profit industry: manipulative and misleading marketing
> campaigns, educational programs far more expensive than comparable programs
> or non-profit programs, and a lack of needed services.

The report further stated that the money from military personnel helped the companies circumvent the 90% of revenues cap on the revenues they can receive from federal student aid.

330.    The report also stated that EDMC received $60.5 million from military students from August 2009 to July 2010 – ranking it third among the 24 colleges that were the subject of the report.

     **F.**     **Additional Scienter Allegations**

          **1.**     **The Undisclosed Material Related Party Transaction With an Affiliate of Goldman Sachs Capital Partners Supports a Strong Inference of Scienter**

331.    As alleged herein at ¶¶230, 294, the August 5, 2010 *BusinessWeek* article cites EDMC's former CFO, Robert T. McDowell, as attributing the Company's substantial debt from the 2006 Transaction as having "changed the culture of EDMC" toward an aggressive growth strategy that led to EDMC's having engaged in abusive and deceptive recruiting and enrollment practices.  McDowell further described, however, this debt was substantially owed to EDMC's private equity shareholders, including Goldman Sachs Capital Partners.  As McDowell stated, "[y]ou can't take on that amount of private equity debt, you need to earn high rates of return for these investors."  EDMC had, however, concealed this material fact: that affiliates of its private equity shareholders were major creditors of EDMC's in connection with the debt incurred in connection with the 2006 Transaction.  This debt was an enormous and a material liability on the Company's books as of and throughout the Class Period.  EDMC's stock fell by over 8%, or $1.14 per share per share, after the release of the *BusinessWeek* article.

332.    As discussed in ¶¶231, 295, above, in its Form 8-K filed on December 8, 2010, EDMC provided confirmation of McDowell's August 5, 2010 revelation and gave additional details regarding EDMC's indebtedness to an affiliate of one of its private equity investors,

namely Goldman Sachs Capital Partners.  The undisclosed fact that, as of and throughout the

Class Period, EDMC was materially indebted to an affiliate of Goldman Sachs Capital Partners

was a material related party transaction that EDMC was required to disclose under SFAS 57or

ASC 850.  The Exchange Act Defendants' failure to disclose this material related party

transaction represented a knowing or reckless violation of a "bright line" rule under GAAP.

333.    The undisclosed material related party transactions with Goldman Sachs Credit

Partners, particularly when viewed in light of the fact that these loans had near-term maturities,

evidences a strong inference of the Exchange Act Defendants' scienter insofar as: (1) Goldman

Sachs Capital Partners, by and through its affiliates, was using EDMC as a short-term cash

generator (paid through the revolving credit facility and term loan) that took advantage of its

position as a 39.1% shareholder (which was substantially greater before the EDMC IPO, at the

time the revolving credit facility and term loan were first entered into) and major creditor of

EDMC's to benefit from EDMC's abusive and deceptive recruiting and enrollment practices that

started after the 2006 Transaction; and (2) the fact that EDMC was earning money through a

stable and guaranteed source (federal student loans) that grew with EDMC's enrollments

suggests that Goldman Sachs Credit Partners' loans to EDMC were essentially a zero-risk

proposition for Goldman Sachs Credit Partners that provided no benefit to EDMC shareholders,

particularly for loans set to mature in 2012 and 2013 given that EDMC's abusive and deceptive

recruiting and enrollment practices were only recently revealed.  Moreover, it is clear that under

this undisclosed related party transaction, the Exchange Act Defendants were serving the shorter-

term interests of Goldman Sachs Capital Partners and its affiliates over the interests of EDMC's

public shareholders throughout the Class Period.  The Company's pervasive use of abusive and

deceptive recruiting and enrollment practices – and Defendants' false and misleading statements

and material omissions of fact regarding those and related practices – alleged herein served to ensure that Goldman Sachs Capital Partners' affiliates would continue to be paid on the debt instruments before any negative consequence would come to the Company from a possible loss of Title IV funding due to its abusive and deceptive recruiting and enrollment practices.

