IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DOUGLAS N. GAER, individually and on behalf )
of all others similarly situated, )
               Plaintiff, )
 )
     vs )     Civil Action No. 10-1061
 )     Judge Fischer
EDUCATION MANAGEMENT CORP., et al., )     Magistrate Judge Mitchell
             Defendants. )


## REPORT AND RECOMMENDATION

### I.     Recommendation

It is respectfully recommended that the motion to dismiss the Amended Complaint filed

by Defendants Barclays Capital, Inc., Barrington Research Associates, BMO Capital Markets

Corp., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., J.P. Morgan Securities, Inc.,

Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co., Piper Jaffray & Co., Robert

W. Baird & Co., Signal Hill Capital Group, LLC, Stifel, Nicolaus & Co., Inc., and William Blair

& Co., LLC (Docket No. 71) be granted.  It is further recommended that the motion to dismiss

the Amended Complaint filed by Defendants Education Management Corp., Adrian M. Jones,

Randall J. Killeen, Jeffrey T. Leeds, John R. McKernan, Jr., Leo F. Mullin, Todd S. Nelson, Paul

J. Salem, Edward H. West, and Peter O. Wilde (Docket No. 74) be granted.

### II.     Report

This is an action under the Securities Act of 1933 (the "Securities Act") for the benefit of

those individuals who purchased the common stock of Education Management Corp. ("EDMC")

in an initial public offering completed on October 1, 2009 (the "IPO"), and also under the

Securities Exchange Act of 1934 (the "Exchange Act") for the benefit of those individuals who

purchased EDMC common stock in the IPO or on the open market from October 1, 2009 through and including August 13, 2010 (the "Class Period"). On August 11, 2010, Plaintiff Douglas N. Gaer, individually and on behalf of all others similarly situated, filed a complaint (ECF No. 1). On January 10, 2011, an Amended Complaint (ECF No. 56) was filed by lead plaintiff Oklahoma Police Pension and Retirement System and newly-added plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA").

Named as defendants are EDMC and certain individuals associated with EDMC, namely Adrian M. Jones, Randall J. Killeen, Jeffrey T. Leeds, John R. McKernan, Jr., Leo F. Mullin, Todd S. Nelson, Paul J. Salem, Edward H. West, and Peter O. Wilde (together, "EDMC & the Individual Defendants"). In addition, the Amended Complaint names thirteen investments banks that acted as underwriters of the October 2009 IPO, namely Barclays Capital, Inc., Barrington Research Associates, BMO Capital Markets Corp., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., J.P. Morgan Securities, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co., Piper Jaffray & Co., Robert W. Baird & Co., Signal Hill Capital Group, LLC, Stifel, Nicolaus & Co., Inc., and William Blair & Co., LLC (together, the "Underwriter Defendants").

Currently pending before the Court for disposition are two motions to dismiss, one filed by EDMC & the Individual Defendants and the other by the Underwriter Defendants. For the reasons that follow, the motions should be granted.

Facts

EDMC is a Pennsylvania corporation with business headquarters in Pittsburgh. It is one of the largest for-profit, post-secondary education providers in North America, operating campus and online programs at 101 locations in 31 states and Canada through its Argosy University,

Brown Mackie Colleges, Art Institute and South University schools, awarding undergraduate and graduate degrees and specialized non-degree disciplines. As of October 2010, EDMC had 158,300 enrolled students. (Am. Compl. ¶¶ 2, 21.) Prior to and throughout the Class Period, EDMC reported dramatic increases in student enrollments: as of October 2008, it had 110,800 enrolled students, and a year later, as of October 2009, it reported having over 136,000 students, an increase of nearly 23%. Between October 2009 and October 2010, it saw a further increase in enrollments of 22,300, or nearly 16.4%. (Am. Compl. ¶ 3.)

On June 1, 2006, EDMC was acquired and taken private in a $3.4 billion leveraged buyout by private equity investors, including Goldman Sachs Capital Partners ("GSCP") ("2006 Transaction"). (Am. Compl. ¶ 7.) These investors brought in Todd S. Nelson, EDMC's Chief Executive Officer; Edward H. West, EDMC's Chief Financial Officer; and other senior management. Plaintiffs allege that the purpose of these changes in management was to boost EDMC's revenues and profits. (Am. Compl. ¶¶ 63, 189.) EDMC remained privately held until its October 1, 2009 IPO, selling 23,000,000 shares of common stock at $18.00 per share. Net proceeds to EDMC, after transaction costs, totaled $387.3 million. (Am. Compl. ¶¶ 7, 90.) After the IPO, EDMC's private equity shareholders continued to own nearly 70% of EDMC's outstanding common stock. Id.

EDMC's primary source of revenue is student tuition, nearly all of which – 81% to 89% during the Class Period – is paid by the federal government as student aid under Title IV of the Higher Education Act of 1965 ("HEA"). (Am. Compl. ¶¶ 4, 48.) EDMC's business is highly regulated, particularly by the Department of Education ("DOE") and compliance with applicable regulations for receipt of such aid is crucial to EDMC's business and critically important to investors. To be eligible for Title IV funds, the HEA prohibits institutions from making

misrepresentations to prospective and enrolled students.  (Am. Compl. ¶¶ 5-6, 49-54; 20 U.S.C. § 1092(a); 34 C.F.R. § 668.71.)  Institutions are also prohibited from compensating admissions, recruiting and financial aid staff "based directly or indirectly" on "securing enrollments or financial aid," and a safe harbor provision permits only "[t]he payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid."  (Am. Compl. ¶ 51; 34 C.F.R. § 668.14(b)(22)(ii)(A).) This incentive compensation ban was specifically enacted to curb recruiting abuses that lead to the enrollment of unqualified students and a drain on Title IV aid.

### Announcement of New Negotiated Rulemaking

On May 26, 2009, over four months before the IPO, DOE published a notice in the Federal Register announcing its intention to establish negotiated rulemaking committees and hold public hearings related to the proprietary education sector.  (Am. Compl. ¶ 55; 74 Fed. Reg. 24728-24729 (May 26, 2009).[1])  Among other topics, DOE would consider "[i]ncentive compensation paid by  institutions to persons or entities engaged in student recruiting or admission activities" and assessment of "[g]ainful employment in a recognized occupation." Id.

### Conference Calls

On May 29, 2009, DOE Deputy Undersecretary Robert Shireman held two conference calls about the proposed process, one with educational institutions and one with financial analysts and investors who monitor the proprietary education industry.  (Am. Compl. ¶ 56.)

---

[1]    EDMC Request for Judicial Notice ("RJN") Ex. 3 (ECF No. 76).

Shireman said DOE was considering "whether to move forward with any possible changes" regarding incentive compensation, and that where gainful employment was concerned, "the question is is that an area where it might make sense to have some clarifications?" (RJN Ex. 4 at 5; Ex. 5.)

Additional Notice of Negotiated Rulemaking

On September 9, 2009, DOE placed another notice in the Federal Register announcing its intent to establish negotiated rulemaking committees and soliciting nominations for negotiators. (Am. Compl. ¶ 57; 74 Fed. Reg. 46399-46401 (Sept. 9, 2009).[2]) The notice listed the issues that each committee would address, including "[i]ncentive compensation" and "[g]ainful employment in a recognized occupation," but without further comment. Id. It stated that DOE "anticipate[d]" that negotiations would not even begin until the end of October 2009. As with the prior notice, no proposed rule changes were released.

IPO References to Negotiated Rulemaking

The IPO was issued on October 1, 2009 and contained seven pages entitled "Risks Related to Our Highly Related Industry." (RJN Ex. 1 at 14-20.) Specifically, the IPO stated in headings that:

> Failure of our schools to comply with extensive regulations could result in monetary liabilities or assessments, restrictions on our operations, limitations on our growth or loss of external financial aid funding for our students.
>
> ***
>
> Congress may change eligibility standards or reduce funding for federal student financial aid programs, or other governmental or regulatory bodies may change similar laws or regulations relating to other student financial aid programs, which could reduce the growth of our student population and revenue.

---

[2]    RJN Ex. 6.

***

Our failure to comply with various state regulations or to maintain any national, regional or programmatic accreditation could result in actions taken by those states or accrediting agencies that would have a material adverse effect on our student enrollment and results of operations.

***

Government and regulatory and accrediting agencies may conduct compliance reviews, bring claims or initiate litigation against us, which may adversely impact our licensing or accreditation status, and thereby adversely affect our results of operations.

(RJN Ex. 1 at 14-20.)

Defendants note that each heading was amplified by textual descriptions that spelled out risks EDMC could face from future changes in the regulatory regimes under which it operates or from non-compliance with applicable regulations.  For example, the Prospectus states that "[t]he agencies that regulate our operations periodically revise their requirements and modify their interpretations of existing requirements … Any action by Congress or the U.S. Department of Education that significantly reduces funding for the federal student financial aid programs or the ability of our schools or students to participate in these programs would have a material adverse effect on our student population and revenue."  (RJN Ex. 1 at 14-15.)

In addition, EDMC cautioned that subsequent events might cause its future results to differ materially from expectations. It specifically identified the following factors as presenting such risks:

government and regulatory changes including revised interpretations of regulatory requirements that affect the post-secondary education industry;

[EDMC's] compliance with extensive federal, state and accrediting agency regulations and requirements; and

[EDMC's] ability to maintain eligibility to participate in Title IV

programs.

Id. at 35.

Final Rulemaking Sessions

Final dates of negotiated rulemaking sessions were November 2-6, 2009, December 7-11, 2009 and January 25-29, 2010. (Am. Compl. ¶ 57.) However, the negotiated rulemaking process failed to yield regulations. (RJN Ex. 18.) Plaintiffs allege that, by February 2010, DOE was considering a requirement that institutions show a 90% repayment rate on Title IV loans among a program's graduates to satisfy the gainful employment requirement and, on July 23, 2010, this was reduced to a 45% repayment rate to be fully eligible for Title IV funds. (Am. Compl. ¶¶ 58, 61.)

EDMC Conference Calls

At conference calls held in February, May and August of 2010, after admonitions about the presence of forward-looking statements, Nelson commented upon possible future developments in the regulatory realm and expressed optimism that "we can comply with whatever language that is finally included in the [incentive compensation] regulation." (RJN Ex. 11 at 2-3.) In May, Nelson noted, based on the information he had at that time, his "feeling" was that the company could comply albeit with some "minor modifications." (RJN Ex. 12 at 13.)