### 2. Defendants Nelson and West Were Motivated To Commit Fraud Because Their Compensation Was Tied To EDMC's Performance

334. EDMC's compensation structure provided further incentive and additional motive for Defendants Nelson and West to participate in the fraud. Defendants Nelson and West had a strong personal financial motive in making false and misleading statements relating to EDMC's financial performance, enrollment and operating results because their annual compensation and incentives were tied to the financial and business performance of the Company throughout the Class Period. As stated in EDMC's Prospectus, filed with the Securities and Exchange Commission on October 2, 2009, EDMC's corporate goal was to link "a significant portion of compensation to [the Company's] financial and business results." The Company's compensation programs included performance-based bonuses and long-term compensation if employees delivered superior earnings results and certain non-financial metrics as discussed below.

335. The four components of executive compensation for Defendants Nelson and West were: (1) Base Salary; (2) Annual Cash Bonus; (3) Long-Term Incentives (compensation based on the increase in stock price); and (4) Executive Benefits (other perks).

336. According to EDMC's 2010 Proxy Statement, for FY 2010, July 1, 2009 through June 30, 2010, the amount of bonuses paid to Defendants Nelson and West were determined based on the following metrics:

| Financial/Operational Metric | Weighting |
|---|---|
| EBITDA | 60% |
| Revenue | 20% |
| Individual performance metric(s) | 20% |

337.    Notably, eighty percent of the bonuses paid to Defendants Nelson and West were tied to the financial performance of the company, unrelated to the academic performance or career placement of EDMC students and graduates and the quality of the academic programs that EDMC offered to its students.  As such, Defendants Nelson and West were motivated to increase enrollments and, thus increase EDMC's reported financial performance, through abusive and deceptive recruiting and enrollment practices in order to attain higher bonuses.

338.    Additionally, the remaining twenty percent of the bonus calculations were based on "individual performance" which included "student persistence, graduate employment rate and graduate starting salary."  Therefore, Defendants Nelson and West were also motivated to manipulate these figures.

339.    The following table summarizes the total compensation that EDMC awarded to Nelson and West during FY 2010:

|        | Salary | Bonus | Other Compensation | Options Awarded |
|--------|--------|-------|--------------------|-----------------|
| **Nelson** | $607,464 | $1,261,597 | $33,737 | 223,685 shares |
| **West** | $534,102 | $1,083,919 | $66,239 | 447,370 shares |

340.    Defendants Nelson and West received a large sum of monetary compensation based on their ability to cause EDMC to meet targeted EBITDA, targeted revenue, and targeted operational metrics.  Thus, each of the metrics used to determine Defendants Nelson's and West's bonuses and other compensation during the Class Period created an incentive for them to engage in the wrongful acts alleged above.

**3.      The Magnitude and Pervasiveness of the Abusive and Deceptive Recruiting and Enrollment Practices and the Nature of the Practices Supports a Strong Inference of Scienter**

341.    The sheer number of abusive and deceptive recruiting and enrollment practices detailed by numerous former employees in various geographic locations and business units

further supports a strong inference of scienter.  The fact that these practices did not occur at a few EDMC institutions, but at numerous EDMC institutions nationwide, supports that these were not isolated instances, but a widespread pattern of fraudulent activity.  Moreover, that these practices were the result of an enrollment quota and improper incentive based compensation system that was developed by senior management and approved by Defendants Nelson and West indicates that they knew of or recklessly disregarded that these abusive and deceptive recruiting and enrollment practices were occurring system-wide at EDMC.  Further, the Exchange Act Defendants' statements that EDMC's compensation system for admissions representatives complied with Title IV, when, as reported by numerous former employees it, in fact, violated the ban on incentive compensation, including the "safe harbors," further evidences their scienter.