In both calls and again in August, Nelson and West specifically declined to comment on pending gainful employment metrics because EDMC did not have the proper data to analyze the potential effect. (RJN Ex. 11 at 12-13, 15-16; Ex. 12 at 15; Ex. 49 at 4, 12.) When asked in February 2010 to predict whether EDMC could meet future gainful employment tests, Nelson stated: "I think, Kelly, it would be inappropriate for us to go into and speculate on it based on the data that's out there relative to what the Department has proposed." (RJN Ex. 11 at 16.) In May,

West reported a series of metrics and made no representations, as Plaintiffs assert, "as to the 'gainful employment' regulations," (Am. Compl. ¶ 276; RJN Ex. 12 at 4.) In August, Plaintiffs allege that EDMC assured that it would meet new repayment rate requirements but West explicitly warned that the Company was not making such a statement: "We caution using this information to assess any potential impact, as it is not the repayment rate." (RJN Ex. 49 at 4); see also id. at 12 ("Let me state as I said, restate what said in my comments – this does not correlate to or approximate repayment rate….").

DOE Develops Regulations

Thereafter, DOE developed proposed regulations on June 18, 2010 (75 Fed. Reg. 34806-34890)[3] and July 26, 2010 (75 Fed. Reg. 43616-43708)[4] and issued final regulations on October 29, 2010 (75 Fed. Reg. 66665-77, 66832-66975).[5] The DOE deferred finalizing certain proposed rules on gainful employment eligibility, instead announcing it would be holding yet additional meetings, including two days of public hearings on November 4–5, 2010, to hear from individuals and organizations who had submitted comments on the proposals under consideration. (RJN Exs. 37, 38.)

On January 25, 2011, DOE announced that it would issue clarifications in the form of "Dear Colleague" letters to even the final rules that it did release in October, including the revised regulations addressing incentive compensation. (RJN Ex. 47.) On March 17, 2011, DOE issued one such clarification addressing incentive compensation. (RJN Ex. 22.)

On June 2, 2011, DOE released the final "gainful employment" regulations. (RJN Ex.

---

[3] RJN Ex. 14.
[4] RJN Ex. 15.
[5] RJN Exs. 37, 38.

50.)[6]  Defendants note that they turned out to be far less draconian than prior proposals, for example, setting a repayment rate of 35%, rather than the previously considered 90% and 45% rates.  EDMC's overall repayment rate was 38%.  (RJN Exs. 51-53.)  Upon release of these regulations, stocks went up, including EDMC's, which closed at $24.76 per share, up $4.46 from the previous day's closing.  (RJN Ex. 54.)

GAO Report

Beginning in May 2010, and continuing through July of that year, the United States Government Accountability Office ("GAO") conducted a number of undercover "interviews" of admissions representatives at fifteen for-profit schools, with GAO employees posing as prospective students. The resulting report, released and presented to Congress as testimony on August 4, 2010, acknowledged that the sample of colleges was "nonrepresentative,"[7] and that the GAO "cannot project the results of [its] undercover tests or cost comparisons to other for-profit colleges."[8] Despite those limitations, the GAO report, which was critical of various actions reportedly observed, received widespread media attention, putting a spotlight on the entire industry, and its release was followed by a drop in the price of nearly every industry stock.  (Am. Compl. ¶¶ 285-87) (citing articles in the New York Times, Wall Street Journal and Bloomberg). See RJN Ex. 41 (graph showing EDMC stock performance and Bloomberg U.S. For-Profit Education Index); Ex. 42 (table showing EDMC stock performance and Bloomberg U.S. For-profit Education Index).

In Congressional testimony that accompanied the report, the GAO identified the fifteen

---

[6]  ECF No. 88.
[7]  RJN Ex. 7 at 2; Ex. 8 at 2.
[8]  RJN Ex. 7 at 3; Ex. 8 at 3.

schools visited, including an Illinois campus of EDMC's Argosy University. (RJN Ex. 9 at [7].) None of the over one-hundred other EDMC schools or campuses were even mentioned. Moreover, the report of the Argosy visit involved only one or two admissions employees out of over one thousand and only two prospective "students" out of the hundreds of thousands that consider EDMC schools for post-secondary education. (RJN Ex. 7 at 19-26; Ex. 8 at 19-27.) In its report, GAO also identified what it termed "good practices," with commentary that this was "not surprising" and that "[t]here are good people trying to do the right thing." (RJN Ex. 9 at [7-11].) Argosy was among the three schools highlighted as demonstrating "good practices."

According to Plaintiffs, the GAO report detailed over 70 instances of "abusive and deceptive recruiting and enrollment practices" encountered during the investigation. (Am. Compl. ¶ 288.) But Defendants note that the GAO never found that Argosy acted in an abusive or deceptive manner; it was specifically not among the four where GAO purportedly found a campus with examples of "fraudulent actions encouraged by for-profit colleges." (RJN Ex. 7 at 7-8; Ex. 8 at 7-8.)

Plaintiffs allege that the truth about EDMC's improper practices first began to emerge in connection with the GAO Report. (Am. Compl. ¶ 9.) However, Defendants note that the report expressly states that its findings were based on investigation conducted from May through July 2010. (Stanton Decl. Ex. B at 4.) As the media widely reported on August 3, 2010, GAO sent undercover investigators to 15 for-profit colleges and found that all of those colleges used deceptive or questionable recruiting and enrollment practices. Such practices included misleading prospective students about tuition costs, program quality, accreditation, graduation rates, employment prospects and expected salaries, and encouraging prospective students to falsify financial aid forms and engage in other financial aid improprieties. (Am. Compl. ¶¶ 285-

87.)  The media reports also revealed that there was "little question that these practices occur across the industry and are in no way limited to a few rogue recruiters or even schools." (Am. Compl. ¶ 286.)  In response, EDMC's stock price declined almost 6% to close at $14.82 per share on August 3, 2010. (Am. Compl. ¶ 287.)

On November 30, 2010, GAO reissued its report, but did not change its overall conclusions and findings.  (RJN Ex. 8.)  With respect to Argosy, the reissued report no longer includes an instance of an ADA stating that instructors had "professional experience" in response to a question regarding faculty qualifications. Plaintiffs note that, although Defendants state that the other change related to Argosy is "substantial," in fact, the report only revised the description to reflect that the ADA "indicated," rather than "said," that not everyone graduates, in response to a request for the graduation rate.  The instance of the Argosy ADA providing misleading information regarding tuition cost to the undercover investigator remained exactly the same in the reissued report.  (RJN Ex. 8 at 25.)  Nevertheless, Plaintiffs have not explained how either the original report or the reissued report supports a claim that EDMC engaged in "systemic" improper practices.

HELP Committee

On June 24, 2010, the Senate Health Education Labor and Pension ("HELP") Committee took public testimony from noted Wall Street short seller Steve Eisman who made a presentation (based on one previously given at an investor conference) and touted the short selling of stocks in companies in the sector (essentially wagering the stock price would fall).  He did not mention EDMC.  (RJN Ex. 19.)

Plaintiffs allege that, on August 4, 2010, at a HELP Committee hearing on its ongoing investigation into for-profit colleges and the related GAO Report, it was further revealed that for-

profit colleges, including EDMC, engaged in abusive recruiting practices in an effort to consistently increase revenues through federal student aid. (Am. Compl. ¶¶ 288-93.) Argosy University in Illinois, an EDMC school, was identified as one of the 15 schools in the GAO Report. (Am. Compl. ¶ 289.) The hearing testimony and related media coverage described how these abusive practices were rampant throughout the for-profit education industry, and improper compensation structures, such as at EDMC, were identified as a cause of such abuses. (Am. Compl. ¶ 290.) In response, EDMC's stock price fell 3.44% to close at $14.31 per share. (Am. Compl. ¶ 293.)

Defendants respond that the Amended Complaint does not cite any hearing testimony that detailed improper practices by EDMC in the period prior to the IPO. They point out that it is a matter of public record that there were four speakers at the HELP Committee hearing:[9]

1. Joshua Pruyn, a former admissions representative at Westwood College (an entity unrelated to EDMC and whose parent company is Alta Colleges, Inc.) spoke about his experiences while employed by Westwood. His testimony did not mention EDMC.

2. Dr. Michaela S. McComis, Executive Director of Accrediting Commission of Career Schools and Colleges, spoke about ACCSC's accreditation standards. Her testimony did not refer to EDMC.

3. David Hawkins, Director of Public Policy and Research, National Association for College Admission Counseling, spoke about the need for professional standards in post-secondary admission practices. His testimony did not refer to EDMC.

---

[9]    See Full Committee Hearing – For Profit Schools: The Student Recruitment Experience, http://help.senate.gov/hearings/hearing/?id=19454102-5056-9502-5d44-e2aa8233ba5a; see also Hearing on For-Profit School Recruitment before the S. Comm. on Health, Ed. Labor & Pensions, 111th Cong. 9 (2010), 2010 WL 4873720 (F.D.C.H.)

4. Gregory Kutz testified concerning the GAO's post-IPO investigation. He was questioned by Senator Harkin as to whether any of the fifteen schools embraced by the DOE's investigation had engaged in "good practices." In response, Mr. Kutz identified EDMC's Argosy University in Illinois as an example of good practices.

Plaintiffs allege that Mr. Kutz identified Argosy University as "school number 10" in the GAO Report. (Am. Compl. ¶ 289.) However, school number 10 was not a school that the GAO Report found to have "encouraged fraud." Instead, the GAO Report concluded that three statements a single admissions representative at one of EDMC's 104 schools allegedly made to a DOE undercover agent at some point between May and July 2010 constituted "questionable" practices because the representative allegedly provided "incomplete" information about Argosy's program costs and graduation rates. That conclusion rested on two "Scenarios":

> Scenario 1. Admissions representative said the bachelor's degree would take 3.5-4 years to complete, but only provided an annual cost estimate for 1/5 of the program.

> Scenario 2: When the undercover applicant asked about the qualifications of the professors, the only information provided about the qualifications of the professors is that they have professional experience.

> Admissions representative did not provide the graduation rate when directly asked. Instead she said not everyone graduates.

(RJN Ex. 7 at 24.) Defendants argue that these scenarios do not support Plaintiffs' inference that they revealed pre-IPO systemic improprieties in EDMC's recruiting and enrollment practices.

When the report was reissued on November 30, 2010, the first bullet under "Scenario 2" was removed. (RJN Ex. 8 at 25.)

BusinessWeek Article

Plaintiffs allege that, on August 5, 2010, a BusinessWeek article, "Goldman Schools Students on Debt," based substantially on observations of EDMC's former CFO, "revealed that

EDMC had incurred substantial debt " in connection with the 2006 Transaction and revealed that a Goldman Sachs affiliate was a substantial creditor of EDMC. (Am. Compl. ¶ 10.) In response, EDMC's stock price fell 8.04% to close at $13.04 per share. (Am. Compl. ¶ 294.)