### 4. The Exchange Act Defendants' Statements Regarding "Gainful Employment" Support A Strong Inference of Scienter

342.    The Exchange Act Defendants' repeated statements regarding EDMC's incomparable "cohort default rates" in connection with their discussions of the repayment rate thresholds and the "gainful employment" regulations further evidences their scienter as they knew or were reckless in not knowing that such cohort default rates were in no way comparable to, or an indicator of, EDMC's repayment rates.  Further, the fact that the Exchange Act Defendants did not disclose additional information regarding EDMC's defaults, deferment, and forbearance that suggested that EDMC's repayment rates were far lower than 90% until after the Department of Education departed from its consideration of a 90% repayment rate, further evidences their scienter as they knew or had access to information demonstrating that EDMC's repayment rates were significantly below 90% when they issued statements suggesting otherwise and failed to disclose this material information.

343.    Likewise, Defendant Nelson's post-class period August 24, 2010 internal email to EDMC's employees admitting that the proposed "gainful employment" regulations could have a "substantial" and "signifcant" negative impact on EDMC, and EDMC's substantial lobbying efforts against the "gainful employment" regulations, supports a strong inference of scienter as this contradicts the Exchange Act Defendants' Class Period statements regarding "gainful employment," including that the regulation changes would be manageable for EDMC.

### 5.    The Misconduct Relates to EDMC's Core Operations

344.    As EDMC's primary source of revenue is tuition collected from students in connection with their enrollment in the Company's academic programs - approximately 81% to 89% of which was derived from Title IV funds during the Class Period - recruiting and enrollment and compliance with the HEA in order to receive Title IV are of critical importance to its operations.  Accordingly, EDMC's recruiting and enrollment practices and compliance with the HEA constituted the Company's core operations and formed the heart of its business. Defendant Nelson, as CEO of the Company, and Defendant West, as President and CEO of the Company, are deemed to have knowledge of its core operations.

### G.    Loss Causation/Economic Loss

345.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price, and operated as a fraud or deceit on acquirers of the Company's common stock.  At all times relevant, the Exchange Act Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and other Class members.  Those statements were materially false and misleading because they misrepresented and failed to disclose to the investing public

that EDMC had been regularly and systematically engaged in improper and abusive recruiting, enrollment and admission compensation tactics, including encouraging prospective students to falsify their financial aid forms, misleading prospective students about tuition costs, graduation rates, and employment prospects and expected salaries, improperly compensating its admissions staff, inflating its enrollment data, and misrepresenting the success of EDMC's graduates and the repayment rate of its graduates in connection with pending "gainful employment" regulations. Throughout the Class Period, the Exchange Act Defendants publicly issued materially false and misleading statements and omitted material facts, causing EDMC's common stock price to be artificially inflated. Plaintiffs and other Class members purchased EDMC's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

346. As detailed above, as the truth about EDMC was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. That decline in EDMC's common stock price was a direct result of the nature and extent of the Exchange Act Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct. The economic loss, *i.e.,* damages, suffered by the Plaintiffs and other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct was revealed.

347.     The truth about EDMC was revealed to the market in a series of disclosures. On August 3, 2010, news reports detailed the findings of the GAO Report, including that colleges encouraged and utilized abusive and deceptive recruiting and enrollment practices, and reported that the abuses were industry-wide.  In response, EDMC's stock price declined $0.93, or almost 6%, from a close of $15.75 per share on August 2, 2010 to a close of $14.82 per share on August 3, 2010.

348.     The next day, August 4, 2010, EDMC was named as one of the specific schools that the GAO visited and encountered abusive and deceptive recruiting and enrollment practices. Additional news further stressed that the abusive and deceptive recruiting and enrollment practices were industry-wide.  In response to the news, EDMC stock price fell 3.44%, or $0.51, on August 4, 2010 to a close of $14.31 per share.