Defendants respond that, notwithstanding Plaintiffs' allegation that the Prospectus did not disclose information regarding EDMC's indebtedness to Goldman affiliates, the role of Goldman and its affiliates as EDMC creditors under its senior secured credit facilities was disclosed. For example, paragraph 131 of the Amended Complaint states that:

> Information about EDMC's substantial and material indebtedness to Goldman Sachs Credit Partners, an affiliate of Goldman Sachs Capital Partners, in the term loan facility and revolving credit facility was material information to an investor in deciding whether to purchase EDMC common stock at $18.00 per share in the IPO. Moreover, EDMC's omission to disclose this information was contrary to SFAS 57 and relevant GAAP. The registration statement, however, did not disclose information regarding EDMC's indebtedness to Goldman Sachs Credit Partners.

But page 164 of the Prospectus stated that:

> Affiliates of Goldman, Sachs & Co., J.P. Morgan Securities Inc., Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. Incorporated, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Barclays Capital Inc. are lenders to EDMC and or agents under its senior secured credit facilities, for which they received or will receive customary fees and expenses.

(RJN Ex. 1 at 164.) On November 8, 2006, EDMC filed Amendment No. 1 to Form S-4 Registration Statement, Exhibit 10.1 to which is the original Credit and Guaranty Agreement which disclosed that GSCP was a lender of $1,185,000,000 on the term loan and was a lender of $51,562,500 (out of $300,000,000) on the revolving credit facility. (RJN Ex. 32 at App. A-1-1, A-2-1.)

In their response brief, Plaintiffs contend that the BusinessWeek article revealed that EDMC <u>still</u> owed substantial debt to affiliates of its private equity shareholders and that the debt contributed to EDMC's abusive practices. (ECF No. 79 at 38.) Defendants note that this

argument clashes with Plaintiffs' original contention that a Goldman Sachs affiliate's status as a lender was never disclosed to the public and that, in any event, the BusinessWeek article does not refer to lenders in October 2009 or August 2010, but refers only to the original 2006 loans.

HELP Committee Request

On August 9, 2010, EDMC announced that it had received a request for information from the Senate HELP Committee, seeking information regarding financial aid, recruitment, enrollment, graduate placements, student debt levels and tuition. (Am. Compl. ¶ 295.)  In response, EDMC's stock fell $2.53 to close at $12.71 per share. Id.

Defendants respond that disclosure of a request for information reveals that information has been requested and nothing more.  Plaintiffs have not explained how a request for information can be construed as a revelation that EDMC was engaging in improper activities that artificially raised its stock price.

DOE Data

After market close on Friday, August 13, 2010, DOE released data on federal student loan repayment rates, revealing that EDMC's overall repayment rate was 38% – well below what Defendants had suggested.  (Am. Compl. ¶¶ 308-10.)  In response, EDMC's stock price fell almost 20% to close at $9.71 per share on Monday, August 16, 2010. (Am. Compl. ¶ 310.)

Plaintiffs allege that this data release confirmed that EDMC was systemically employing improper recruiting and enrollment practices throughout the Class Period and showed that EDMC could not maintain Title IV eligibility under pending regulations.

Defendants argue that matters of public record refute Plaintiffs' assertion that these data revealed wide-spread EDMC improprieties. First, the data in question did not exist at the time of the IPO. They were created specifically in connection with the DOE's July 2010 proposed

gainful employment regulation; the DOE expressly stated that "The repayment rate data were provided as background information about the development of the proposed [gainful employment] rule" which the DOE first released in July 2010.[10]  Accordingly, post-IPO data could not have been disclosed in the October 2009 Prospectus.

Second, Plaintiffs' characterization of these data is contradicted by the DOE.  In an August 24, 2010 release of Frequently Asked Questions intended to clarify the data's significance, the DOE specifically disavowed use of the data to assess the impact of its proposed gainful employment regulation on any educational institution.  As the Department emphasized in the IFAP notice releasing the data, it is not possible to use the data to determine the impact on any particular program offered today at an institution for multiple reasons.  FAQs (emphasis in original).[11]  Accordingly, since these post-IPO data could not be used to assess a school's future ability to comply with the DOE's proposed more restrictive – gainful employment regulations, they clearly provide no support for Plaintiffs' allegation that prior to the IPO EDMC's recruiting practices were improper under then-applicable, less stringent regulations.

Plaintiffs note that, following these disclosures, Attorneys General in Florida, Illinois and Kentucky opened investigations into EDMC regarding financial aid; unfair and deceptive practices regarding recruitment, enrollment, accreditation, job placement and graduation rates; payment of incentive compensation in violation of the HEA; student-loan default rates; and

---

[10]     See information for Financial Aid Professionals, Release of Data and Technical Documentation for NPRM on Gainful Employment, August 13, 2010, available at: http://www.ifap.ed.gov/eannouncements/081310ReleaseGainfulDataTechDocNPRM.html

[11]     See U.S Department of Education, Frequently Asked Questions: Recently Released Repayment Rate Data, August 24, 2010, available at: http://www2.ed.gov/policy/highered/reg/hearulemaking/2009/ge-faq/pdf

disbursement of financial-aid funds. (Am. Compl. ¶ 327.)  Further, they note that, on May 2,

2011, EDMC announced that, on April 29, 2011, the DOJ announced its intervention in a qui tam

action that had been filed under seal against EDMC alleging that it improperly paid recruiters

based on the number of students they enrolled.  See Block Decl. Ex. 1.  The qui tam action,

which had been filed on April 5, 2007 at Civ. A. No. 07-461, alleges systemic violations of the

HEA incentive compensation ban at EDMC, including rampant violations of the safe harbors and

an improper compensation "matrix," in order to increase enrollments and federal aid revenue,

just as in the AC.  See Block Decl. Ex 2.  California and Illinois have also intervened.  See Block

Decl. Ex. 3.  Finally, Plaintiffs request that the Court take judicial notice of the Joint Complaint

in Intervention by the United States of America and the States of California, Florida, Illinois and

Indiana filed August 8, 2011 against EDMC and certain EDMC subsidiaries.  (Civ. A. No. 07-

461, ECF No. 128; Second Block Decl., ECF No. 91, Ex. 1.)

Defendants respond that: 1) these facts are not contained in the Amended Complaint; 2)

Plaintiffs cannot rely on allegations in separate complaints; and 3) the fact that government may

join in a qui tam suit does not demonstrate that the suit has merit.  Defendants are correct and no

weight should be given to the allegations in the qui tam suits or the fact that the government has

elected to join them.[12]  Similarly, the Bloomberg article that reports on the filing of the

---

[12]    This Court respectfully disagrees with Judge Gertner of the District of Massachusetts, who
recently stated that plaintiffs could "buttress" their complaint with the allegations made by the
California attorney general, who joined a qui tam case following an investigation.  Hill v. State
Street Corp., 2011 WL 3420439, at *10 (D. Mass. Aug. 3, 2011).  Judge Gertner cited no
authority for this conclusion, which is contrary to the standards that govern pleadings in
federal court.   The Court of Appeals for the Third Circuit has held that a court erred by taking
judicial notice of a plaintiff's deposition testimony in a prior proceeding on a motion to
dismiss. Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004).  A fortiori, a court
may not take judicial notice of the allegations made in a complaint in another case.

government's amended complaint in the qui tam suit is noticeable only "to indicate what was in the public realm at the time, not whether the contents of [the article] were in fact true." Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006).

Bittel Testimony

Kathleen Bittel submitted a letter to the Senate HELP Committee on September 15, 2010 and testified before the Committee on September 30, 2010. (Am. Compl. ¶¶ 64-65.) The CWs' allegations were first disclosed when the Complaint referring to them was filed after the close of the market on January 10, 2011. Plaintiffs rely on these witnesses' individual perspectives to support the allegation that EDMC had engaged in systemic recruiting and enrollment improprieties. See generally Am. Compl. ¶¶ 95-151.

However, Defendants note that, on September 15, where Ms. Bittel submitted her letter to the HELP Committee, EDMC's stock price closed at $9.18 per share, up from a close of $8.98 on September 14. EDMC s stock price then rose on every trading day through September 23, when it closed at a price of $12.70 per share. Ms. Bittel's September 30 testimony was followed by an even more positive market movement: EDMC's stock price closed on September 30 at $14.68 per share, up nearly $3.00 per share from a closing price of $11.79 per share on September 29. Similarly, EDMC's stock price rose steadily in the days following the filing of the Complaint and the public disclosure of the CWs' allegations. On January 10, 2011, EDMC's stock price closed at $13.68 per share, and the Complaint was filed after the close of the market that day. On January 11, EDMC's stock price closed at $13.83. On the next three trading days, January 12, 13 and 14, EDMC's stock price closed at increasingly higher prices: $14.05, $14.34, and $14.78, respectively.

Allegations Regarding EDMC'S Growth, Recruiting and Title IV Eligibility

In the Amended Complaint, Plaintiffs note that, at all relevant times, EDMC consistently reported significant enrollment and revenue increases, with its student enrollment growing over 21% and net revenue increasing over 23% each quarter compared to the prior year. (Am. Compl. ¶¶ 147, 236-37, 239, 241, 249, 253-54, 256-57, 266, 269, 271, 281, 297-98.) EDMC's reported net revenues were over $650 million in each quarter during the Class Period, almost 90% of which was from federal student aid. (Am. Compl. ¶¶ 147, 253, 256, 266, 269, 271, 281, 285, 297-98.) In the Prospectus and in press releases, quarterly filings and conference calls, EDMC also publicly touted its business and financial performance, the quality of and demand for its programs, its commitment to students, graduate success and placement rates and its compliance with the HEA. (Am. Compl. ¶ 8; RJN Ex. 1.)

Plaintiffs allege that Defendants misrepresented EDMC's growth as being attributable to its recognized brand, diverse and national program offerings, strong management team, commitment to high standards of educational quality, commitment to students' and graduates' success and the demand for its programs. (Am. Compl. ¶¶ 138-44, 153-54, 238-40, 255, 258, 270, 272-73, 296, 299-301.) They further allege that Defendants misrepresented EDMC's recruitment, marketing and admissions practices as focused on identifying students that were best equipped to succeed and matching them to appropriate programs, (Am. Compl. ¶¶ 148-49, 274, 302-03), and touted the success of EDMC's students and graduates, including reported graduate employment rates of 85–87%. (Am. Compl. ¶¶ 153-54, 240, 258, 273, 301.) Finally, they allege that Defendants falsely stated that compensation for admissions staff complied with the HEA, including the safe harbor prohibiting compensation based solely on the number of students enrolled. (Am. Compl. ¶¶ 158, 244, 275.)