349.     The following day, on August 5, 2010, after the market closed, a *BusinessWeek* article, "Goldman Schools Students on Debt," revealed that EDMC owed substantial debt to its private equity shareholders, a previously undisclosed material related party transaction.  The article further described that this was a material factor related to its aggressive enrollment growth goals and strategies that, in turn, led to abusive and deceptive recruiting and enrollment practices.  The next day, August 6, 2010, EDMC's stock price fell 8.04%, or $1.14, to a close of $13.04 per share.

350.     On August 9, 2010, EDMC announced that on August 5, 2010 it had received a request for information the Senate HELP Committee issued requesting information including in regard to financial aid, recruitment, enrollment, graduate placements, student debt levels and tuition, further revealing that the abusive and deceptive recruiting and enrollment practices were

pervasive at EDMC.  In response to this news, on August 9, 2010, EDMC's stock fell 2.53%, or

$0.33, to a close of $12.71 per share.

351.    Finally, after the close of the market on August 13, 2010, the Department of

Education released its repayment rate data demonstrating that EDMC's overall repayment rate

was 38% and confirming that the abusive and deceptive recruiting and enrollment practices were

pervasive throughout EDMC.  In the wake of that news, EDMC's stock price fell almost 20%, or

$2.42, from its close of $12.13 per share on Friday, August 13, 2010 to close at $9.71 per share

on Monday, August 16, 2010, having traded on extremely high volume of 3,329,113 shares.  The

only day of higher volume trading during the Class Period was October 2, 2009 - the first day of

open market trading after the IPO

352.    Based on the disclosures above, the price of EDMC's common stock declined,

eliminating the inflation in the price of those securities.  That decline in value caused Plaintiffs

and the Class economic harm.

## X.      CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT IV
### (Against Defendants EDMC, Nelson and West)
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

353.    Plaintiffs repeat and re-allege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

354.    This Count asserted against Defendants EDMC, Nelson and West is based upon

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated

thereunder.

355.    During the Class Period, Defendants EDMC, Nelson and West singly and in

concert, directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to

which they knowingly or recklessly engaged in acts, transactions, practices and course of

business which operated as fraud and deceit upon Plaintiffs and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the other members of the Class. The purpose and effect of said scheme, plan and unlawful course of conduct was, among other things, to induce Plaintiffs and the other members of the Class to purchase EDMC's common stock during the Class Period at artificially inflated prices.

356.   Throughout the Class Period, EDMC acted through, whom it portrayed and represented to the financial press and public as its valid representatives. The willfulness, motive, knowledge and recklessness of Defendants Nelson and West are therefore imputed to EDMC, which is primarily liable for the securities law violations of Defendants Nelson and West.

357.   As a result of the failure to disclose material facts, the information Defendants EDMC, Nelson and West disseminated to the investing public was materially false and misleading as set forth above, and the market price of EDMC's common stock was artificially inflated during the Class Period. In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiffs and other members of the Class relied, to their detriment, on the integrity of the market price of EDMC's common stock in purchasing shares of the Company. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

358.   Plaintiffs and other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

359.    By reason of the foregoing, Defendants EDMC, Nelson and West directly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class in connection with their purchases of EDMC's common stock during the Class Period.

**COUNT V**
**(Against Defendants Nelson and West)**
**Violations of Section 20(a) of the Exchange Act**

360.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

361.    Defendants Nelson and West, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

362.    Defendants Nelson and West have the power and influence and exercised same to cause EDMC to engage in the illegal conduct and practices complained of herein.

363.    By reason of the conduct alleged in Count IV of this Complaint, Defendants Nelson and West are liable jointly and severally and to the same extent as the Company for the aforesaid wrongful conduct, and are liable to Plaintiffs and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of EDMC's common stock during the Class Period.

## XI.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

364.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased EDMC common stock from October 1, 2009 through and including August 13, 2010, including all

persons who purchased EDMC common stock in the IPO pursuant to the Registration Statement and Prospectus for the IPO, and who were damaged thereby (the "Class").  Excluded from the Class are the Defendants, the Company's officers and directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any other entity in which any of the Defendants has a controlling interest or of which the Company is a parent or subsidiary.