Plaintiffs allege that the truth, which was concealed from investors, was that EDMC's meteoric growth was not driven by EDMC's commitment to education or to its students' success, but, rather, the fact that EDMC employed pervasive and systemic abusive and deceptive recruiting and enrollment practices. They contend that these practices were aimed at manipulating students into enrolling by any means to maintain a constant supply of revenue via Title IV funds. Allegedly, these and other practices were encouraged by EDMC management through, inter alia, training, a culture of intimidation and improper admissions staff compensation.

In connection with the 2006 Transaction, EDMC's private equity shareholders brought a hand-picked management team to EDMC, including Defendants Nelson and West. (Am. Compl. ¶¶ 63, 189.) Plaintiffs allege that new management set unrealistic goals for enrollment and growth and instituted improper and abusive recruitment and compensation systems in order to achieve this growth. (Am. Compl. ¶¶ 63, 96, 101, 188-91.) The admissions department at EDMC became a high-pressure, boiler room sales environment where abusive practices were used to manipulate students into enrolling.

The Amended Complaint cites accounts of numerous former EDMC employees, including Confidential Witnesses ("CWs") 1, 2, 3, 4, 5, 6, 7, 12, 13, 14, 15 & 16 and current employee Kathleen Bittel, from different geographic regions and business units, who state that EDMC systemically employed abusive and predatory recruiting tactics as of the IPO and throughout the Class Period. (Am. Compl. ¶¶ 63, 97-98, 203-15.) Plaintiffs allege that Admission representatives, or Associate Directors of Admissions ("ADAs"), regularly used such practices, including making misrepresentations to prospective students regarding: (1) financial aid availability and repayment obligations; (2) the cost of EDMC programs; (3) the quality of its

programs; (4) academic obligations; (5) available career prospects and salaries after graduation; and (6) EDMC's career services assistance. (Am. Compl. ¶¶ 63, 97, 106-07, 203, 205, 207, 209-12.)  They further allege that EDMC staff also encouraged students to cheat on placement exams and routinely exploited prospective students' vulnerabilities to manipulate them into enrolling. (Am. Compl. ¶¶ 63, 66, 68, 81, 83, 98, 100, 204, 210, 214.)

The Amended Complaint alleges that ADAs were trained and directed to make misrepresentations and employ other abusive and predatory tactics to lure students to enroll, (Am. Compl. ¶¶ 63, 100, 204-07, 211-13), and that Defendant Nelson instituted these abusive and deceptive recruitment practices (Am. Compl. ¶¶ 63, 96, 204.)  Specifically, ADAs were instructed to: (1) conceal or misrepresent the actual cost of programs; (2) get students enrolled "by any means;" (3) "make the program sound like it is more effective than it is;" (4) answer prospective students' questions evasively when the "real answer" would discourage enrollment; and (5) affirmatively lie about pertinent information, including career and salary prospects and financial aid. (Am. Compl. ¶¶ 63, 97, 107, 207, 209.)  Plaintiffs allege that ADAs would be reprimanded for telling prospective students truthful information about tuition costs and loan repayment obligations.  (Am. Compl. ¶¶ 63, 97, 207.)

ADAs were also trained and instructed to pressure prospective students and exploit their vulnerabilities. (Am. Compl. ¶¶ 63, 97-98, 204-05, 209, 214.)  As CW15, an ADA for most of the Class Period stated, "[w]e were told [by supervisors] to make [prospective students] feel the pain" by using details about the students' personal lives to pressure them into enrolling.  For example, a prospective student with a child and AIDS was told, "now more than ever you need an education, for what time you have left here, get a job where they might have life insurance, get a job where you can get health insurance." (Am. Compl. ¶¶ 63, 97, 204.)

Plaintiffs allege that ADAs were instructed to enroll, and did enroll, students who were unqualified and/or unable to afford tuition. (Am. Compl. ¶¶ 63, 98, 206, 214.)  EDMC preyed upon economically or otherwise disadvantaged individuals by luring them with, among other things, promises about federal student aid and false assurances that such aid need not be repaid. (Am. Compl. ¶¶ 63, 81, 97-98, 193, 207, 214.)  Indeed, EDMC targeted lower-income populations as they were eligible for the most federal aid.  (Am. Compl. ¶¶ 68, 98, 214.) Additionally, financial aid staff directed students to falsify tax returns, including at the direction of their superiors. (Am. Compl. ¶¶ 63, 212-13.)

Plaintiffs allege that the systemic abusive practices also resulted from extreme pressure management placed on staff and the improper compensation system that paid ADAs based solely on the number of students they enrolled, in violation of the HEA.  (Am. Compl. ¶¶ 63, 66, 96-98, 100-02, 112, 193-94, 196-202, 206.)  Led by Defendants Nelson and West, management created an environment that "was very frightening, very intimidating" and encouraged abusive recruitment practices. (Am. Compl. ¶¶ 63, 101, 193.)  Management kept close tabs on each ADA's performance and monitored individual enrollment numbers on a weekly basis.  (Am. Compl. ¶¶ 63, 194.)  At weekly meetings, Admissions VPs throughout EDMC reviewed ADA enrollment numbers and, based solely on the numbers of students each ADA enrolled, made decisions regarding which ADAs would be disciplined or fired.  Id.

As relayed by CW7, a former Director of Staffing for EDMC Online, EDMC aggressively sought to expand the number of ADAs and set weekly recruiting goals for new ADAs to project how many ADAs were needed to keep up the volume of student enrollments so EDMC could meet its earnings targets.  (Am. Compl. ¶¶ 63, 191-92.)  CW7 prepared weekly reports called the "Hire and Fire Report," "Recruitment Matrix" and "Weekly Staffing Report"

that tracked these goals and also tracked how many ADAs were hired, fired or quit each week. Id.  The reports were circulated to management and uploaded to EDMC's system through a "Recruitment Dashboard" to which only EDMC's senior-level managers had access, and management knew "hour by hour" the current enrollment numbers. Id.

The Amended Complaint also details the accounts of numerous former EDMC employees from different geographic regions and business units (including CWs 1, 2, 3, 4, 11, 15 & 16) confirming that ADA compensation was determined solely by the number of students that the ADA enrolled, in violation of the HEA.  (Am. Compl. ¶¶ 63, 100-02, 196-202.)  EDMC used a chart, the "matrix," that set ADA salaries based on the number of students they enrolled. (Am. Compl. ¶¶ 63, 102, 197, 199.)  Although EDMC's compensation matrix purported to account for other factors beyond enrollment numbers, Plaintiffs allege that in truth, other factors were not considered.  (Am. Compl. ¶¶ 63, 198-99.)  As CW4, a former ADA, relayed, when hired, South University's Director of Online Admissions informed CW4 that EDMC used the "matrix" to improperly circumvent the prohibition on paying commissions and, in fact, the "matrix" was based on how many students ADAs enrolled, in violation of the HEA.  Id.  As other ADAs from different EDMC schools described, "[i]t was all about [enrollment] numbers," "[i]t was all about the [compensation] matrix."  (Am. Compl. ¶¶ 63, 194, 210.)  This improper compensation system also encouraged ADAs to use abusive practices to manipulate students into enrolling; increasing the ADAs' enrollment numbers and, directly, their compensation.  (Am. Compl. ¶¶ 63, 100, 197, 203, 210.)

Plaintiffs allege that Defendants Nelson and West reviewed and approved EDMC's compensation system, and all ADA pay raises were approved by EDMC at the corporate level. (Am. Compl. ¶¶ 63, 103, 196.)  CW15 states that Nelson implemented the improper ADA

compensation system. (Am. Compl. ¶¶ 63, 196.)  As CW15 described, Nelson instituted the same improper compensation system he used as CEO of Apollo, the parent of the University of Phoenix ("UOP").  (Am. Compl. ¶ 63.)  In February 2004, the DOE issued a scathing report on UOP's admissions staff compensation system, finding that UOP improperly relied on a compensation "matrix" which listed a number of factors, but, in reality, enrollment numbers superseded all other factors, and admissions staff were compensated solely based on the number of students enrolled and UOP paid DOE $9.8 million in a settlement related to these violations. See DOE Report on UOP, Block Decl. Ex. 4; Settlement Agreement, Block Decl. Ex. 5.  DOE also found that UOP staff were trained to use predatory and abusive sales tactics, and management constantly tracked recruiters' enrollment numbers and created a high-pressure environment to motivate them to increase their enrollment numbers. Id.

Plaintiffs allege that, during the Class Period, EDMC also inflated its reported graduate employment and salary figures by: (1) improperly using average salaries for a given field rather than graduates' actual earnings; (2) manufacturing emails from graduates to "say whatever it needed to say, to justify [inclusion as a] placement;" (3) improperly using waivers; (4) counting as "employed" graduates who worked at a job for one day; and (5) manipulating graduates' job descriptions to incorrectly count them as having "field related employment." (Am. Compl. ¶¶ 71-79, 82, 108, 216, 218-20.)

EDMC career services staff had weekly "brainstorming meetings" where "angles" would be developed to fit graduates who were not adequately employed into the gainfully employed statistics. (Am. Compl. ¶¶ 79, 219.)  Similarly, EDMC counted students as "enrolled" when they were not currently enrolled in classes, thus inflating EDMC's reported enrollment figures. (Am. Compl. ¶¶ 63, 112, 217.)

Plaintiffs allege that EDMC's culture of abusive and predatory practices drove EDMC's ever-increasing enrollment and revenue growth. These practices violated the HEA and threatened EDMC's access to its primary source of revenue, federal student aid. Yet, Defendants misrepresented and concealed this material information from investors throughout the Class Period.

These pending regulations were widely publicized prior to and during the Class Period and their impact on specific publicly traded for-profit schools, including EDMC, was material to investors. (Am. Compl. ¶ 221.) Defendants represented that EDMC would not be harmed by the gainful employment regulations and suggested that EDMC's current and historical metrics would meet the repayment rate thresholds being then considered. (Am. Compl. ¶¶ 244, 259-61, 275-76, 304-05.) In truth, and as revealed at the end of the Class Period, EDMC's repayment rate was well below both the 90% and 45% thresholds.

Allegations Regarding Undisclosed Material Related Party Transaction

Plaintiffs allege that Defendants also failed to disclose that, at the time of the IPO and throughout the Class Period, Goldman Sachs Credit Partners, L.P. ("GS Credit"), an affiliate of EDMC's private equity shareholder GSCP, remained a lender to EDMC in connection with its over $1 billion senior secured debt. They allege that nothing in the Prospectus or elsewhere revealed the existence of this material relationship. (Am. Compl. ¶¶ 85, 94, 118-22, 125-26, 245, 262, 267, 282, 333.)