365.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company had more than 120 million shares of its common stock outstanding, which were actively traded on the NASDAQ, and approximately 23 million shares of common stock were sold pursuant to the IPO.  Although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members of the Class who traded Company common stock during the Class Period.

366.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendants violated federal securities laws based upon the facts alleged herein;

(b)    Whether the Exchange Act Defendants acted knowingly or recklessly in making materially misleading statements and/or omissions during the Class Period;

(c)    Whether the market prices of the Company's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(d)    Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

367.    Plaintiff's' claims are typical of the claims of the members of the Class as

Plaintiffs and members of the Class sustained damages arising out of Defendants' wrongful

conduct in violation of federal laws as complained of herein.

368.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

369.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy since joinder of all members of this Class is impracticable.

Furthermore, because the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for the Class members

individually to redress the wrongs done to them.  There will be no difficulty in the management

of this action as a class action.

370.    Plaintiffs will rely, in part, upon the presumption of reliance established by the

fraud-on-the market doctrine in that:

      (a)    Defendants failed to disclose material facts during the Class
           Period;

      (b)    EDMC's stock met the requirements for listing, and was listed and
           actively traded on the NASDAQ, a highly efficient and automated
           market;

      (c)    EDMC made available periodic public reports about its financial
           results and condition;

      (d)    EDMC regularly communicated with public investors via
           established market communication mechanisms, including through
           regular dissemination of press releases on the national circuits of
           major newswire services and through other wide-ranging public
           disclosures, such as communications with the financial press and
           other similar reporting services;

(e)  EDMC was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of those reports was publicly available and entered the public marketplace;

(f)  the misleading statements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g)  Plaintiffs and members of the Class purchased their Company stock between the time Defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

371.  Based upon the foregoing, Plaintiffs and members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's common stock.

372.  As a result of the foregoing, the market for EDMC's common stock promptly digested current information regarding EDMC from all publicly-available sources and reflected such information in the price of EDMC's common stock.  Under those circumstances, all purchasers of EDMC's common stock during the Class Period suffered similar injury through their purchase of EDMC's common stock at artificially inflated prices, and a presumption of reliance applies.

## XII.  <u>NO SAFE HARBOR</u>

373.  The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as

forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of EDMC who knew that those statements were false, misleading or omitted necessary information when they were made.

## XIII.   PRAYER FOR RELIEF

WHEREFORE**,** Plaintiffs, on their own behalf and on behalf of the Class, prays for judgment as follows:

(a)   Determining this action to be a proper class action and certifying Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)   Awarding Plaintiffs the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d)   Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder; and

(e)   Granting such other and further relief as the Court may deem just and proper.

Dated: January 10, 2011

**CHIMICLES & TIKELLIS LLP**

Steven A. Schwartz
PA I.D. No. 50579
One Haverford Centre
Haverford, PA 19041
(610) 642-8500 (extension 319)
(610) 645-4720 (direct dial)
(610) 649-3633 (telecopy)
steveschwartz@chimicles.com

*Liaison Counsel for Plaintiffs*

**BERMAN DEVALERIO**

/s/ Kathleen M. Donovan-Maher
Kathleen M. Donovan-Maher
(MA I.D. #558947 - *pro hac vice*)
Jeffrey C. Block
(MA I.D. #600747 - *pro hac vice*)
Kristin J. Moody
Steven J. Buttacavoli
One Liberty Square
Boston, Massachusetts 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: kdonovanmaher@bermandevalerio.com
Email: jblock@bermandevalerio.com
Email: kmoody@bermandevalerio.com
Email: sbuttacavoli@bermandevalerio.com

*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2011, I electronically filed the foregoing Amended Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

/s/ Kathleen M. Donovan-Maher
Kathleen M. Donovan-Maher