Defendants respond that Plaintiffs have ignored the public record. The 2006 Transaction was effected pursuant to a March 3, 2006 merger agreement after approval by EDMC's public shareholders. That shareholder vote came after EDMC's distribution of a Proxy Statement that was filed with the SEC (Proxy). The Proxy disclosed that approximately $3.55 billion would be

needed to effect the going-private transaction; that debt financing would fund a substantial part of this amount; and that Goldman, Sachs & Co., other private equity shareholders and their respective affiliates had committed to a senior secured revolving facility of up to $250 million and to other credit facilities aggregating up to $1.945 billion.  (Proxy at 31, under Debt Financing).[13]

Thereafter, an EDMC subsidiary filed with the SEC a Credit and Guaranty Agreement (Credit Agreement) dated as of June 1, 2006 among EDMC and its lenders. The Credit Agreement memorialized the borrowing that supported the 2006 Transaction and identified GS Credit and affiliates of the other private equity shareholders as EDMC lenders.  Defendants note that Goldman Sach's role as a lender in connection with the 2006 Transaction was widely reported.  See Harris Rubinroit, Education Management Proposes Terms on $1.48 billion of Loans, Bloomberg, May 4, 2006 ("Education Management Corp. met with potential lenders today to discuss the proposed terms of $1.48 billion in loans to help fund its buyout … Credit Suisse Group, Goldman Sachs Group Inc., Merrill Lynch & Co. and Bank of America Corp. are arranging the financing, the person involved said."); Education Management Announces Agreement to be Acquired by Providence Equity Partners and Goldman Sachs Capital Partners for $43 per Share in a $3.4 Billion Transaction, PR NEWSWIRE, March 6, 2006 ("The transaction will be financed through a combination of equity contributed by the private equity sponsors and debt financing provided by Credit Suisse, Goldman Sachs, Merrill Lynch and Bank of America."); Joyce Gannon, Art Institute Operator Education Management Corp. to go Private

_____

[13]    The Proxy was filed on April 26, 2006 and is available on the SEC's website at: http://www.sec.gov.Archives/edgar/date/880059/000095015206003532/j1906902defm14a.htm #472.

in $3.4 Billion Acquisition, Pittsburgh Post-Gazette, March 7, 2006 ("Terms of the deal call for

Providence Equity and Goldman Sachs to acquire 100 percent of Education Management's

common shares with equity and debt financing.")[14]

The Credit Agreement specifically disclosed that GSCP had a term loan commitment of

$1.185 billion and a revolving loan commitment of $51,562,500 to finance the 2006 Transaction.

(RJN Ex. 32.)  Defendants argue that the Prospectus revealed that Goldman Sachs, through its

affiliates GSCP and GS Credit, was both an equity investor and a creditor.

Procedural History

This action was filed on August 11, 2010.  Jurisdiction is invoked pursuant to Section 22

of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28

U.S.C. §§ 1331 and 1337.  On November 10, 2010, leave was granted to the Oklahoma Police

Pension and Retirement System to act as lead plaintiff in this case.  On January 11, 2011, lead

plaintiff and newly-added plaintiff SEPTA filed an Amended Complaint (ECF No. 56).  Count I

alleges violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants.

Count II alleges violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2),

against EDMC and the Underwriter Defendants.  Count III alleges violations of Section 15 of the

Securities Act, 15 U.S.C. § 77*o*, against the Individual Defendants.  Count IV alleges violations

of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange

Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5, against EDMC and Individual

Defendants Nelson and West.  Count V alleges violations of Section 20(a) of the Exchange Act,

15 U.S.C. § 78t(a), against Nelson and West.

---

[14]    Stanton Decl. Exs. D-F.

27

On March 28, 2011, the Underwriter Defendants (ECF No. 71) and EDMC & the Individual Defendants (ECF No. 74) filed motions to dismiss the Amended Complaint. Plaintiff filed a response on May 11, 2011 (ECF No. 79) and on June 1, 2011, both sets of defendants filed reply briefs (ECF Nos. 84, 85). On June 2, 2011, Plaintiffs filed a notice of supplemental authority (ECF No. 87). On June 7, 2011, the Underwriter Defendants filed a supplemental brief (ECF No. 88) and on June 14, 2011, Plaintiffs filed a response to the reply brief filed by EDMC and the Individual Defendants (ECF No. 89).

EDMC & the Individual Defendants argue that: 1) the "core theory" of the Amended Complaint is that EDMC engaged in affirmative misconduct and intentional misrepresentation and the allegations fail to meet the heightened standard of Rule 9(b), but even under Rule 8 and the Twombly/Iqbal cases, the allegations fail to show a plausible theory of recovery; 2) DOE regulations permit paying ADAs based on admissions, just not solely based on admissions, and Plaintiffs' evidence does not support their claim that payment was based solely on admissions; 3) anecdotal stories from the CWs about individual recruiting incidents do not support a theory of violating the securities laws; 4) Kathleen Bittel's testimony, which also consists primarily of anecdotal stories, information that was revealed in the Registration Statement and the negotiated rulemaking process which was very public (and EDMC did not have to reveal what was already known), is insufficient; 5) Statements of Financial Accounting Concepts (SFACs) are not part of Generally Accepted Accounting Principles (GAAP), CW8 was not in a position to understand how overall EDMC numbers were compiled, counted or reported and EDMC did not sell or solicit sales of shares so it cannot be held liable under 15 U.S.C. § 77*l*(a)(2); 6) the Exchange Act allegations require scienter and the Private Securities Litigation Reform Act of 1995 (PSLRA) further requires that loss causation be articulated, but Plaintiffs have no specific facts that Nelson

and West intended to defraud anyone; 7) allegations of fraud on the market require that losses be caused by the defendant's conduct, not a market-wide phenomenon, and here the "revelations" that occurred between August 3 and August 13, 2010 concerned the market as a whole, not EDMC, and the later revelations (Bittel's testimony, the filing of the Amended Complaint containing the allegations of the CWs) were followed by an <u>increase</u> in EDMC's stock price; 8) the allegation that West misled investors regarding EDMC's "cohort default rates" in a February 2010 call is completely belied by the record, and Nelson's forward-looking comments about what EDMC might do if DOE adopted certain regulations are insufficient to state a claim; 9) the control person allegations should be dismissed as derivative of the other claims which fail; and 10) the Amended Complaint should be dismissed with prejudice because Plaintiffs have already amended the complaint once and failed to cure the deficiencies therein.

The Underwriter Defendants argue that: 1) the allegation that EDMC did not reveal that affiliates of its private equity shareholders have been substantial creditors in connection with debt that finances 2006 transaction is belied by the Prospectus, Registration Statement and other items of record; 2) Plaintiffs' allegation that the "truth" about EDMC's alleged improprieties was revealed between August 3 and August 13, 2010 has no factual basis and cannot support a misrepresentation claim; 3) since the allegation that the Prospectus failed to disclose that a Goldman Sachs affiliate was a creditor of EDMC is false, it could not have contributed to improper recruiting and enrollment practices; 4) the allegation that the Prospectus failed to disclose the DOE's negotiated rulemaking proceeding fails to support a misrepresentation claim against the Underwriters and the "bespeaks caution" doctrine protects even misleading statements when countered by true statements; and 5) the allegations concerning Kathleen Bittel and the CWs do not support a material misrepresentation claim against the Underwriters.

Plaintiffs respond as follows: 1) Rule 9(b) does not apply to the Securities Act claims, the Amended Complaint alleges that the Prospectus failed to reveal how EDMC recruiting practices did not comply with existing regulations and when the truth emerged between August 3 and August 10, 2010, the share price dropped nearly 40%, which is by definition material, plus the CWs were employed in various positions at EDMC including senior personnel and their statements contain indicia of reliability (and their credibility cannot be impeached on a motion to dismiss in any event), the "matrix" for compensation was just a cover for basing it solely on admissions, and Defendants cite False Claims Act cases which did not involve improper incentive pay schemes; 2) it was not "obvious" that DOE's initiation of negotiated rulemaking threatened EDMC's ability to receive 90% of its revenues, Item 303 triggered EDMC's obligation to disclose trends and since EDMC addressed some risks it had to address others; 3) Defendants did not disclose that GS Credit, an affiliate of private equity shareholder GSCP, was a lender under EDMC's over $1 billion senior-secured debt, which is a per se GAAP violation, and the 2006 Credit Agreement was no longer in effect at the time of the IPO (it had been superseded by the 2007 Credit Agreement, which made no mention of GS Credit, and the same is true of the 2009 Credit Agreement); and 4) whether EDMC's practices violated GAAP is a question of fact not capable of being determined on a motion to dismiss and EDMC's "quantum of correction" argument is unsupported, as the omissions are clearly material.

In their reply briefs, Defendants argue that: 1) Plaintiffs concede that the "critical information" was not Bittel's letter or the tales of the 16 CWs (because the market reacted positively to these developments), so the key must be the "revelations" of August 3-13, 2010, yet these revelations did not focus on EDMC but on the market as a whole, only CW1 alleged that salaries were based <u>solely</u> on enrollments but without explaining how he or she knew what

EDMC was doing across the company or why the matrix (which states that it takes non-enrollment factors into account) should be rejected as a sham; 2) the Amended Complaint contains no "strong inference of fraudulent intent" particularly when it relies on allegations regarding Nelson's former employer and the theory that he "brought" the compensation system to EDMC, even though the Amended Complaint also alleges that the system predated Nelson's arrival; 3) Plaintiffs misrepresent the timeline—the IPO came out in October 2009 and the regulations were issued 18 months later with no way of knowing what they would be, Item 303 only requires disclosure of "known" trends and even if it was technically violated this is not a per se violation, Nelson's comments were forward-looking and West explicitly warned that he was not stating that EDMC would meet the repayment rate; and 4) EDMC made numerous disclosures which Plaintiffs have ignored, nor have they explained why they do not need to allege the size of the GAAP violations and their argument that EDMC was a "seller" because it had a prospectus and issued shares is simply wrong.[15]

Securities Act Claims

The Securities Act "creates federal duties, particularly involving registration and disclosure, in connection with the public offering of securities." In re Adams Golf Inc., Sec. Litig., 381 F.3d 267, 273 (3d Cir. 2004). Section 11 pertains to misrepresentations and omissions in registration statements, and Section 12(a)(2) governs similar conduct in prospectuses and other solicitation materials. Id. To state a claim under Section 11, a plaintiff must plead facts showing that a registration statement: (i) "contained an untrue statement of material fact;" (ii) "omitted to state a material fact required to be stated therein;" or (iii) omitted

---

[15] The Court need not address all of these arguments.

to state a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); see Adams Golf, 381 F.3d at 277; see also In re Merck & Co. Sec. Litig., 432 F.3d 261, 74-75 (3d Cir. 2005). Section 12(a)(2) requires similar allegations with respect to a prospectus or oral communication. 15 U.S.C. § 77*l*(a)(2); Adams Golf, 381 F.3d at 273. Although such claims do not have a scienter element, "[w]e have made it clear that claims under both section 11 and section 10(b) require a showing of a 'material' misrepresentation or omission." Merck, 432 F.3d at 273.

The Third Circuit has adopted the Supreme Court's definition of materiality for both Securities Act and Exchange Act claims: whether the misrepresentation or omission carried a "substantial likelihood of importance to a reasonable shareholder." Id. (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Framed another way, materiality is shown where missing information "significantly altered the total mix of information" available. Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988). Basic reflected a "careful" decision "not to set too low a standard of materiality." Id.; see also Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1318 (2011).

Defendants point out that Sections 11 and 12(a)(2) are not unlimited in their scope. First, there can be no liability for omissions unless there is a duty to speak. 15 U.S.C. §§ 77k(a), 77l(a); Adams Golf, 381 F.3d at 277; cf. Basic, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); Winer Family Trust v. Queen, 503 F.3d 319, 329 (3d Cir. 2007); Oran v. Stafford, 226 F.3d 275, 285 (3d Cir. 2000) ("Even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."). In addition, "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good."

TSC Indus., 426 U.S. at 448.  And, the goal is not to have management "simply . . . bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." Id. at 448-49.  Although questions of materiality may involve factual issues, they can be, and are, resolved on a motion to dismiss. See, e.g., Merck, 423 F.3d at 275.

The specificity with which Securities Act claims must be pleaded rests on the nature of the allegations—claims "sounding in fraud" must meet the heightened pleading requirements of Rule 9(b) whereas those based in negligence must still meet Rule 8.  In re Suprema Specialities, Inc. Sec. Lit., 438 F.3d 256, 270 (3d Cir. 2006). In determining whether a complaint "sounds in fraud," a court must assess each claim to determine whether acts of fraud on the part of the defendants form the basis for the claim against them.  Id.  See also California Public Employees Retirement Sys. v. Chubb, 394 F.3d 126, 160 (3d Cir. 2004) ("CALPERS").

In CALPERS, the Third Circuit held that where the "core theory" which permeates a complaint is one of "intentionally committed accounting violations," "false and misleading statements" regarding the condition of the business and "omi[ssion of] critical information that would tend to negate representations" in a prospectus along with allegations that "brim with references to defendants' intentional and reckless misrepresentation of material facts," the complaint is one that is subject to Rule 9(b).  394 F.3d at 160-61.

EDMC and the Individual Defendants argue that, although the application of Rule 9(b) is not necessary to dismiss the Amended Complaint, the "core theory" of the Securities Act case is not negligent supervision but that a number of improprieties existed in EDMC's operations which, if disclosed, would put the investing world on notice of a company running a high risk of losing its access to Title IV money.  (See Compl. ¶¶ 99-134).  They argue that these are allegations of affirmative misconduct and intentional misrepresentation, and it is therefore

important that the protections of Rule 9(b) be in place.

They further argue that, if the Court determines that the claims do not sound in fraud, Rule 8 still applies and requires dismissal. They argue that the recent Supreme Court decisions in Iqbal and Twombly require the Complaint to articulate facts that sufficiently support a "plausible" road to recovery. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (holding that a complaint must include factual allegations that "state a claim to relief that is plausible on its face.") (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 129 S.Ct. at 1949 (citations omitted). Mere "possibilities" of misconduct are insufficient. Id. at 1949-50. District courts are required to engage in a two part inquiry:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. . . . Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show the plaintiff has a "plausible claim for relief.". . . . In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

The Supreme Court has held that "courts must consider the complaint in its entirety, as well as other sources …, in particular documents incorporated into the complaint by reference and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights,

Ltd., 551 U.S. 308, 322 (2007). This would include the Registration Statement and Prospectus. Litwin v. Blackstone Group, L.P., 634 F.3d 706, 708 (2d Cir. 2011). "Where the Complaint refers to other documents, we draw on information in those documents beyond what is directly quoted in the Complaint." Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 246 n.3 (3d Cir. 2009).

The Court of Appeals for the Third Circuit has held that, when "individual defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims." In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 272 (3d Cir. 2006). As Plaintiffs have expressly pleaded ordinary negligence with respect to the Securities Act claims in Counts I-III and have disavowed any allegation of fraud, Rule 8 applies to these claims.

Nevertheless, Plaintiffs' allegations must still meet the materiality requirement, Merck, 432 F.3d at 273, and they are insufficient. Plaintiffs' allegations can be grouped into the following categories: 1) they allege that Defendants failed to reveal the negotiated rulemaking that was underway and the final rules that were adopted; 2) they allege that Defendants failed to fully reveal Goldman Sachs' role behind the scenes; and 3) they allege that Defendants failed to reveal EDMC's improper conduct, such as recruiting practices, payment schemes that violated the safe harbor and misrepresentations regarding the success of alumni. Having reviewed all of the materials submitted, the case law and the standards, the Court concludes as follows: 1) Defendants did reveal the rulemaking that was contemplated and could not possibly have predicted what the final results would be months later; 2) the Prospectus and Registration Statement did reveal the roles of Goldman Sachs and its affiliates; and 3) as to the allegedly

improper conduct, Plaintiffs rely on the "revelations" of August 3-13, 2010 which did not focus on EDMC but on the market as a whole, only CW1 alleged that salaries were based <u>solely</u> on enrollments but without explaining how he or she knew what EDMC was doing across the company or why the matrix (which states that it takes non-enrollment factors into account) should be rejected as a sham, and they rely on allegations regarding Nelson's former employer and the theory that he "brought" the compensation system to EDMC, even though the Amended Complaint also alleges that the system predated Nelson's arrival.

Was Negotiated Rulemaking Revealed?

Plaintiffs allege that EDMC failed to reveal that negotiated rulemaking was in process or the final rules that were adopted. Specifically, Plaintiffs allege that the Prospectus failed to disclose the fact that, prior to the IPO, the DOE had initiated a negotiated rulemaking process to develop new regulations that would gravely threaten EDMC's ability to participate in Title IV student financial assistance programs (that provided the overwhelming majority of EDMC's revenues) by: (1) repealing the 2002 regulations on incentive compensation safe harbors to the HEA ban on incentive compensation paid to admissions and financial aid personnel; and (2) defining the meaning of gainful employment of graduates in connection with Title IV funding eligibility. (Am. Compl ¶ 93.)

Defendants contend that this claim is belied by the record. First, they note that Plaintiffs concede that the rulemaking proceeding was a matter of public record: (1) on May 26, 2009, the DOE had announced its intention to establish this negotiated rulemaking proceeding in a Federal Register Notice; (2) on May 29, 2009, a DOE Deputy Undersecretary, Robert Shireman, held conference calls regarding the rulemaking process and reported that the DOE was considering changes in its incentive compensation and gainful employment regulations; and (3) on

September 9, 2009, a Federal Register Notice announced the DOE's establishment of two

negotiated rulemaking committees that were to meet in late 2009 to address these topics.  (Am.

Compl. ¶¶ 55-57.)  Because these facts were public knowledge, neither EDMC nor the

Underwriters had any duty to disclose them in the Prospectus.  See Klein v. General Nutrition

Cos., 186 F.3d 338, 343 (3d Cir. 1999).

Second, they contend that Plaintiffs are obliged to concede that (1) the committees whose

input was a required first-step in the development of any revision of DOE regulations under the

HEA did not even meet until November 2009; and (2) they did not conclude their deliberations

until final meetings in January 2010, almost four months after the IPO. (Am. Compl. ¶ 57.)

Thus, as of the date of the Prospectus, no hard information could have been disclosed about the

outcome of the negotiated rulemaking proceeding.  The negotiating committees had not met.

They had not defined the scope of regulations they might propose and  they had not developed

any regulatory proposal.  No legal obligation existed to speculate as to the outcome of that

proceeding.  In re Verifone Sec. Litig., 11 F.3d 865, 869 (9th Cir. 1993) (no duty to disclose

predictions as to future events in a Section 11 case); Chamberlain v. Reddy Ice Holdings, Inc.,

No. 08-cv-13451, 2010 WL 5056184, at *20 (E.D. Mich. Dec. 6, 2010) ("[T]he mere specter of

possible but uncertain regulatory enforcement does not impose a duty to disclose.").  Defendants

cite a case which specifically held there is no duty to disclose risks allegedly associated with

publicly available regulatory information.  See Payne v. DeLuca, 433 F. Supp. 2d 547, 601-03

(W.D. Pa. 2006) (Schwab, J.) ("Securities laws require issuers to disclose firm-specific

information [t]he defendants did not engage in fraud by failing to tell investors about the FDA's

published regulatory guidelines and how they might affect the FDA's view of [defendant's]

application.") (quoting Noble Asset Mgmt. v. Allos Therapeutics, Inc., CA No. 04-1030-RPM,

2005 U.S. Dist. LEXIS 24452, *20-21 (D. Colo. Oct. 20, 2005)); see also Glover v. DeLuca, No. 2:03-cv-0288, 2006 WL 2850448, at *29 (W.D. Pa. Sept. 29, 2006) (Hardiman, J.) (reiterating holding in Payne of no duty to disclose regulations that were not firm specific).

Third, Defendants contend that Plaintiffs ignore the fact that the negotiated rulemaking committees never reached any consensus or proposed any regulations on incentive compensation or gainful employment. Particularly under these circumstances, the Prospectus was not required to speculate as to various avenues the negotiated rulemaking process might have followed. Alleged risks arising out of potential changes to a regulatory framework fall squarely within the category of soft information and need not be disclosed. In re Sofamor Danek Grp., Inc., 123 F.3d 394 (6th Cir. 1997) ("[P]redictions [about future regulatory actions] not substantially certain to hold, like most matters of opinion, simply do not come within the duty of disclosure.") (citing Starman v. Marathon Oil Co., 772 F.2d 231, 241 (6th Cir. 1985)); Kushner v. Beverly Enter., Inc., 317 F.3d 820, 831 (8th Cir. 2003) ("no duty to disclose soft information such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions.").

Fourth, Defendants argue that the fact that the DOE ultimately months after the IPO drafted and published its own proposed regulatory changes does not support Plaintiffs' material omission claim. Again, they note that Plaintiffs concede the critical fact: it was not until June 16 and July 23, 2010, that the DOE published Notices of Proposed Rulemaking with its proposed incentive compensation and gainful employment regulations. (Am. Compl. ¶¶ 60-61.) Moreover, those proposed regulations were then subject to a period of public comment. Thereafter, on October 29, 2010, more than a year after the IPO, DOE published its final incentive compensation and gainful employment regulations. Those regulations would not become effective before July 2011 and would only apply to EDMC prospectively. Subsequently,

final "gainful employment" regulations were not issued until June 2011.

Defendants contend that neither EDMC nor the Underwriters had any obligation: (1) to prophesy that the DOE would propose regulatory changes after the rulemaking committees failed to act; (2) to speculate as to the final shape of any such DOE proposals; or (3) to predict the effect that any such proposals might have upon EDMC at some point in the future.  To be actionable, a statement or omission must be misleading at the time it is made; liability cannot be imposed on the basis of subsequent events.  In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 586 (D.N.J. 2001); see also Zucker v. Quasha, 891 F. Supp. 1010, 1017 (D.N.J. 1995). Neither EDMC nor the Underwriters had any legal obligation to embed speculation in the Prospectus.  See Wieglos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989) ("Issuers need not disclose Murphy's Law or the Peter Principle, even though these have substantial effects on business. So too issuers need not estimate the chance that a federal agency will change its rules or tighten upon enforcement."); see also In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002).

Defendants argue that, given EDMC's abundant risk disclosures, Plaintiffs' alleged omission about the negotiated rulemaking process the DOE initiated in 2009 is plainly immaterial under the "bespeaks caution" doctrine, which holds that true statements in a prospectus may discredit allegedly misleading statements so obviously that the risk of real deception drops to nil.  Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097 (1991). That doctrine is equally applicable to allegations of both affirmative misrepresentations and omissions concerning soft information.  In re Numerex Corp. Sec. Litig., 913 F. Supp. 391, 397 (E.D. Pa. 1996) (citing In re Donald Trump Casinos Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)).

Plaintiffs contend that the "bespeaks caution" doctrine does not apply, citing Dolphin and

39

Bradbury, Inc. v. S.E.C., 512 F.3d 634, 640 (D.C. Cir. 2008). In that case, the Court of Appeals for the District of Columbia Circuit held that cautionary words about future risk cannot insulate from liability the failure to disclose that the risk had already transpired. In that case, Bradbury knew that an anchor tenant would vacate premises at the end of its lease term, but the prospectus described this only as a possibility. However, that precept has no application in this case, as the risk to which Plaintiffs refer (possible future regulations) had not already transpired when Defendants offered cautionary words.

The Court concludes that the documents of record demonstrate that EDMC did warn investors about the potential impact that rulemaking might have, that EDMC discussed the possible effect of changing regulations in the Prospectus and that it was not obligated to predict months in advance about the final regulations that eventually issued. Plaintiffs have compressed the timeline: the IPO was issued on October 1, 2009 (and the Prospectus contained seven pages of information about EDMC's highly regulated industry), the breakdown in negotiated rulemaking occurred in January 2010, the DOE proposed new regulations in June and July 2010, the Class Period ended on August 13, 2010 but final regulations were not issued until October 2010 (to apply prospectively) and final "gainful employment" regulations did not issue until June 2, 2011.

Item 303

SEC Regulation S-K, Item 303 requires an issuer to:

> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).  Plaintiffs allege that failure to disclose information required by Item 303 can form the basis of a Securities Act claim.  <u>Litwin v. Blackstone Group, L.P.</u>, 634 F.3d 706, 716 (2d Cir. 2011).

Defendants respond that, in <u>Litwin</u>, the court held that the plaintiffs alleged that the IPO failed to disclose a known downward trend in the real estate market, but here, the Registration Statement revealed the existence of the beginning of the regulatory process, but could not possibly have revealed the ultimate outcome that would not occur until eighteen months later. <u>See also</u> <u>J&R Marketing v. GMC</u>, 549 F.3d 384, 390-92 (6th Cir. 2008) (rejecting an attempt to base a Section 11 claim on an Item 303 non-disclosure).

In addition, the Court of Appeals for the Third Circuit has held that "a violation of [Item 303's] reporting requirements does not automatically give rise to a material omission under Rule 10b-5." <u>Oran v. Stafford</u>, 226 F.3d 275, 288 (3d Cir. 2000).  Moreover, "[i]f a company's stock trades on an efficient market, we measure materiality under the <u>Burlington</u> (as ratified by <u>Oran</u>) standard" and "[t]his standard is applicable to section 11 as well as section 10(b)." <u>In re Merck</u>, 432 F.3d at 274, 275.  Defendants argue that Plaintiffs have pled an efficient market, and therefore the materiality standards are the same for section 11 and section 10(b).  The Amended Complaint states that "the market for EDMC s common stock promptly digested current information regarding EDMC from all publicly-available sources and reflected such information in the price of EDMC s common stock."  (Am. Compl. ¶¶ 21, 372.)  Thus, under the standards in the Third Circuit, even if Defendants' failure to reveal a matter required to be disclosed by Item 303 (and Plaintiffs have not demonstrated that this is so), such a failure would not give rise to a material omission because they have pleaded an efficient market.

The Court concludes that Defendants are correct.  Plaintiffs have not demonstrated that

Item 303 required EDMC to reveal hypothetical results of a negotiated rulemaking process that had barely begun when the IPO issued. Moreover, Plaintiffs have pleaded an efficient market and thus even if Defendants' actions constituted a failure to make such a revelation, it would not constitute a material omission in any event.

Was Goldman Sachs' Role Revealed?

Plaintiffs allege that Defendants failed to reveal the role of Goldman Sachs and its affiliates. Defendants respond that the record belies this allegation.

The Prospectus revealed that three individuals associated with Goldman Sachs sit on the Board. (RJN Ex. 1 at 105-06.) Goldman Sachs has the right to appoint two board members. (Id. at 107.) Goldman Sachs was an underwriter in the public offering. (Id. at 160.) Goldman Sachs or its affiliates owned more than 45% of EDMC's shares prior to the IPO. (Id. at 139.) A Goldman Sachs affiliate entered into an interest rate swap with EDMC and served as its investment banker. (Id. at 144.) And Goldman Sachs and its affiliates serve as lenders to EDMC. (Id. at 164.)

In addition, as explained above, the 2006 Transaction was effected pursuant to a March 3, 2006 merger agreement after approval by EDMC's public shareholders. That shareholder vote came after EDMC's distribution of a Proxy Statement that was filed with the SEC. The Proxy disclosed that approximately $3.55 billion would be needed to effect the going-private transaction; that debt financing would fund a substantial part of this amount; and that Goldman, Sachs & Co., other private equity shareholders and their respective affiliates had committed to a senior secured revolving facility of up to $250 million and to other credit facilities aggregating up to $1.945 billion. (Proxy at 31, under Debt Financing).

Thereafter, an EDMC subsidiary filed with the SEC a Credit and Guaranty Agreement

(Credit Agreement) dated as of June 1, 2006 among EDMC and its lenders. The Credit Agreement memorialized the borrowing that supported the 2006 Transaction and identified GS Credit and affiliates of the other private equity shareholders as EDMC lenders. Goldman Sach's role as a lender in connection with the 2006 Transaction was widely reported. See Harris Rubinroit, Education Management Proposes Terms on $1.48 billion of Loans, Bloomberg, May 4, 2006 ("Education Management Corp. met with potential lenders today to discuss the proposed terms of $1.48 billion in loans to help fund its buyout … Credit Suisse Group, Goldman Sachs Group Inc., Merrill Lynch & Co. and Bank of America Corp. are arranging the financing, the person involved said."); Education Management Announces Agreement to be Acquired by Providence Equity Partners and Goldman Sachs Capital Partners for $43 per Share in a $3.4 Billion Transaction, PR NEWSWIRE, March 6, 2006 ("The transaction will be financed through a combination of equity contributed by the private equity sponsors and debt financing provided by Credit Suisse, Goldman Sachs, Merrill Lynch and Bank of America."); Joyce Gannon, Art Institute Operator Education Management Corp. to go Private in $3.4 Billion Acquisition, Pittsburgh Post-Gazette, March 7, 2006 ("Terms of the deal call for Providence Equity and Goldman Sachs to acquire 100 percent of Education Management's common shares with equity and debt financing.")

The Credit Agreement specifically disclosed that GS Credit had a term loan commitment of $1.185 billion and a revolving loan commitment of $51,562,500 to finance the 2006 Transaction. (RJN Ex. 32.) Thus, the Prospectus revealed that Goldman Sachs, through its affiliates GSCP and GS Credit, was both an equity investor and a creditor.

Plaintiffs argue that the disclosures made in 2006 are irrelevant because the 2006 Credit Agreement was amended thereafter. However, as Defendants observe, this argument is

nonsensical—Plaintiffs cannot complain that Defendants failed to reveal certain information and then, when presented with evidence that the information was in fact revealed, contend that the documents were superseded and thus irrelevant.  Moreover, Plaintiffs contend that the BusinessWeek article revealed that EDMC still owed substantial debt  to affiliates of its private equity shareholders, yet the article referred only to the 2006 loans, not the lenders in October 2009 or August 2010.

<u>Were EDMC "Improprieties" Revealed?</u>

Finally, Plaintiffs allege that EDMC failed to reveal its improper practices, such as paying ADAs "solely" based on recruiting numbers, and that if EDMC had revealed these improprieties, the market price of EDMC stock would have dropped.  Defendants argue that only CW1 actually makes the claim that ADAs were paid based "solely" on recruiting numbers but without revealing how he or she would know all ADAs were compensated, that Plaintiffs disparage the "matrix" and claim it was a sham but have no basis for doing so and that many of the allegedly "improper" activities (aggressively seeking students, monitoring financial performance, computing enrollment numbers or various alleged acts regarding recruiting, financial reporting and placement practices) are not in fact fraudulent or misleading.

As Defendants note, despite the many allegations of the Amended Complaint, only CW1 alleges that compensation was based "solely" on recruiting success.  CW1 acknowledged that EDMC utilized a compensation "matrix" which took into account "qualitative factors other than the number of enrollments" (Am. Compl. ¶ 63), but alleges that "in reality … enrollment volume (measured by a 'new student point range') was the sole consideration used to determine compensation levels" for ADAs.  The Court of Appeals requires confidential witnesses to provide some indicia of their reliability.  <u>CALPERS</u>, 394 F.3d at 146-47.  CW1 was a "Senior

Admissions Representative" at South University's Online Division for less than two years and does not allege how he or she knew how all of EDMC's ADAs were compensated. In addition, Plaintiffs have not cited a "corrective disclosure" regarding the compensation plans that was met with a stock price decrease which would indicate a sign of materiality. In addition, CW1's allegations are insufficient to support a claim that the "matrix" was a sham for an improper payment scheme.

Finally, as Defendants note, aggressively seeking students, monitoring financial performance, computing enrollment numbers or various alleged acts regarding recruiting, financial reporting and placement practices are not in fact fraudulent or misleading. In the Registration Statement, EDMC revealed that it expended great efforts in recruiting students and utilized traditional marketing and recruiting techniques. (RJN Ex. 1 at 2, 3, 24, 48, 78.) Plaintiffs do not explain why it was fraudulent or misleading for EDMC to prepare internal reports related to performance, to maintain a "dashboard" of performance figures, to update performance measures daily, or to try to motivate ADAs with positive reinforcement and criticism. See In re Mirant Corp. Sec. Litig., 2009 WL 48188, at *3, 18-19 (N.D. Ga. Jan. 7, 2009) (dismissing Securities Act and Exchange Act claims based on anecdotal reports from various anonymous former employees about "improper" trading practices because, inter alia, the "blanket characterization of business transactions as illegal does not make them so, nor does alleging their non-disclosure necessarily state a valid Securities Act or Exchange Act violation"). Similarly, despite Plaintiffs' repeated references to these practices, they have not explained how these activities support a claim for violations of the securities laws.

Defendants have cited a case that involves a scenario similar to this one, In re Career Education Corporation Securities Litigation, 2006 WL 999988 (N.D. Ill. Mar. 28, 2006). In that

case, investors brought suit against Career Education Corporation ("CEC") and two individuals, alleging that they made false and misleading statements on CEC's website and in its press releases that artificially inflated the market price of its common stock. As in this case, the complaint relied upon confidential witnesses, who reported that they were told to "do whatever it takes" to meet start goals and bad debt goals set by corporate, provided inflated placement rates, extended a start date, noticed that students were missing proof of high school graduation or GED and were told that "nobody should be a drop" until the president approved so as not to result in reduction in expense amounts. The court held that:

> Although these allegations provide some quantification of problems at various CEC schools with their starts, student population, and job placements, they only involve six schools, while CEC has seventy-eight campuses world-wide. SAC ¶ 2. Plaintiff's burden, however, was to raise an inference of fraud on a nation-wide level such that CEC's statements and omissions regarding its starts, student population, and job placement numbers nationally were false or misleading. Additionally, these allegations do not raise the inference that "do whatever it takes" meant engaging in improper accounting of its student starts or other student population statistics and graduation rates. Further, none of these witnesses purports to know what occurred at CEC with regard to these statistics; thus, none of these witnesses knows how the student population statistics at these six schools were incorporated into the statements concerning the student statistical data at issue in this case. As a result, plaintiff cannot establish that the starts, student population, and job placement problems at these … six schools were material to his injuries.

Id. at *8.

Similarly, the CWs come from only a few schools out of EDMC's total of 101, the ADAs (entry-level admissions personnel) profess to have the greatest knowledge of company-wide practices and the Amended Complaint bases an allegation that "EDMC overstated its enrollments by counting students as being 'enrolled' when, in fact, they were not presently enrolled in EDMC's courses" (Am. Compl. ¶ 112) upon CW8's "belief" that EDMC should not have counted some students as enrolled merely because they indicated a probability of enrolling for

the next term and without alleging what the "true" enrollment was or whether the number of

students who were "technically" enrolled but should not have been was material to the overall

number of enrollments.  These allegations are insufficient in the same way that the allegations

were insufficient in the <u>CEC</u> case.

Exchange Act Claims

The Supreme Court recently stated that:

> Section 10(b) of the Securities Exchange Act makes it unlawful for any
> person to "use or employ, in connection with the purchase or sale of any security
> ... any manipulative or deceptive device or contrivance in contravention of such
> rules and regulations as the Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of investors." 15 U.S.C.
> § 78j(b). SEC Rule 10b–5 implements this provision by making it unlawful to,
> among other things, "make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements made, in the light
> of the circumstances under which they were made, not misleading." 17 CFR
> § 240.10b–5(b). We have implied a private cause of action from the text and
> purpose of § 10(b). <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S.
> 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

> To prevail on their claim that Matrixx made material misrepresentations or
> omissions in violation of § 10(b) and Rule 10b–5, respondents must prove "(1) a
> material misrepresentation or omission by the defendant; (2) scienter; (3) a
> connection between the misrepresentation or omission and the purchase or sale of
> a security; (4) reliance upon the misrepresentation or omission; (5) economic loss;
> and (6) loss causation." <u>Stoneridge Investment Partners, LLC v. Scientific–</u>
> <u>Atlanta, Inc.</u>, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

<u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S.Ct. 1309, 1317-18 (2011).  In that case, the Court

held that: 1) the fact that adverse report events linking Zicam with incidents of anosmia (loss of

sense of smell) were not statistically significant did not preclude them from being material to

reasonable investors; 2) the investors sufficiently alleged the materiality of these reports to a

reasonable investor; and 3) the investors sufficiently alleged scienter.

The Court of Appeals has held that claims of securities fraud must satisfy the heightened

pleading standards of the PSLRA, specifically, they must specify each misleading statement,

why the statement was misleading and if an allegation is made on information and belief, all facts supporting that belief with particularity. Second, they must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. Avaya, 564 F.3d at 252-53 (citing 15 U.S.C. § 78u-4(b)(1, 2)). In addition, there is a safe harbor for forward-looking statements, namely they are immunized from liability provided that the statement is identified as such and accompanied by meaningful cautionary language, or is immaterial, or the plaintiff fails to show that the statement was made with actual knowledge of its falsehood. Id. at 254 (citing 15 U.S.C. § 78u-5(c)(1)).

Plaintiffs cite Frank v. Dana Corp., 2011 WL 2020717 (6th Cir. May 25, 2011), which applied the Matrixx case and concluded that it had to examine the plaintiffs' claims holistically. In that case, Burns and Richter (the CEO and CFO of Dana Corp., respectively), reported rosy predictions for the company despite knowledge that some divisions of Dana were faring poorly. They attempted to argue that faulty accounting systems were responsible, but the court observed that plaintiff's inference that they recklessly ignored the falsity of their external statements was at least as plausible as the faulty accounting inference. Id. at *5-6.

However, the Frank case is distinguishable. In that case, there was no question that Burns and Richter reported positive information despite being aware of a different true set of facts. Here, by contrast, Plaintiffs have not pointed to any statements that Nelson and West reported that were false or misleading. Rather, their allegation is that Nelson and West participated in the "fraud." Yet, as explained above, they have failed to point to specific facts that fraud actually occurred.

Moreover, EDMC & the Individual Defendants have correctly noted that Plaintiffs have not pointed to specific facts that giving rise to a "strong inference" that Nelson and West

intended to defraud anyone and thus the elements of scienter and loss causation are lacking. They also correctly observe that Plaintiffs have not indicated that any losses were caused by EDMC's conduct as opposed to market-wide phenomena and that Nelson and West's forward-looking statements they cite are not actionable. As noted above, the allegation that Nelson "brought" the compensation system from UOP when he joined EDMC in 2007 is contradicted by the allegation of the complaint that the allegedly improper practices existed at EDMC prior to Nelson's arrival.

Finally, Plaintiffs cite statements made by Nelson and West in February, May and August 2010, but these statements are not actionable. Nelson commented upon possible future developments in the regulatory area and stated that "we can comply with whatever language that is finally included in the [incentive compensation] regulation." (RJN Ex. 11 at 2-3.) He also indicated that his "feeling" was that EDMC could comply, with some "minor modifications." (RJN Ex. 12 at 13.) In both calls and again in August, Nelson and West specifically declined to comment on pending gainful employment metrics because EDMC did not have the proper data to analyze the potential effect. (RJN Ex. 11 at 12-13, 15-16; Ex.12 at 15; Ex. 49 at 4, 12). When asked in February 2010 to predict whether EDMC could meet future gainful employment tests, Nelson stated: "I think, Kelly, it would be inappropriate for us to go into and speculate on it based on the data that's out there relative to what the Department has proposed." (RJN Ex. 11 at 16.) In May, West reported a series of metrics but did not make a representation, as Plaintiffs assert, "as to the 'gainful employment' regulations," (Compl. ¶ 276). (RJN Ex. 12 at 4.) In August, West explicitly warned that EDMC was not making the statement that EDMC could meet new repayment rate requirements: "We caution using this information to assess any potential impact, as it is not the repayment rate." (RJN Ex. 49 at 4); see also id. at 12 ("Let me

state as I said, restate what said in my comments – this does not correlate to or approximate repayment rate…").

Defendants correctly note that personal predictions about future events based upon speculative outcomes constitute "forward-looking" statements that do not give rise to liability under Section 10(b). 15 U.S.C. § 78u-5(c)(1)(B); In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 278-79 (3d Cir. 2010); Avaya, 564 F.3d at 254-55. Therefore, the Exchange Act claims should also be dismissed.

Controlling Person Liability

Section 20(a) of the Exchange Act provides for liability for "controlling persons." 15 U.S.C. § 78t. However, "controlling person liability is premised on an independent violation of the federal securities laws." Merck, 432 F.3d at 275 (citation omitted). Because Plaintiffs have failed to allege an independent violation of the federal securities laws, they cannot maintain a claim for controlling person liability either.

Finally, Plaintiffs request that they be granted leave to amend the Amended Complaint. Defendants argue that Plaintiffs have had time to develop their case have already amended the complaint once and thus no further leave should be granted.

The Court of Appeals has held that, when there is a "stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA," GSC Partners CDO Fund v. Washington, 368 F.3d 228, 246 (3d Cir. 2004), a complaint should be dismissed with prejudice. In this case, since the filing of the Amended Complaint, Plaintiffs have made several submissions, but all of them relate to the qui tam action and do not develop the facts of this case. Therefore, the Amended Complaint should be dismissed without leave to

amend.

EDMC & the Individual Defendants filed a motion for oral argument (ECF No. 77) on their motion to dismiss. Oral argument was not necessary to resolve the questions presented and this motion should be denied.

For these reasons, it is recommended that the motion to dismiss the Amended Complaint filed by Defendants Barclays Capital, Inc., Barrington Research Associates, BMO Capital Markets Corp., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., J.P. Morgan Securities, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co., Piper Jaffray & Co., Robert W. Baird & Co., Signal Hill Capital Group, LLC, Stifel, Nicolaus & Co., Inc., and William Blair & Co., LLC (Docket No. 71) be granted. It is further recommended that the motion to dismiss the Amended Complaint filed by Defendants Education Management Corp., Adrian M. Jones, Randall J. Killeen, Jeffrey T. Leeds, John R. McKernan, Jr., Leo F. Mullin, Todd S. Nelson, Paul J. Salem, Edward H. West, and Peter O. Wilde (Docket No. 74) be granted.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within the time specified in the Notice of Electronic Filing. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated:  August 30, 2011